COOLEY LLP
MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
BETHANY C. LOBO (248109) (blobo@cooley.com)
101 California Street, 5th Floor
San Francisco, CA  94111-5800
Telephone:     (415) 693-2000
Facsimile:     (415) 693-2222

COOLEY LLP
MARK F. LAMBERT (197410) (mlambert@cooley.com)
ANGELA L. DUNNING (212047) (adunning@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:     (650) 843-5000
Facsimile:     (650) 849-7400

Attorneys for Defendants
PALMER LUCKEY and OCULUS VR, LLC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TOTAL RECALL TECHNOLOGIES, | Case No.  3:15-cv-02281 (WHA) |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** |
| v. | |
| PALMER LUCKEY and OCULUS VR, LLC as successor-in-interest to OCULUS VR, INC., | Date:         January 7, 2016<br>Time:         8:00 a.m.<br>Place:        Courtroom 8, 19th Floor<br>Judge:       Honorable William Alsup<br>Trial Date:  September 12, 2016 |
| Defendants. | |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...........................................................................................1

II.   PROCEDURAL HISTORY............................................................................1

III.  STATEMENT OF RELEVANT FACTS AND ALLEGATIONS.....................2
      A.    The Parties ..........................................................................................2
      B.    The Seidl/Luckey Contract .................................................................3
      C.    Seidl's and Luckey's Performance Under the Contract.......................5
      D.    Summary of TRT's Prior Claims and Proposed New Claim for "Actual Fraud"....8

IV.   LEGAL STANDARDS ...................................................................................9

V.    TRT'S MOTION FOR LEAVE TO AMEND SHOULD BE DENIED ...........10
      A.    TRT's Proposed Amendment Does Not Cure the Fatal Standing Defect.............10
      B.    TRT's Proposed Amendment Does Not Cure the Fatal Pleading Defects
            Necessitating Dismissal of Each of TRT's Claims Under Rule 12(b)(6).............12
            1.    TRT's Contract Claims (Counts I and II) Cannot Survive Dismissal .......13
            2.    TRT's Conversion Claim (Count III) Cannot Survive Dismissal.............16
            3.    TRT's Constructive Fraud Claim (Count IV) Cannot Survive
                  Dismissal.................................................................................................17
            4.    TRT's New Actual Fraud Claim (Count V) Cannot Survive Dismissal....19
                  a.    TRT fails to plead a claim for fraudulent concealment ................20
                  b.    TRT fails to plead a claim for intentional misrepresentation ........21
            5.    TRT's UCL and Common Law Unfair Competition Claims (Counts VI
                  and VII Cannot Survive Dismissal ..........................................................22
      C.    TRT's Motion Constitutes a Bad Faith Effort To Put Off Dismissal of Its Case
            and Thereby Prejudice Defendants ........................................................24

VI.   CONCLUSION................................................................................................24

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

i.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. City of Beverly Hills*,
    911 F.2d 367 (9th Cir. 1990)................................................................................9, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................9, 10, 21

*Bank of the W. v. Sup. Ct.*,
    2 Cal. 4th 1254 (1992) ................................................................................23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................9

*Bennett v. Hibernia Bank*,
    47 Cal. 2d 540 (1956) ................................................................................17

*Berryman v. Merit Prop. Mgmt. Inc.*,
    152 Cal. App. 4th 1544 (2007)................................................................................23

*Branch v. Tunnell*,
    14 F.3d 449 (9th Cir. 1994)................................................................................10

*Buchanan v. United States*,
    No. C 10-00092 WHA, 2010 U.S. Dist. LEXIS 15601 (N.D. Cal. Feb. 23,
    2010) (Alsup, J.)................................................................................9

*Cel-Tech Commc'ns, Inc. v. L.A. Cell. Tel. Co.*,
    20 Cal. 4th 163 (1999) ................................................................................23

*Cty. of Santa Clara v. Astra U.S., Inc.*,
    428 F. Supp. 2d 1029 (N.D. Cal. 2006) ................................................................................10

*Dowell v. Biosense Webster, Inc.*,
    179 Cal. App. 4th 564 (2009)................................................................................15

*Forgeron Inc. v. Hansen*,
    149 Cal. App. 2d 352 (1957)................................................................................15

*G.S. Rasmussen & Assoc. v. Kalitta Flying Serv., Inc.*,
    958 F.2d 896 (9th Cir. 1992)................................................................................17

*Gardner v. Martino*,
    563 F.3d 981 (9th Cir. 2009)................................................................................9

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

ii

*In re Glenfed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994)........................................................................................19

*Hatchwell v. Blue Shield of Cal.*,
   198 Cal. App. 3d 1027 (1988)....................................................................................11

*Jackson v. Fischer*,
   931 F. Supp. 2d 1049 (N.D. Cal. 2013) ...................................................................21

*Jobscience, Inc. v. CVPartners, Inc.*,
   No. C 13-04519 WHA, 2014 U.S. Dist. LEXIS 26371 (N.D. Cal. Feb. 28,
   2014) (Alsup, J)........................................................................................................18

*Karo v. San Diego Symphony Orchestra Ass'n.*,
   762 F.2d 819 (9th Cir. 1985) (collecting California cases)......................................11

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009)..................................................................................10

*Klamath-Lake Pharm. Ass'n v. Klamath Medical Serv. Bureau*,
   701 F.2d 1276 (9th Cir. 1983)....................................................................................9

*Kolani v. Gluska*,
   64 Cal. App. 4th 402 (1998)....................................................................................16

*Meyer v. Wells Fargo Bank,* N.A.,
   No. C 13-03727, 2014 U.S. Dist. LEXIS 21368 (N.D. Cal. Feb. 19, 2014)......10, 18

*Mktg. West Inc. v. Sanyo Fisher (USA)*,
   7 Cal. App. 4th 603 (1992)......................................................................................20

*Monreal v. GMAC Mortgage, LLC*,
   948 F. Supp. 2d 1069 (S.D. Cal. 2013)...................................................................20

*Novelposter v. Javitch Canfield Grp.*,
   No. 13-cv-05186-WHO, 2014 U.S. Dist. LEXIS 156268 (N.D. Cal. Nov. 4,
   2014) ........................................................................................................................11

*Nunes v. Ashcroft*,
   375 F.3d 805 (9th Cir. 2003)......................................................................................9

*Puricle, Inc. v. Church & Dwight Co.*,
   568 F. Supp. 2d 1144 (C.D. Cal. 2008)...................................................................15

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012)......................................................................................9

*Robert Half Int'l, Inc. v. Ainsworth*,
   68 F. Supp. 3d 1178, 1184–86 (S.D. Cal. 2014) .....................................................16

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007)..................................................................10, 13

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008)............................................................23

*Thompson v. Impaxx, Inc.*,
    113 Cal. App. 4th 1425 (2003).............................................................15

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) .......................................................................23

*Trew v. Int'l Game Fish Ass'n, Inc.*,
    404 F. Supp. 2d 1173 (N.D. Cal. 2005) ............................................10, 13

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 ...................................................................................9

*Walton v. Davis*,
    22 Cal. App. 456 (1913)....................................................................12

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003).............................................................11

**Statutes**

Fed. R. Civ. P. 9(b) .......................................................................10, 18, 19

Fed. R. Civ. P. 12(b)(1)........................................................................11

Fed. R. Civ. P. 12(b)(6)...........................................................1, 9, 10, 12

Fed. R. Civ. P. 15(a)..............................................................................9

Cal. Civ. Code § 1559.........................................................................11

Cal. Civ. Code § 3426.1......................................................................16

Cal. Civ. Proc. Code § 338(c) ............................................................17

Cal. Bus. & Prof. Code §16600 ...............................................14, 15, 16

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ...............................................8, 23

**Other Authorities**

130 A.L.R. 664 (2015)........................................................................12

1 Witkin, Summary 10th (2005) Contracts, § 202 ................................15

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

1    **I.      INTRODUCTION**

2          Plaintiff Total Recall Technologies' ("TRT") motion for leave to file its proposed Second

3    Amended Complaint ("SAC") is an obvious ploy to avoid a hearing on Defendants' fully briefed

4    motion to dismiss the First Amended Complaint ("FAC") and thereby delay judicial scrutiny of

5    TRT's deficient claims.   The SAC contains few allegations that are, in fact, new, and none

6    remedy the fundamental defects warranting dismissal of TRT's claims.   Even more problematic

7    for TRT, the proposed SAC selectively quotes from a previously uncited document that,

8    considered in its entirety under the incorporation by reference doctrine, reveal devastating facts

9    TRT has intentionally omitted from its pleading and concealed from the Court.   These facts,

10   which the Court may now consider in ruling both on TRT's motion for leave to amend and on any

11   motion to dismiss the SAC, put the lie to TRT's entire case and show each of its claims to be

12   baseless and incapable of surviving scrutiny under Rule 12(b)(6).   TRT's motion for leave to file

13   a further amended complaint is brought in bad faith and should be denied as futile.

14   **II.    PROCEDURAL HISTORY**

15         TRT filed its original complaint on May 20, 2015.   Rather than opposing Defendants'

16   motion to dismiss, TRT filed its FAC on August 31.  (Dkt. 40.)  Defendants moved to dismiss the

17   FAC on September 21, and briefing on that motion has been complete since October 19, 2015.

18         On October 13, 2015, the Court ordered that: (i) defendants "assert any objections to

19   plaintiff's outstanding discovery requests within one week"; (ii) "all objections shall be resolved

20   and production completed within four weeks"; and (iii) Defendants' pending motion to dismiss

21   the FAC "be held in abeyance until all objections are fully resolved and production is complete."

22   (Dkt. 59.)  In compliance with the order, Defendants served timely responses and objections to

23   TRT's written discovery on October 20.  (Lambert Decl. ¶ 2.)  While nearly two months have

24   passed, TRT has not challenged Defendants' written responses, despite the requirement in the

25   order that all objections be resolved by November 10.   (*Id.* ¶ 3.)   Defendants substantially

26   completed their production of more than 280,000 pages of documents on November 10.  (*Id.* ¶ 4;

27   *see also* Mot. (Dkt. 69) at 4.)  They have since produced a small handful of additional documents

28   obtained after that date.  (Lambert Decl. ¶ 4.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

On November 18, 2015, defense counsel requested that TRT agree to a December hearing date on Defendants' pending motion to dismiss.  (*Id.* ¶ 5.)  TRT's counsel refused on the grounds that they had not yet completed their review of Defendants' document production and that both sides were still re-reviewing documents withheld as privileged.  (*Id.*)

Late in the afternoon on November 27, 2015, the Friday after Thanksgiving, counsel for TRT informed defense counsel that TRT "intends to further amend" and requested that Defendants stipulate to TRT filing its SAC on December 14.  (Dkt. 69-3; Lambert Decl. ¶ 6.) The letter requested a teleconference among counsel on Monday, November 30 (*id.*), the deadline to seek leave to amend under the Court's Case Management Order.  (Dkt. 35 ¶ 3.)

Defense counsel responded with a proposed time for a teleconference and requested that TRT's counsel immediately send a draft of the SAC TRT was proposing to file so that the parties could have a meaningful discussion.  (Lambert Decl. ¶ 7.)  TRT's counsel rejected this request as "premature" and refused to send a draft or even discuss what would be contained in the amended pleading.  (*Id.* ¶ 8 & Ex. A.)  Thus, defense counsel informed counsel for TRT during the teleconference that Defendants could not stipulate to the late filing of an amended pleading that TRT was refusing to share with them.  (*Id.* ¶ 9.)  Within hours, TRT filed the instant motion, attaching a copy of the proposed SAC it had withheld from Defendants as "premature."

Defendants now respectfully oppose TRT's motion.  Allowing TRT to further amend would be futile, as the new allegations contradict, rather than bolster, TRT's claims.

## III.   STATEMENT OF RELEVANT FACTS AND ALLEGATIONS[1]

### A.   The Parties

TRT alleges that it is a Hawaiian partnership formed in December 2010 between two individuals, Ron Igra and Thomas Seidl, to develop "immersive 3D technology."  (SAC ¶¶ 1–3, 9.)  Defendant Palmer Luckey is a California resident and co-founder of Oculus LLC, which later incorporated as Oculus VR, Inc. and then reregistered as defendant Oculus VR, LLC, a Delaware limited liability company headquartered in Menlo Park, California.  (*Id.* ¶ 4–5.)  OculusVR makes

---

[1] Unless otherwise noted, these allegations appear in both the FAC and proposed SAC (Dkt. 69-5).  For convenience, Defendants cite only to the SAC and documents incorporated by reference.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

2.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

the Rift, a next-generation virtual reality headset that uses state-of-the-art displays, optics and tracking systems to provide incredible visual fidelity and an immersive, wide field-of-view. Together, these advanced technologies enable the sensation of "presence"—the feeling as though the person wearing the Rift is actually present in the scene being rendered, whether that is an action video game setting, a 3D movie, or a room with friends.  (*Id.* ¶¶ 25–26, 28–29.)

### B.      The Seidl/Luckey Contract

In December 2010, Seidl contacted Luckey to solicit his assistance in developing a head mounted virtual reality display (or "HMD") that could be used to view video content captured by a 3D camera Seidl was developing.  (*Id.* ¶¶ 9–12.)  In April 2011, Seidl asked Luckey to build a prototype HMD with four attributes: (1) immersive stereoscopic 3D rendering; (2) an ultra-wide field of view such that the user could not see the screen's edges; (3) head tracking with low latency; and (4) a price point attractive to the consumer mass market.  (*Id.* ¶¶ 10, 12, 14.)  TRT does not allege that Luckey was asked to or agreed to keep these communications confidential.

On April 8, 2011, Seidl emailed Luckey that he expected exclusive rights to the prototype since he would be paying for the parts to build it: "Just so we are on the same page. With the initial payment to you I would like exclusive rights to your design unless we decide not to use it." (*Id.* ¶ 14.)  Luckey responded, "Yes, we are on the same page here. . . . I am sure we can put together a contract of some sort to finalize it all." (*Id.* ¶ 15.)  On April 11, 2011, Luckey received a PayPal payment of $798 to buy parts. (*Id.* ¶ 16.)

Not until four months later did Seidl and Luckey enter into an integrated confidentiality agreement, entitled "Nondisclosure, exclusivity and payments agreement," dated August 1, 2011 (the "Seidl/Luckey Contract" or "Contract").  (*Id.* ¶ 18 & Ex. A.)  TRT is not a party or signatory to the Contract, and neither TRT nor Ron Igra is mentioned anywhere in it.  Nevertheless, TRT's allegations implicate the following provisions.

First, an "Integration" clause provides that the Contract "expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations, and understandings."  (*Id.*, Ex. A ¶ 7.)  This clause further states that the Contract "may not be amended except in a writing signed by both parties."  (*Id.*)

Cooley LLP
Attorneys At Law
Palo Alto

3.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

Second, the Contract imposes limited confidentiality requirements.  Paragraph 1 defines "Confidential Information" and provides that Seidl (the "Disclosing Party") must label any such information as "Confidential" if transmitted in writing, or promptly designate it in writing as such if transmitted orally.  (*Id.* ¶ 1.)   Paragraph 2 of the Contract sets forth "Exclusions from Confidential Information" and exempts Luckey (the "Receiving Party") from any "obligations under this Agreement" as to "information that is (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of [Luckey]; (b) discovered or created by [Luckey] before disclosure by [Seidl]; (c) learned by [Luckey] through legitimate means other than from [Seidl] or [Seidl's] representatives; or (d) is disclosed by [Luckey] with [Seidl's] prior written approval." (*Id.* ¶ 2.)  Paragraph 3 provides that Luckey is to keep confidential and use for Seidl's "sole and exclusive benefit" any information received from Seidl that meets the "Confidential Information" definition and does not fall within the specified "Exclusions from Confidential Information." (*Id.* ¶ 3.)   Paragraph 4 provides that Luckey's confidentiality obligations extend only to information that qualifies as a trade secret of Seidl.  (*Id.* ¶ 4 (Luckey's "duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until [Seidl] sends [Luckey] written notice releasing [Luckey] from this Agreement, whichever occurs first.").)

Third, the Contract's "Exclusivity" provision contemplated that Luckey would build a prototype HMD for Seidl.  Subject to the exclusions and limitations of paragraphs 2 and 4 of the Agreement, Luckey was to keep all details of the prototype HMD confidential and refrain from developing or aiding any other person in developing an HMD, but *only if* he received at least $10,000 in royalties from Seidl's sale of the HMD by July 1, 2012.  The provision states:

> 9. Exclusivity. The Receiving party [Luckey] shall keep all details including drawings and part suppliers of the Head Mounted Display confidential and shall not aid any other person or entity in the design of a Head Mounted Display other than the disclosing party [Seidl].  (sic)  Unless within a twelve month period from 1st july 2011 [Luckey] has not received a minimum payment in royalties of 10,000 US dollars by [Seidl].  The exclusivity shall remain in place for a period of 10 years providing a minimum of 10,000 US dollars is paid from [Seidl] to [Luckey] per annum.

(SAC ¶ 19 & Ex. A ¶ 9 (all grammatical and other drafting errors in original).)

Cooley LLP
Attorneys At Law
Palo Alto

4.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

TRT alleges, without supporting facts, that Seidl entered the Contract with Luckey "on behalf of, *and acting as an agent of*, TRT." (SAC ¶ 18 (italicized language in SAC only).) That allegation, however, is contradicted by the opening paragraph of the Contract itself, which states that it was "entered into by and between Thomas Seidl . . . and Palmer Luckey." (*Id.*, Ex. A at 1.) The Contract does not reference any alleged partnership between Igra and Seidl or state that Seidl was entering the Contract as an agent for or on behalf of anyone other than himself. And the SAC does not allege that Seidl informed Luckey that he was entering into a contract with anyone other than Seidl, or plead any other facts from which one might infer that Luckey knew of TRT's existence. To the contrary, the Contract explicitly provides that Seidl individually was the only person with whom Luckey was contracting. (*See, e.g.*, *id.* ¶ 9 (stating that Luckey "shall not aid any other person or entity in the design of a Head Mounted Display other than [Seidl]"; ¶ 3 (mandating that Luckey use "Confidential Information" for *Seidl's* "sole and exclusive benefit").

### C.     Seidl's and Luckey's Performance Under the Contract

After executing the Contract, Luckey shipped a prototype HMD to Seidl on August 23, 2011 (the "August 2011 Device"). (SAC ¶ 20.) TRT alleges that the August 2011 Device "was later returned to Luckey for further improvement" and that TRT provided "confidential feedback and information" to improve its design. (*Id.* ¶¶ 20–21.) The SAC, however, still does not identify any of this purported "confidential feedback and information" or plead that it was designated "Confidential" as required by Paragraph 1 of the Seidl/Luckey Contract.

TRT also alleges that Luckey never returned "*[t]hat* Head Mounted Display," suggesting that Luckey was expected to modify and return the August 2011 Device and improperly failed to do so. (*Id.* ¶ 20 (emphasis added).) In fact, the Skype chats between Luckey and Seidl that TRT selectively quotes from in paragraph 31 of the SAC make clear that Seidl explicitly rejected the August 2011 Device and its single panel design; that Luckey dismantled that device and used its parts to build Seidl a second, multi-panel prototype at Seidl's request; and that Seidl repeatedly assented to use by Luckey and third parties of the design for the August 2011 Device. (Lambert Decl., Ex. B.) More specifically, the Skype log establishes as follows:

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

5.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

- Seidl returned the August 2011 Device to Luckey on or about October 13, 2011.  On the same day, Luckey informed Seidl that he had begun working on a new "dual screen HMD" for Seidl. (*Id.* at LUCKEY0113305.)[2]

- From October 2011 through January 2012, Seidl and Luckey continued to chat periodically, with Luckey updating Seidl about advancements in display technology and his continuing work on a dual-panel HMD design for Seidl.  (*Id.* at LUCKEY0113305–19.) Luckey and Seidl also discussed the idea of a three- or even four-display-panel HMD, which Luckey and Seidl agreed Luckey should test further.  (*Id.* at LUCKEY0113321–27.)

- During this same time period, Luckey repeatedly discussed other HMDs he had built or was working on, with no objection from Seidl.  (*See, e.g., id.* at LUCKEY0113319 (January 10, 2012: "At my job, we have a HMD I built that is driven off an iPhone 4S" display panel); LUCKEY0113330 (January 25, 2012: discussing a film, Hunger in Los Angeles, that was to be shown at the Sundance Film Festival using "one of my [Luckey's] HMDs" that he had built in his lab at work); LUCKEY0113331 (January 25, 2012: stating: "I have entirely eliminated [eye strain] in my recent HMDs").)

- On February 8, 2012, Seidl asked Luckey when he expected to be able to deliver the two-panel HMD prototype he had requested.  Luckey informed him that he hoped to be able to complete it in March, after an industry conference, but needed more display panels to do so. (*Id.* at LUCKEY0113343.)

- In response, Seidl stated: "I don't know why you need more parts, [] I got you 2 panels and all the bits needed about 7 months ago." (*Id.*)  Luckey explained that one of the two panels he had purchased with Seidl's funds was in the original single-panel August 2011 Device Seidl had rejected, which was still in Luckey's possession.  Luckey also told Seidl that his lab had "built 4 single panel HMDs" based on the "same design" but using panels they had purchased separately.  (*Id.* at LUCKEY0113344.)

- Seidl made no objection to use by others of any design elements of the August 2011 Device.  To the contrary, Seidl urged Luckey to focus on making him a multi-panel HMD, and stated: "the single panel HMD is *no use to me*." (*Id.* (emphasis added).)

- Even when Luckey tried to explain that he had made improvements to the single-panel design to increase field of view, Seidl remained firm that he wanted "a dual panel HMD" instead.  (*Id.*)  Accordingly, Seidl asked Luckey to disassemble the August 2011 Device by ripping out the single display panel and to use the removed panel, with other parts, to create a new HMD with two display panels. Luckey agreed to do so.  (*Id.*)

- On May 17, 2012, after months of communications regarding his ongoing work, Luckey informed Seidl that he had shipped Seidl's new HMD, which featured two main display panels and two sub-panels, rendering "4 separate views." (*Id.* at LUCKEY0113377–78.) After a mix-up with the delivery service, which mistakenly shipped the package to Texas, it was returned to Luckey, who shipped it to Seidl again on May 21, 2012.  (*Id.* at LUCKEY0113384–85.)

---

[2] Defendants cite to the version of the Skype chat log they produced, but note that the same chat log was produced by TRT in discovery.  (Lambert Decl. ¶ 11.)

Cooley LLP
Attorneys At Law
Palo Alto

6.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

- On May 22, 2012, Luckey informed Seidl that he was "going to open-source that old single panel design, I think," referring to making the design for the August 2011 Device available to the public. Luckey added that a "few VR nerds want to make their own." Seidl assented: "ok." (*Id.* at LUCKEY0113386; *see also* SAC ¶ 31 (selectively quoting this exchange).)

- Luckey contacted Seidl on June 11, 2012, stating: "Hey, not heard anything for a couple of weeks . . . Whats up?" (*Id.* at LUCKEY0113388)  In response, Seidl acknowledged that he had received the Seidl HMD but had not tested it yet as he was in the process of shooting new video footage. (*Id.*)  Seidl still had not tested the device by July 28, 2012: "I [have] not tried your latest, was waiting for the better footage." (*Id.* at LUCKEY0113389.)

The SAC intentionally omits that Seidl explicitly rejected the August 2011 Device in February 2012, stating it was of "no use" to him and instructing Luckey to cannibalize its parts for a different design. (*Id.* at LUCKEY0113344.)  TRT also omits that Seidl made no objection when Luckey told him that same day that others were using the identical single-panel design. (*Id.*)  And TRT has consistently avoided pleading that Luckey built and delivered to Seidl a different, multi-panel HMD in May 2012.  This is so even though the Skype chat TRT selectively quotes in the proposed SAC was *produced in discovery by TRT.*

Having intentionally concealed these critical facts, as well as the fact that Luckey was working on a variety of other single- and multi-panel HMD designs with Seidl's knowledge, TRT nevertheless alleges on information and belief that the August 2011 Device Seidl rejected is what became the Oculus Rift.  (¶ 22.)  TRT provides no particularized factual basis for this purported belief, alleging only that the Rift had some of the general HMD characteristics Seidl supposedly requested: affordability, high immersion, and a wide field of view.  (¶¶ 10, 25, 28–29.)[3]  TRT alleges that, before the Contract had been in effect for one year, Luckey took steps in preparation to commercialize the Rift by: (1) in April 2012, launching the website oculusvr.com with a high level description of the Rift and announcing on the MTBS3D online message board that he planned to pursue a Kickstarter campaign (¶¶ 24–26); (2) in May 2012, providing a Rift prototype to game developer John Carmack, who reviewed the Rift online (¶¶ 28–30, 32); and (3) in June 2012, forming Oculus LLC, allowing the Rift to be demonstrated at the E3 industry event, and

---

[3] TRT alleges, and Defendants dispute, that the August 2011 Device and the Rift are based on the same design.  While TRT's contention could not be further from the truth, Defendants accept it as true for purposes of this opposition.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

agreeing to work with others to commercialize the Rift (¶¶ 34–36).  The SAC adds allegations that Luckey provided Carmack with unidentified "confidential details" about the Rift between April and June 2012, and that Luckey knew that Carmack would be demonstrating the Rift to an online technology news outlet (the Verge) in May 2012.  (¶¶ 23, 33.)

> **D.**   **Summary of TRT's Prior Claims and Proposed New Claim for "Actual Fraud"**

Although TRT is not a party to the Seidl/Luckey Contract, it nevertheless asserts claims against Luckey under that Contract.  (¶¶ 40–48.)  TRT alleges that Luckey breached paragraph 9 of the Contract, the "Exclusivity" provision, by developing and publicly discussing the Oculus Rift and preparing to commercialize it for Luckey's own benefit.  (¶¶ 22, 41–42.)  TRT alleges that Luckey breached the Contract's implied covenant of good faith and fair dealing by falsely promising to refrain from such actions.  (¶ 47.)

TRT also attempts to assert a variety of other claims against both Luckey and OculusVR based on the Contract: (1) a conversion claim based on allegations that Defendants converted the August 2011 Device "and associated components and materials" (¶ 50); (2) a constructive fraud claim based on an alleged "contractual and personal relationship as evidenced by the parties' Agreement," and concealment of Luckey's alleged intent to breach the Contract's exclusivity provision (¶¶ 56–61); and (3) claims for unfair competition under the common law and California Business and Professions Code section 17200 *et seq.* (the "UCL") based on allegations that Defendants passed off the August 2011 Device as their "own original product" (¶¶ 73, 76).

By its motion, TRT also seeks leave to add a claim for "actual fraud" against Luckey based on allegations that he concealed from TRT his "ongoing discussions with Carmack" and plans for a Kickstarter campaign in 2012.  (¶¶ 66–67.)  TRT also claims "Luckey intentionally misled TRT and its partners by telling Seidl that he would 'open source' the Head Mounted Display design when, to the contrary, he was engaged in efforts to commercialize it through Kickstarter and Oculus."  (¶ 68.)  For the reasons that follow, these allegations fail to state a claim upon which relief may be granted.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

8.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

## IV.   LEGAL STANDARDS

Leave to Amend: Federal Rule of Civil Procedure 15(a) states that leave to amend shall be freely given "when justice so requires."   Under this Rule, leave to amend is properly denied where: (1) the amendment is sought in bad faith; (2) plaintiff has unduly delayed in seeking leave; (3) the party opposing amendment will be prejudiced; (4) the proposed amendment would likely prove futile; and (5) plaintiff has previously amended its complaint.   *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990).  "The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint."   *Id.* (citation omitted); *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (same) (abrogated on other grounds).   Moreover, "[f]utility alone can justify the denial of a motion for leave to amend."   *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2003) (citation omitted).   Amendment is futile if the proposed amended complaint fails to state a claim that would survive a motion to dismiss.   *See Gardner v. Martino*, 563 F.3d 981, 992 (9th Cir. 2009) (affirming denial of leave to amend, where facts plaintiffs proposed to add to second amended complaint did not state claim); *Klamath-Lake Pharm. Ass'n v. Klamath Medical Serv. Bureau*, 701 F.2d 1276, 1292-93 (9th Cir. 1983) (denying leave to amend as futile); *Buchanan v. United States*, No. C 10-00092 WHA, 2010 U.S. Dist. LEXIS 15601, at *6 (N.D. Cal. Feb. 23, 2010) (Alsup, J.) (same).

Failure to State a Claim: A complaint should be dismissed under Rule 12(b)(6) if it fails to allege facts sufficient to state a cognizable legal claim.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6).   "To avoid dismissal, the complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"   *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 875 (9th Cir. 2012) (citing *Twombly*, 550 U.S. at 555).   It is not enough that a claim be possible or conceivable; it must be "plausible."   *Twombly*, 550 U.S. at 570.   "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotations and citation omitted).   Conclusory allegations, unsupported by facts, "are not entitled to the assumption of truth."   *Id.* at 679.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

9.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

On a Rule 12(b)(6) motion, the Court may consider a document "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). This rule, known as the incorporation-by-reference doctrine, prevents plaintiff "from surviving a Rule 12(b)(6) motion by deliberately omitting . . . documents upon which [its] claims are based." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (citation omitted); *see also Trew v. Int'l Game Fish Ass'n, Inc.*, 404 F. Supp. 2d 1173, 1176 n.2 (N.D. Cal. 2005) (considering full text of document selectively quoted in plaintiff's complaint but not attached thereto).

Rule 9(b). Fraud claims trigger heightened pleading requirements under Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). To satisfy this requirement, plaintiff must plead the "who, what, when, where and how of the misconduct charged." *Meyer v. Wells Fargo Bank*, N.A., No. C 13-03727, 2014 U.S. Dist. LEXIS 21368, at *7 (N.D. Cal. Feb. 19, 2014) (quoting *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003)). "Allegations of fraud based on information and belief do not satisfy the particularity requirement unless accompanied by a statement of the specific facts on which the belief is founded." *Cty. of Santa Clara v. Astra U.S., Inc.*, 428 F. Supp. 2d 1029, 1036 (N.D. Cal. 2006).

## V.    TRT'S MOTION FOR LEAVE TO AMEND SHOULD BE DENIED

### A.    TRT's Proposed Amendment Does Not Cure the Fatal Standing Defect

As thoroughly briefed in Defendants' motion to dismiss the FAC (Dkt. 48 at 9–11), TRT lacks Article III standing to assert any of its claims. Each of TRT's claims arises from and depends upon the Seidl/Luckey Contract, to which TRT is not a party and under which TRT has no rights. Even the newly proposed "actual fraud" claim in the SAC is expressly premised on the Contract, which provides the sole basis for any alleged duty flowing from Luckey to TRT. (*See, e.g.*, SAC ¶ 65 ("Because of their contractual and confidential relationship, Luckey had a duty to disclose his ongoing discussions and efforts with Carmack and Kickstarter . . .."). Under California law, "someone who is not a party to the contract has no standing to enforce [it]." *Hatchwell v. Blue Shield of Cal.*, 198 Cal. App. 3d 1027, 1034 (1988); *see also Warren v. Fox*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

10.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

1  *Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (on facial standing challenge, court

2  need not accept as true conclusory allegations that are contradicted by the complaint's exhibits);

3  *Novelposter v. Javitch Canfield Grp.*, No. 13-cv-05186-WHO, 2014 U.S. Dist. LEXIS 156268, at

4  \*18–20 (N.D. Cal. Nov. 4, 2014) (sustaining facial Rule 12(b)(1) standing challenge and

5  dismissing contract, tort and unfair competition claims as claimant was not a party to, or third-

6  party beneficiary of, the contract at issue).

7  Nor does TRT have standing under the Seidl/Luckey Contract as a third-party beneficiary

8  or undisclosed principal (an unpleaded theory advanced for the first time in TRT's opposition to

9  Defendants' pending motion to dismiss the FAC). As Defendants' reply in support of their

10  pending motion to dismiss establishes (Dkt. 65 at 1–6), TRT is neither a third party beneficiary

11  nor an "undisclosed principal," and nothing in the proposed SAC changes the analysis.

12  A third party may assert rights under a contract as a third party beneficiary only if (1) it is

13  named in the contract or, if not expressly named, is a member of a class "referred to and

14  identified in" the contract; *and* (2) the contract's terms show the contracting parties' express

15  intent to benefit it. *Karo v. San Diego Symphony Orchestra Ass'n.*, 762 F.2d 819, 821–22 (9th

16  Cir. 1985) (collecting California cases); Cal. Civil Code § 1559. The Seidl/Luckey Contract,

17  however, makes no mention of TRT and manifests no intent to benefit TRT. To the contrary, the

18  Contract states that Luckey's work was to be for *Seidl's* "sole and exclusive benefit." (SAC, Ex.

19  A ¶ 3.) Accordingly, TRT is not a third party beneficiary under the Seidl/Luckey Contract.[4]

20  Contradicting its argument that it was a *known and intended* third party beneficiary, TRT

21  argues in the same breath that it was an *unknown*, "undisclosed principal." This contrived basis

22  for standing also fails. A purported undisclosed principal cannot "maintain a suit against the third

23  party if by its express terms, or otherwise, the contract was made with the agent exclusively."

---

[4] The proposed SAC newly alleges that the PayPal receipt Luckey received in connection with the $798 parts payment "shows Ron Igra's email account." (SAC ¶ 16.) Accordingly, TRT re-alleges "on information and belief" that Luckey must have "understood as of at least this date that Igra was Seidl's partner in connection with development of the head mounted display." (*Id.*) The SAC, however, omits any allegation that Igra ever communicated with Luckey, much less any explanation as to how Luckey might have gleaned the nature of Igra's alleged relationship to Seidl, or TRT's existence, from an email address on a PayPal receipt that reveals no such facts. In any event, the PayPal predated the Contract, which makes no mention of TRT or Igra.

Cooley LLP
Attorneys At Law
Palo Alto

11.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

1   130 A.L.R. 664 (2015); *Walton v. Davis*, 22 Cal. App. 456, 459–60 (1913) (reversing grant of

2   relief to plaintiff, a non-contracting party and alleged undisclosed principal, as defendant

3   contracted exclusively with the putative agent for, *inter alia*, the putative agent's personal

4   knowledge).  That is precisely the case here.  The Contract's purported "Exclusivity" provision

5   states that Luckey "shall not aid *any other person or entity* in the design of a Head Mounted

6   Display other than [Seidl]."  (SAC, Ex. A ¶ 9 (emphasis added).)  That is, under the express terms

7   of the Contract, no other "person" (Igra) or "entity" (TRT) was to benefit from Luckey's

8   performance; all but Seidl are expressly excluded.  In addition, the Contract expressly mandates

9   that Luckey use *Seidl's* "Confidential Information" for *Seidl's* "sole and exclusive benefit."  (*Id.*

10   at ¶ 3.)  TRT's contention that it is an undisclosed principal would turn this provision on its head,

11   mandating that the only person or entity Luckey could work to benefit is TRT, not Seidl (defined

12   as the "Disclosing Party").  TRT's undisclosed principal theory is directly at odds with the

13   express language of the Seidl/Luckey Contract TRT seeks to enforce.

14          In sum, the fatal standing defect that mandates dismissal of the FAC would also require

15   dismissal of the proposed SAC, rendering the amendment futile.  No legitimate interest would be

16   served by allowing TRT to amend or add claims that it lacks standing to pursue.  To the contrary,

17   allowing TRT to amend again would serve merely to prolong the litigation unnecessarily and

18   prejudice Defendants by forcing them to needlessly incur the additional burden and expense of

19   preparing a third motion to dismiss.

20   **B.      TRT's Proposed Amendment Does Not Cure the Fatal Pleading Defects**
         **Necessitating Dismissal of Each of TRT's Claims Under Rule 12(b)(6)**
21

22          Defendants respectfully refer the Court to their opening brief and reply in support of their

23   motion to dismiss the FAC for an exhaustive discussion of why each cause of action asserted by

24   TRT fails to state a claim.  (Dkts. 48 at 11–25, 65 at 6–15.)  As the proposed SAC does nothing to

25   address these myriad pleading deficiencies, Defendants will not repeat that discussion here.

26   Instead, Defendants focus the following discussion on the new allegations in the proposed SAC

27   and documents incorporated therein by reference, which only serve to underscore the fatal defects

28   in TRT's claims and the futility of amendment.

Cooley LLP
Attorneys At Law
Palo Alto

12.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

**1.    TRT's Contract Claims (Counts I and II) Cannot Survive Dismissal**

The crux of TRT's claims for breach of the Seidl/Luckey Contract and the implied covenant of good faith and fair dealing is that, beginning in April 2012, Luckey publicly disclosed information about the Oculus Rift and took steps in preparation to commercialize it, such as forming Oculus VR and announcing an upcoming Kickstarter campaign. (SAC ¶¶ 42, 47.) TRT asserts that this conduct violated the Contract's exclusivity provision, which allegedly required Luckey to "keep all details . . . of the Head Mounted Display confidential" and precluded him from "aid[ing] any other person or entity in the design of a Head Mounted Display other than [Seidl]" from the moment he signed it. (*Id.* ¶ 19 (citing SAC, Ex. A ¶ 9).) Like the FAC, the proposed SAC fails to plead an actionable claim for breach of the Seidl/Luckey Contract.

In assessing TRT's claims, the Court is entitled to consider the full contents of the Skype chat log[5] that TRT selectively quotes from in paragraph 31 of the SAC. *See Swartz*, 475 F.3d at 763; *Trew*, 404 F. Supp. 2d at 1176 n.2. As the Skype transcript shows, Seidl expressly rejected the design of the August 2011 Device and relinquished any rights he might have had to that design under the Contract.

As the proposed SAC acknowledges, the Contract was never intended to secure to Seidl rights in a head mounted display that he had no intention of using. To the contrary, Seidl told Luckey: "I would like exclusive rights to your design *unless we decide not to use it*." (SAC  ¶ 14 (emphasis added.) What TRT has concealed from the Court through selective quotation is that Seidl definitively decided not to use the August 2011 Device, telling Luckey on February 8, 2012: "the single panel HMD is *no use to me*." (Lambert Decl., Ex. B at LUCKEY0113344 (emphasis added).) Indeed, Seidl instructed Luckey to disassemble the August 2011 Device and use its parts to create a new, multi-panel HMD, which Luckey did, and sent to Seidl in May 2012. (*Id.* at LUCKEY0113344, 377–78, 384–85.) And TRT ignores that, beginning in February 2012, Seidl repeatedly assented to Luckey sharing design details about the "useless" August 2011 Device with third parties and the public. (*See id.* at LUCKEY0113344 (voicing no objection to Luckey's

---

[5] Skype provides an instant messengering service that allows users to send messages to each other over the Internet in real time and maintain a log of all such messages.

Cooley LLP
Attorneys At Law
Palo Alto

13.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

1   sharing the design with his lab at USC, which had "built 4 single panel HMDs" based on the

2   "same design"); LUCKEY0113386 (agreeing that Luckey could "open-source" the design of the

3   August 2011 Device).

4        Even if TRT had standing to enforce the Seidl/Luckey Contract (it does not), it could not

5   legitimately claim exclusive rights under that Contract to a design that Seidl rejected and gave

6   written permission to Luckey to disclose.  To the contrary, the Contract explicitly provides that

7   Luckey's "obligations under this Agreement do not extend to information that . . . (d) is disclosed

8   by [Luckey] with [Seidl's] prior written approval.  (SAC, Ex. A ¶ 2; *see also id.* ¶ 4 (providing

9   that Luckey's "duty to hold Confidential Information in confidence shall remain in effect until the

10  Confidential Information no longer qualifies as a trade secret or until [Seidl] sends [Luckey]

11  written notice releasing [Luckey] from this Agreement").  Accordingly, TRT cannot establish that

12  Luckey breached the Contract's exclusivity provision either by disclosing details about the

13  August 2011 Device or by continuing to develop and commercialize it for his own purposes.[6]

14       TRT's contract claims also fail because the exclusivity provision is void and

15  unenforceable.  As fully briefed in Defendants' motion to dismiss the FAC (Dkt. 48 at 14–15; Dkt.

16  65 at 8–9), the provision runs afoul of California Business and Professions Code section 16600

17  insofar as it purports to prohibit Luckey from designing HMDs for anyone other than Seidl.

18  (SAC, Ex. A ¶ 9.)  On its face, this prohibition impermissibly bars Luckey from designing

19  competing products regardless of whether any Seidl (or TRT) "Confidential Information" is

20  involved, and according to TRT, even though Luckey was never paid for his work.  (SAC ¶ 43.)

21  As such, it is void under Section 16600.  (*See* TRT's Opp. to Defs. Mot. To Dismiss (Dkt. 57) at

22  12 (conceding that a contract barring a party from selling "any products which are directly or

23  indirectly competitive" is void) (citing *Puricle, Inc. v. Church & Dwight Co.*, 568 F. Supp. 2d

24

25  _____

    [6] TRT has never identified—in its pleadings or "Identification of Confidential Information" (Dkt.
    47)—any information purportedly provided by Seidl to Luckey that meets the definition of
26  "Confidential Information" under the Contract.  (*Cf.* SAC ¶ 21 (alleging that TRT provided
    unidentified "confidential feedback and information to Luckey").)  Defendants dispute that Seidl
27  provided Luckey any such information at any time, and dispute that Luckey used any such
    information in designing the August 2011 Device or Rift (or any of the other HMDs Luckey built
28  before or since).  However, TRT's contract claims fail for the reasons stated above even assuming
    that Seidl (or TRT) provided Luckey Confidential Information (which they did not).

14.

1144, 1146–48 (C.D. Cal. 2008)); *see also Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003) (holding at pleading stage that, under Section 16600, defendant could not enforce contract requiring employees not to use certain information except for defendant's benefit, where the information was not a trade secret or confidential information that originated with defendant).

TRT's new allegations do nothing to address the fatal defects warranting dismissal of its contract claims.  If anything, they bring the Section 16600 problem into even sharper focus.

TRT now claims that, had it known Luckey was engaged in discussions with Carmack and planning a Kickstarter campaign in the April through June 2012 time period, it "would have paid $10,000 to Luckey to extend the exclusivity provision of the Agreement beyond July 1, 2012, and it would not have agreed to allow Luckey to 'open-source' the Head Mounted Display."  (SAC ¶ 69.)  This allegation is extraordinary.

For one thing, it amounts to an assertion that, for almost an entire year (August 1, 2011 to June 30, 2012), Luckey was bound under a non-compete that prohibited him from designing HMDs for anyone other than Seidl/TRT, irrespective of whether his HMD work involved any confidential information from Seidl or TRT, and without any compensation whatsoever.  No covenant not to compete could be enforced against an independent contractor like Luckey[7] under such circumstances, *Thompson*, 113 Cal. App. 4th at 1430, much less one lacking consideration.[8]

By this new allegation, TRT also asserts that, had it known Luckey had plans to develop and commercialize the August 2011 Device that Seidl rejected, TRT would have attempted to take Luckey and his HMD hostage by paying him $10,000 to lock him out of his lawful profession of designing HMDs for a second year.  That is precisely the kind of anti-competitive conduct Section 16600 was enacted to prevent.  *See Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575 (2009) (Section 16600 "expresses California's strong public policy of protecting the right of its citizens to pursue any lawful employment and enterprise of their

---

[7] The Contract explicitly states: "Nothing in this Agreement shall be deemed to constitute either party a[n] . . . employee of the other party for any purpose."  (SAC, Ex. A ¶ 5.)

[8] *See* 1 Witkin, Summary 10th (2005) Contracts, § 202, p. 236 ("The fact that a promise is made with the purpose or hope of profit will not sustain it if in fact nothing of value is received."); *Forgeron Inc. v. Hansen*, 149 Cal. App. 2d 352, 360 (1957) ("an agreement to be enforceable must be supported by good and valuable consideration").

Cooley LLP
Attorneys At Law
Palo Alto

15.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

choice"); *Kolani v. Gluska*, 64 Cal. App. 4th 402, 407 (1998) (affirming dismissal of contract claim with prejudice as non-compete clause was invalid under Section 16600); *Robert Half Int'l, Inc. v. Ainsworth*, 68 F. Supp. 3d 1178, 1184–86 (S.D. Cal. 2014) (dismissing claims based on alleged violation of contract restricting defendants' ability to practice their profession).[9]

Finally, TRT's assertion that it "would not have agreed [to allow Luckey] to 'open-source' the Head Mounted Display" had Luckey disclosed his commercialization activities that allegedly began in April 2012 (SAC ¶ 69), is of no help to TRT.  TRT ignores the fact that, *in February 2012*, Seidl had unequivocally stated that a single-panel design was of "no use" to him and assented to use by others of the design for the August 2011 Device.  (*See* Lambert Decl., Ex. B at LUCKEY0113344.)  No matter what Luckey may or may not have been planning to do with the August 2011 Device in April 2012 (and Defendants dispute that Luckey did anything with it other than dismantle it to obtain parts to build Seidl a multi-panel HMD), the fact that Seidl had two months earlier disclaimed any desire to make use of it and assented to its use by others terminated any obligations Luckey may have had under the Agreement with respect to the August 2011 Device.  TRT's attempt to rewrite history by selectively omitting facts in documents it incorporates by reference in its pleading cannot save its contract claims from dismissal.

### 2.  TRT's Conversion Claim (Count III) Cannot Survive Dismissal

TRT's new allegations also underscore and exacerbate the fatal flaws in its conversion claim.  By alleging that Luckey never returned the August 2011 Device to Seidl (SAC ¶¶ 20, 51), TRT attempted to create the misimpression in its pleading that Luckey had impermissibly kept the August 2011 Device and converted it to his own use.  Indeed, to avoid preemption under the California Uniform Trade Secret Act, Cal. Civ. Code § 3426.1 ("CUTSA"), TRT amended its original complaint to allege in the FAC that "Defendants knowingly converted to the Defendants' own use *tangible* property owned by TRT," including "at least one prototype virtual reality Head Mounted Display (and associated components and materials) built for and in conjunction with

---

[9] TRT also ignores the fact that the exclusivity provision is expressly conditioned upon payment of $10,000 "in royalties" from the sale of the HMD, based on a royalty rate of "2.5% . . . of the net profit made by [Seidl] from sales of the head mounted display." (SAC, Ex. A ¶¶ 9, 10.) Simply paying Luckey $10,000 would not have triggered or extended the exclusivity provision.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

16.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

TRT." (SAC ¶ 50 (emphasis added).)  In fact, as discussed above, the Skype chat log shows that: (a) Seidl rejected the August 2011 Device and relinquished all rights to it; (b) at Seidl's request, Luckey disassembled the August 2011 Device and cannibalized it for parts to make a new, multi-panel HMD with a wider field of view; and (c) Luckey sent the second HMD to Seidl in May 2012.  As such, TRT cannot satisfy the requirement of pleading that Defendants wrongfully dispossessed TRT of the August 2011 Device, a necessary element of its conversion claim.  *See G.S. Rasmussen & Assoc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 906 (9th Cir. 1992).

TRT's conversion claim is also untimely.  A claim for conversion of tangible property is subject to a three-year statute of limitations that runs from the date of the alleged conversion, even if the plaintiff is ignorant of it.  Cal. Code Civ. Proc. § 338(c); *Bennett v. Hibernia Bank*, 47 Cal. 2d 540, 561 (1956).  Here, TRT alleges that Luckey converted the August 2011 Device "[a]t various times throughout 2012 and after." (SAC ¶ 50.)  Moreover, although TRT has carefully avoided alleging the specific act that constituted conversion or the date on which it occurred, the proposed SAC alleges that Luckey's purported improper use began in April 2012, when Luckey allegedly shared unidentified "confidential details" about the Rift with Carmack (*id.* ¶ 23) and posted about the Rift on the oculusvr.com website and MTBS3D message board (*id.* ¶¶ 25, 26); and that his alleged conversion of the August 2011 Device continued into May 2012, when Luckey began preparations on May 1, 2012 to demonstrate the Rift at the E3 industry event and provided the Rift to Carmack on May 17, 2012 (*id.* ¶¶ 27–29).  Because the statute of limitations bars a claim for conversion arising before May 20, 2012 (three years prior to the filing of the complaint), TRT's conversion claim is time-barred.[10]

**3.      TRT's Constructive Fraud Claim (Count IV) Cannot Survive Dismissal**

TRT's constructive fraud claim is untouched in the SAC.  It alleges that Luckey misled TRT "about his intent to perform his duties [under the Contract] by failing to disclose that he lacked such intent." (SAC ¶ 57.)  TRT further claims that Luckey's lack of intent to perform is evidenced by the following actions that he allegedly failed to disclose to TRT: "(1) creating a

---

[10] *See* Dkt. 48 at 10–11 (discussing elements of claim for conversion and additional reasons why TRT fails to adequately plead them).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

17.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

1   Web site – oculusvr.com – in April 2012, (2) providing a Head Mounted Display to Carmack in

2   May 2012, (3) signing an NDA with ZeniMax concerning the Head Mounted Display in May

3   2012, (4) permitting Carmack to display the Head Mounted Display at the E3 convention in Los

4   Angeles in June 2012, and (5) forming Oculus LLC in June 2012.  (*Id.* ¶ 58.)  For the reasons

5   stated in Defendants motion to dismiss briefing (Dkts. 48 at 18–20; Dkt. 65 at 11), these

6   allegations fall short of pleading a claim for constructive fraud.

7       "To state a claim for constructive fraud under California law, a party must allege: (1) a

8   fiduciary or confidential relationship; (2) an act, omission or concealment involving a breach of

9   that duty; (3) reliance; and (4) resulting damage."  *Jobscience, Inc. v. CVPartners, Inc.*, No. C 13-

10  04519 WHA, 2014 U.S. Dist. LEXIS 26371, at *6 (N.D. Cal. Feb. 28, 2014) (Alsup, J) (citation

11  omitted).  A claim for constructive fraud "triggers heightened pleading under FRCP 9(b)."  *Meyer*,

12  2014 U.S. Dist. LEXIS 21368, at *8; *see also Jobscience*, 2014 U.S. Dist. LEXIS 26371, at *6.

13      Here, TRT cannot establish the first element as Luckey had no relationship of any kind

14  with TRT.  TRT was not a party to the Seidl/Luckey Contract, and the SAC does not allege any

15  other factual basis for a fiduciary or confidential relationship.

16      TRT also fails to plead the second element—that Luckey breached any duty owed to TRT.

17  The proposed SAC identifies a series of events between April and June 2012 that allegedly

18  demonstrate that Luckey never intended to comply with the (unenforceable) exclusivity provision.

19  TRT claims that, had it known of Luckey's intent to breach the Contract, it would not have

20  engaged him to build the prototype HMD and instead "would have pursued its desire to develop

21  head mounted display technology with someone else."  (SAC ¶ 60.)  But, like the FAC, the

22  proposed SAC contains no allegations establishing Luckey's alleged lack of intent to perform *at*

23  *the time he entered the Contract*.  To the contrary, TRT's allegations suggest at most that Luckey

24  began making preparations to offer his own virtual reality headset *eight to ten months after* he

25  entered the Contract with Seidl, at a time when Seidl had rejected the August 2011 Device and its

26  single-panel design, and consented to its use by others.  Accordingly, the proposed SAC does not

27  provide any factual basis—much less the particularized factual basis required under Rule 9(b)—

28  to conclude that Luckey intended to breach the Contract at the time he entered it or at any time

Cooley LLP
Attorneys At Law
Palo Alto

18.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

1  thereafter, as TRT baldly asserts.  *See, e.g., In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548–49

2  (9th Cir. 1994) (explaining that the falsity of a prior statement cannot be inferred merely because

3  it "conflicts with the current state of facts" and that a "plaintiff must set forth, as part of the

4  circumstances constituting fraud, an explanation as to why the disputed statement was untrue or

5  misleading *when made*") (superseded by statute on other grounds).

6        Finally, TRT does not (and cannot) plead the essential element of reliance.  The Skype

7  chat log that TRT quotes establishes that Seidl told Luckey the single-panel August 2011 Device

8  was "no use" to him, assented to Luckey's lab building HMDs based on the same design, and

9  agreed in May 2012 that Luckey could "open-source" the design and make it available to all the

10  world.  Seidl's actions took the August 2011 Device outside the ambit of any protection under the

11  Contract, leaving Luckey free to do anything he wanted with it.  (*See* SAC, Ex. A ¶ 2 (providing

12  that Luckey's "obligations under this Agreement do not extend to information that . . . (d) is

13  disclosed by [Luckey] with [Seidl's] prior written approval); ¶ 4 (providing that Luckey's

14  confidentiality obligations terminate as soon as information ceases to be a trade secret).  TRT

15  cannot show that it reasonably relied to its detriment on Luckey's alleged contractual obligation

16  to perform under an unenforceable non-compete from which Seidl expressly relieved him.[11]

17      **4.**    **TRT's New Actual Fraud Claim (Count V) Cannot Survive Dismissal**

18        TRT's new claim for actual fraud is premised on both alleged fraudulent concealment and

19  alleged fraudulent misrepresentation. TRT alleges that Luckey fraudulently concealed "ongoing

20  discussions with[] Carmack from April 2012 through at least June 2012, including Carmack's

21  Verge and E3 demonstrations" of the Rift, as well as Luckey's plans to promote the Rift through

22  Kickstarter.  (SAC ¶ 67.)  TRT also alleges that Luckey misrepresented to TRT that "he would

23  'open-source' the Head Mounted Display design when, to the contrary, he was engaged in efforts

24  

---

25  [11] Notably, many of the allegedly improper acts by Luckey in the April–June 2012 timeframe
were public by nature.  Creating the oculusvr.com website, announcing the Rift on that site, and

26  announcing a planned Kickstarter campaign for the Rift on the MTBS3D message board were
inherently open and public acts.  (SAC ¶¶ 24–26.)  So, too, were Carmack's subsequent MTBS3D

27  post and tweet about the Rift in May 2012 (*id.* ¶¶ 29–30), publication of the Verge's interview
with Carmack on May 27, 2012 (*id.* ¶ 33), and demonstration of the Rift at E3 in June 2012 (*id.* ¶

28  34).  These public acts are consistent with the Seidl/Luckey communications contained in the
Skype log and contradict allegations in the SAC that Luckey tried to hide his true intentions.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

19.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

1  to commercialize it through Kickstarter and Oculus." (*Id.* ¶ 68.)  For many of the same reasons

2  discussed above, neither of these theories holds water.

3          **a.**        **TRT fails to plead a claim for fraudulent concealment**

4         To state a claim for fraudulent concealment, TRT must plead and prove five elements:

5  (1) Luckey concealed a material fact; (2) Luckey was under a duty to disclose the fact to TRT;

6  (3) Luckey intentionally concealed the fact with the intent to defraud TRT; (4) TRT was unaware

7  of the fact and would not have acted as it did if it had known of the concealed fact; and (5) TRT

8  sustained damage as a result.  *Monreal v. GMAC Mortgage, LLC*, 948 F. Supp. 2d 1069, 1077

9  (S.D. Cal. 2013) (quoting *Mktg. West, Inc. v. Sanyo Fisher (USA) Corp.,* 7 Cal. App. 4th 603,

10  612–13 (1992)).  The SAC fails to satisfy each of these requirements.

11         First, TRT cannot establish that Luckey owed TRT any duty.  TRT is not a party to the

12  Contract, which is the sole alleged basis for any purported duty on Luckey's part.  (SAC ¶ 65

13  ("Because of their contractual and confidential relationship, Luckey had a duty to disclose his

14  ongoing discussions and efforts with Carmack and Kickstarter . . . .").  Nor does the SAC allege

15  that Luckey even knew of TRT's existence, much less facts establishing a "confidential

16  relationship" between Luckey and TRT during the time period in question.

17         Second, TRT cannot establish that Luckey concealed material facts with intent to defraud

18  TRT.  Again, the Skype log establishes that Seidl rejected the August 2011 Device and released

19  Luckey from any contractual obligations he might have had with respect to its design.  Moreover,

20  the fact that Luckey intentionally publicized his plans for the Rift on the oculusvr.com website

21  and MTBS3d message board, allowed Carmack to review the Rift on MTBS3D and Twitter and

22  to give an interview to the Verge, and provided Carmack with a version of the Rift to use at the 3-

23  day E3 industry conference in Los Angeles, undermines any inference that he acted with

24  fraudulent intent to conceal facts from TRT.  To the contrary, it shows that Luckey was relying on

25  Seidl's assent to such action.  "Where a complaint pleads facts that are merely consistent with a

26  defendant's liability, it stops short of the line between possibility and plausibility of entitlement to

27  relief."  *Iqbal*, 556 U.S. at 678 (internal quotations and citation omitted).  Here, TRT's allegations

28  are affirmatively *inconsistent* with its fraud theory, negating any entitlement to relief.

Cooley LLP
Attorneys At Law
Palo Alto

20.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

Third, TRT cannot establish the necessary elements of justifiable reliance and damages. TRT claims that, had it known Luckey was engaged in these public activities, it "would have paid $10,000 to Luckey to extend the exclusivity provision of the Agreement beyond July 1, 2012." But, the exclusivity provision was void *ab initio* under Civil Code section 16600 irrespective of any payment, and a payment of $10,000 would not, in any event, have triggered or extended Luckey's alleged term of indentured servitude.[12] That TRT was allegedly denied the opportunity to make a payment to Luckey that would have no effect under the Contract does not show that it justifiably relied to its detriment.

**b.     TRT fails to plead a claim for intentional misrepresentation**

To state a claim for intentional misrepresentation, a plaintiff must allege: (1) a misrepresentation; (2) knowledge of its falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1067 (N.D. Cal. 2013) (citation omitted). TRT's misrepresentation theory fares no better than its fraudulent concealment claim.

The singular misrepresentation Luckey is supposed to have made is telling Seidl "that he would 'open-source' the Head Mounted Display design." (SAC ¶ 68; *see also id.* ¶ 31 ("Luckey told Seidl that he was 'going to open-source' the Rift design, because '[a] few VR nerds want to make it their own' and it 'seem[ed] like good karma points'").) For the sake of clarity, the actual Skype exchange between Seidl and Luckey reads as follows:

> Luckey: I am going to open-source that old single panel design, I think
> Luckey: A few VR nerds want to make it their own
> Seidl: ok
> Luckey: seems like good karma points

(Lambert Decl., Ex. __ at LUCKEY0113386.) TRT claims that, had it known that Luckey was making plans to commercialize the Rift, "it would not have agreed to 'open-source' the Head Mounted Display." (SAC ¶ 69.) These allegations fail to state a claim for fraud.

The Skype chat establishes that Seidl had already rejected the design for August 2011 Device as of "no use" to him *in February 2012*, and requested a different, multi-panel HMD

---

[12] The "Exclusivity" and "Payments" provisions (SAC, Ex. A ¶¶ 9, 10) contemplated a minimum stream of royalty income to Luckey from Seidl's sale of HMDs, not a flat payment.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

21.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

design that Luckey, in fact, built and delivered. That is, Seidl made clear that he had no plans to manufacture or sell or pay royalties on the August 2011 Device, and that Luckey was free to do with it what he wanted (such as providing it to others in his lab to build). Accordingly, Luckey did not need further permission from Seidl to use or disclose the design for the August 2011 Device, and the Skype chat shows Luckey did not request it. He simply said he was thinking of open-sourcing the design as of May 22, 2012, a proposition that is nowhere refuted in the SAC. Indeed, none of the things Luckey is supposed to have done before this date—sharing details about the Rift with Carmack (SAC ¶¶ 23, 28–30), registering a domain name for Oculus (*id.* ¶ 24), announcing plans to build and sell the Rift with the help of a Kickstarter campaign (*id.* ¶¶ 25–26), and preparing to demonstrate it at E3 (*id.* ¶ 27)—is in any way inconsistent with making the design available to the public to use and build for themselves. Accordingly, the SAC fails to plead that the statement was false when made.

Nor can TRT establish justifiable reliance. Whatever Luckey's plans for the August 2011 Device design might have been at the time of the Skype exchange at issue, Seidl clearly understood when he okayed open-sourcing the design that he would not be able to claim any rights in it thereafter, and that he would not be able to prevent others from using it or trying to make money from it. To manufacture reliance, TRT asks the Court to read into Luckey's exchange with Seidl some sort of commitment that he would not seek to commercialize a single-panel HMD—a representation he never made and that cannot be inferred from the allegations in the SAC. Indeed, one can open-source computer code or other technical information and still make and sell for profit products incorporating that information. As such, TRT cannot state a claim for fraud based on Luckey's statement that he was thinking of open-sourcing the design for the August 2011 Device, and TRT should not be allowed to amend its pleading to assert one.

### 5.   TRT's UCL and Common Law Unfair Competition Claims (Counts VI and VII Cannot Survive Dismissal

As discussed more fully in Defendants motion to dismiss briefing (Dkts. 48 at 21; Dkt. 65 at 13), TRT's common law unfair competition claim fails because TRT does not allege that Defendants passed of their own product as that of TRT. *Bank of the W. v. Sup. Ct.*, 2 Cal. 4th

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

22.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)

1254, 1263 (1992) ("common law tort of unfair competition is . . . synonymous with the act of 'passing off' one's goods as those of another . . ."); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008) (affirming dismissal under *Bank of the West* on ground that passing off was not alleged). TRT's proposed amendment does not cure this fatal defect because the proposed SAC still alleges just the opposite—that Defendants commercialized a product under the OculusVR name that purportedly belongs to TRT. (SAC ¶ 76.)

The UCL claim under California Business and Professions code section 17200 *et seq.* also fails. (*See* Dkts. 48 at 20–21; Dkt. 65 at 12–13.) For the reasons discussed at length above, TRT cannot show that Luckey's actions breached the Seidl/Luckey Contract or were otherwise improper. Thus, TRT fails to plead a predicate violation to support a claim under the UCL's "unlawful" prong. *See Berryman v. Merit Prop. Mgmt. Inc.*, 152 Cal. App. 4th 1544, 1554 (2007) ("a violation of another law is a predicate for stating a [claim] under the UCL's unlawful prong").

Nor does TRT plead facts establishing that Defendants engaged in anti-competitive conduct, as required to plead a violation of the UCL's "unfair" prong. To the contrary, the crux of TRT's complaint is that Defendants launched an allegedly competing business, which increased competition, rather than harming it. TRT continues to ignore that "injury to a competitor is not equivalent to injury to competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cell. Tel. Co.*, 20 Cal. 4th 163, 186 (1999).

Finally, TRT fails to adequately plead a violation of the UCL's "fraudulent" prong. A claim of "fraud" under the UCL requires that plaintiff allege particularized facts showing that it was damaged by defendant's deceptive business practices, which were likely to mislead the public. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). But TRT's claim is not premised on allegations that the public was misled; instead, TRT claims it was damaged because Defendants purportedly used the design of the August 2011 Device in developing and successfully commercializing the Oculus Rift. In any event, the Skype log shows that Seidl had no intention of ever using the August 2011 Device and assented to disclosure and use of the design by others. Accordingly, there was nothing fraudulent or misleading about Defendants developing and selling the Rift, even assuming it is based on the same design as the August 2011 Device (which it is not).

Cooley LLP
Attorneys At Law
Palo Alto

23.

Opposition to Motion for Leave to File
Second Amended Complaint
(Case No. 3:15-cv-02281 WHA)

1

**C.     TRT's Motion Constitutes a Bad Faith Effort To Put Off Dismissal of Its Case and Thereby Prejudice Defendants**

2

3      Defendants' motion to dismiss the FAC has been fully briefed since October 19, 2015.  By

4   its motion for leave to amend, TRT seeks to delay adjudication of that motion (and dismissal of

5   its case) by filing an amended pleading that adds almost nothing new, while intentionally

6   concealing and misrepresenting the true facts.  Indeed, although TRT produced the Skype log and

7   selectively quotes from it in the proposed SAC, it asserts factual allegations that it knows to be

8   false and that are directly contradicted by that very document.   As such, the amendment

9   constitutes a bad faith effort to mislead the Court and prejudice Defendants by forcing them to

10  incur the substantial burden and expense of preparing a *third* motion to dismiss and continuing

11  discovery in a lawsuit TRT is without standing or authority to assert.[13]   Under such circumstances,

12  the Court should exercise the "broad" discretion afforded to it in cases where plaintiff has

13  previously amended, and deny TRT's motion for leave to file a further amended complaint.

14  *Allen*, 911 F.2d at 373.

15  **VI.    CONCLUSION**

16      For the foregoing reasons, Defendants respectfully request that TRT's motion for leave to

17  file the proposed SAC be denied and a hearing set on their pending motion to dismiss the FAC.

18  Dated: December 14, 2015               COOLEY LLP

19                                         By:  ___/s/ Mark F. Lambert_____
                                                Mark F. Lambert

20
                                           Attorneys for Defendants
21                                         PALMER LUCKEY and OCULUS VR, LLC.

22

23  124612138

24  _____
[13] Seidl has not consented to this lawsuit by TRT.  To the contrary, shortly after it was filed, Seidl

25  sent a further Skype chat to Luckey stating: "Was without my knowledge or permis[sion]. . . .
    What he has done seems to be illegal to me.  I have not signed anything or let him [Igra] take

26  action against you." (Lambert Decl., Ex. C.)  Indeed, as Defendants pointed out in their motion to
    dismiss the original complaint (Dkt. 29 at 10), in a separate action pending in Hawaii state court

27  between Igra and Seidl, Igra has sued Seidl for withholding consent to this action, alleging that
    their partnership agreement vests Seidl with veto power over any legal action by the purported

28  partnership and that Seidl has refused "and continues to refuse to authorize Igra, or any other
    person or entity" to bring suit against Luckey or OculusVR.  (Lambert Decl., Ex. D ¶¶ 12, 31, 37.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

24.

OPPOSITION TO MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT
(CASE NO. 3:15-CV-02281 WHA)