IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOTAL RECALL TECHNOLOGIES,<br><br>    Plaintiff,<br><br>  v.<br><br>PALMER LUCKEY and OCULUS VR, LLC, as successor-in-interest to Oculus VR, Inc.,<br><br>    Defendants.<br>                                            / | No. C 15-02281 WHA<br><br>**AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND** |

## INTRODUCTION

In this action for breach of a confidentiality agreement involving head-mounted virtual-reality displays, plaintiff seeks leave to file a second amended complaint. Defendants have also moved to dismiss the first amended complaint. For the reasons stated below, defendants' motion is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's motion is **DENIED**.

## STATEMENT

Plaintiff Total Recall Technologies is a general partnership of Thomas Seidl and Ron Igra formed in 2010 with the goal of developing a prototype of a head-mounted 3D display with four specific attributes (First Amd. Compl. ¶ 10)[1]:

> (1) immersive stereoscopic 3D rendering, (2) an ultra-wide field of view such that the user could not see the edges of the screen,

---

[1] Except to the extent necessary to resolve Total Recall's motion for leave to amend, this order considers only the allegations in the first amended complaint.

        (3) head tracking with low latency, and (4) a price point attractive
to the consumer mass market.

In December 2010, Seidl contacted defendant Palmer Luckey about developing head-mounted displays and exchanged certain information about the goals for that prototype. In April 2011, Seidl requested that Luckey build a prototype according to his specifications with parts to be paid for by Total Recall (*id.* ¶¶ 11–14).

Seidl emailed Luckey to confirm their understanding of the proposed arrangement, "[j]ust so we are on the same page. With the initial payment to you I would like exclusive rights to your design unless we decide not to use it. I need to cover myself if we pay for development and then end up paying for a competitor" (*id.* ¶ 14). Luckey responded, "[y]es, we are on the same page here. . . . I am sure we can put together a contract of some sort to finalize it all" (*id.* ¶ 15). Igra then transferred $798 to Luckey via PayPal for the purchase of parts for the prototype.

In August 2011, Seidl and Luckey entered into a written "Nondisclosure, exclusivity and payments agreement" (*id.*, Exh. A). The preamble of the agreement provided that it was "entered into by and between Thomas Seidl with its principal offices at Maui USA, ('Disclosing Party') and Palmer Luckey, located at Long Beach ('Receiving Party')" for the purpose of protecting certain "Confidential Information," which the agreement defined as follows (*id.* ¶ 1):

> For purposes of this Agreement, "Confidential Information," shall include all information or material that has or could have commercial value or other utility in the business in which Disclosing Party is engaged.

The agreement excluded the following from the definition of Confidential Information (*id.* ¶ 2):

> [I]nformation that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through legitimate means other than from the Disclosing Party or Disclosing Party's representatives; or (d) is disclosed by Receiving Party with Disclosing Party's prior written approval.

The agreement required Luckey to undertake certain protections for any Confidential Information that he received and to return any and all materials in his possession pertaining to

2

1  that Confidential Information if requested in writing by Seidl (*id.* ¶ 3).  The agreement included

2  a nondisclosure and exclusivity provision (*id.* ¶ 9) (errors in original):

> The Receiving party shall keep all details including drawings and part suppliers of the Head Mounted Display confidential and shall not aid any other person or entity in the design of a Head Mounted Display other than the disclosing party.  Unless within a twelve month period from 1st july 2011 the receiving party has not received a minimum payment in royalties of 10,000 US dollars by the disclosing party.  The exclusivity shall remain in place for a period of 10 years providing a minimum of 10,000 US dollars is paid from the disclosing party to the receiving party per annum.[2]

8  The capitalized term "Head Mounted Display" was nowhere defined in the agreement, although

9  it appeared both capitalized and un-capitalized elsewhere in the agreement.   Finally, the

10  agreement concluded by noting that "[e]ach party has signed this Agreement through its

11  authorized representative" (*id.* at 2).

12      In August 2011, Luckey shipped a prototype to Seidl, which he returned to Luckey with

13  feedback for further improvements.  Luckey never returned that prototype to Seidl or anyone at

14  Total Recall, although no one requested its return (First Amd. Compl. ¶¶ 20–21).

15      Between April and June 2012 and without informing anyone at Total Recall, Luckey

16  began the process of commercializing a design for a head-mounted display, which he called the

17  "Rift," by registering the domain name oculusvr.com, blogging about the proposed product,

18  preparing to raise funds on the crowd-funding platform, Kickstarter, communicating with John

19  Carmack, a video game developer at ZeniMax Media, Inc., providing Carmack with a prototype

20  head-mounted display (for which Carmack wrote a review on a public message board on May

21  17, 2012), and ultimately presenting the Rift at a public showcase in June 2012 (*id.* ¶¶ 23–30).

22      In June 2012, Luckey formed Oculus LLC, which raised nearly one hundred million

23  dollars through Luckey's Kickstarter campaign.  Oculus LLC later incorporated as Oculus VR,

24  Inc., then re-registered as defendant Oculus VR, LLC, after Facebook acquired it for over

---

[2] The agreement inconsistently capitalized terms, such as "Disclosing Party" and "Head Mounted Display," without explanation.  This order resolves any ambiguity regarding those terms in the light most favorable to Total Recall, given that we are at the pleading stage.

3

two billion dollars in 2014 (*id.* ¶¶ 31–35). Total Recall never launched its own head-mounted display.

Total Recall commenced this action in May 2015. Seidl has not consented to this litigation. Igra is currently engaged in litigation against Seidl in state court in Hawaii regarding Seidl's refusal to authorize Total Recall to pursue any claims it may have against Luckey. *Igra v. Seidl*, No 14-0694 (Haw. 2d Cir.). (This, however, is not the basis for the instant motion.)

Total Recall asserts the following claims in the operative pleading: (1) breach of contract against Luckey, (2) breach of the implied covenant of good faith and fair dealing against Luckey, (3) conversion against Luckey and Oculus, (4) constructive fraud against Luckey and Oculus, (5) common law unfair competition against Luckey and Oculus, and (6) violation of the Unfair Competition Law against Luckey and Oculus. With its instant motion for leave to file a second amended complaint, Total Recall seeks to add a claim for actual fraud against Luckey based on representations that he intended to "open-source" the prototype he was working on pursuant to his agreement with Seidl.

Defendants moved to dismiss the first amended complaint in September 2015; however, that motion was held in abeyance pending the resolution of certain discovery disputes not relevant here. This order follows full briefing and oral argument on both motions.

**ANALYSIS**

Defendants contend that Total Recall lacks standing to sue based on the contract between Seidl and Luckey. They also argue that Total Recall's non-contract claims are superseded by the California Uniform Trade Secrets Act, that each claim suffers from substantive defects, and that Total Recall has not adequately pled damages. Each argument is addressed in turn.

1. **STANDING.**

Total Recall concedes that it is not named as a party or otherwise directly referenced in the agreement between Seidl and Luckey. It argues that it has standing to pursue its claims

4

either as an intended third-party beneficiary, or in the alternative as an undisclosed principal, for which Seidl acted as an agent.

### A.  Intended Third-Party Beneficiary.

Total Recall contends that Seidl and Luckey intended it to be a third-party beneficiary of their agreement. Section 1559 of the California Civil Code provides that a purported third-party beneficiary must show that the contract was "made expressly for the benefit of a third person." "California courts interpret the word 'expressly' as the negative of 'incidentally.'" *Trustees of Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 779 (9th Cir. 2009) (citing *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004 (2009)). The parties' intent to benefit a third party is a "question of ordinary contract interpretation" that should be "inferred, if possible, solely from the language of the written contract." *Spinks*, 171 Cal. App. 4th at 1023. "[T]here is no requirement that both of the contracting parties must intend to benefit the third party. Rather, it is sufficient that the promisor must have understood that the promisee had such intent." *Ibid.* (citations and internal quotation marks omitted). Here, Luckey was the promisor.

Although the agreement made no mention of Total Recall, it identified Seidl as a party "with *its* principal offices at Maui USA" (First Amd. Compl., Exh. A) (emphasis added). At this stage, the use of a neutral pronoun ("its"), rather than a gendered pronoun ("he"), is sufficiently ambiguous to suggest the parties intended some entity beyond Seidl as an individual to benefit from the agreement. The ambiguity is further compounded by the fact that the agreement concluded that each party "signed [the] Agreement through its authorized representative," a statement that would appear unnecessary if both Luckey and Seidl signed solely on behalf of themselves.[3]

---

[3] The agreement did not include a choice-of-law provision; however, both sides agree that California law, rather than Hawaii law, governs the agreement. It appears that the parties intended the contract to be performed in Long Beach, California, where Luckey was located at the time he entered the agreement. *See* Cal. Civ. Code 1646. Accordingly, this order presumes that California law applies.

5

Indeed, Total Recall's allegations of the parties' conduct outside the four corners of the complaint (which this order considers in light of the aforementioned ambiguity) supports that interpretation. For example, in the initial discussion regarding exclusivity that culminated in the agreement at issue, Seidl informed Luckey, "with the initial payment to you I would like exclusive rights to your design unless *we* decide not to use it. I need to cover myself if *we* pay for development and then end up paying for a competitor" (First Amd. Compl. ¶ 14) (emphasis added). Moreover, Luckey received a payment of $798 from Igra, Seidl's partner in Total Recall, for the parts needed to build the prototype (*id.* ¶ 16).[4]

Total Recall's allegations plausibly show Seidl intended the agreement to benefit Total Recall, and Luckey likewise understood that intention at the time they entered the agreement. *See Spinks*, 171 Cal. App. 4th at 1023. Accordingly, Total Recall has adequately pled that it has standing as a third-party beneficiary. Nevertheless, this order addresses Total Recall's alternative theory, namely, that it has standing as an undisclosed principal.

### B.     Undisclosed Principal.

Total Recall alternatively argues that it has standing to sue as an undisclosed principal of Seidl, who acted as its agent in entering the agreement with Luckey. A "contract made by an agent for an undisclosed principal is for most purposes the contract of the principal and it may sue . . . thereon." *Tom Trading, Inc. v. Better Blue, Inc.*, 26 Fed. Appx. 733, 735 (9th Cir. 2002) (citing *Ikerd v. Warren T. Merrill & Sons*, 9 Cal. App. 4th 1833, 1839 n.6 (1992)). This is true unless the alleged undisclosed principal is "excluded by the terms of the agreement made by the agent . . . ." *American Builder's Assoc. v. Au-Yang*, 226 Cal. App. 3d 170, 176 (1990) (citing *Schader v. White*, 173 Cal. 441, 445 (1916)).

---

[4] There is no indication in the complaint whether or not Seidl or Total Recall decided to use Luckey's design. Defendants seek to introduce evidence of a Skype conversation between Luckey and Seidl in February 2012 in which Seidl apparently rejected the design that allegedly became the Rift on the basis that Total Recall quoted from a different Skype conversation that occurred in May 2012, stored in the same computer file, in the complaint. As discussed below, *infra* n.5, this order only considers the evidence of the May 2012 conversation.

6

Defendants argue that the agreement between Seidl and Luckey excluded the possibility of an undisclosed principal by its terms. Specifically, it required Luckey to maintain confidentiality "for the sole and exclusive benefit of the Disclosing Party" and provided that he "shall not aid any other person or entity in the design of a Head Mounted Display other than the disclosing party [sic]" (First Amd. Compl., Exh. A ¶¶ 3, 8). Although such terms precluded Luckey from working for the benefit of anyone other than Seidl, they did not preclude the possibility that Seidl entered the agreement as an agent of Total Recall. That is, the exclusivity pertained to Luckey's work, not to the parties to the agreement.

Defendants cite *Pearson Education, Inc. v. Alahmad*, 12-2936, 2013 WL 1641533, at *6 (E.D. Cal. Apr. 16, 2013) (Judge Kimberly J. Mueller), for the contention that an entity can only have standing as an undisclosed principal if the complaint alleges fact showing it was "directing the transaction." That decision held that an individual lacked standing as an undisclosed principal because the plaintiff had not adequately alleged an agency relationship. The decision suggested such a relationship could be shown *either* with facts showing the alleged principal "direct[ed] the transaction" *or* that the alleged agent "agreed to act on [the principal's] behalf." *Ibid.*

Here, Total Recall has adequately alleged that Seidl agreed to act on behalf of Total Recall. Seidl and Igra formed the partnership for the purpose of developing a prototype in 2010, and Seidl later engaged Luckey for precisely that purpose. Moreover, when Seidl first asked Luckey for exclusive rights to his prototype he asked for such rights "unless *we* decide not to use it." Seidl's use of a plural pronoun raises at least a factual issue as to whether he agreed to contract with Luckey on behalf of Total Recall, his partnership with Igra. Further, the fact that the agreement specifically noted that each party signed "on behalf of its authorized agent" explicitly acknowledged the possibility that either party might be signing the agreement as an agent for an undisclosed principal.

*  *  *

7

Accordingly, Total Recall has plausibly alleged that it has standing to pursue claims that rely on the agreement between Seidl and Luckey. Nevertheless, defendants argue that Total Recall's claims must be dismissed under Rule 12(b)(6).

### 2. CONTRACT CLAIMS.

Total Recall asserts two claims arising directly from the agreement between Seidl and Luckey. Its first claim is for breach of contract, and its second is for breach of the implied covenant of good faith and fair dealing, each against Luckey.

#### A. Breach-of-Contract Claim.

Luckey argues that he has not breached the terms of the contract inasmuch as the nondisclosure and exclusivity provisions thereunder never took effect. Luckey further argues that the contract violates California's prohibition on covenants not to compete.

##### (1) Total Recall's Performance.

The agreement set forth Luckey's exclusivity and nondisclosure obligations as follows (First Amd. Compl., Exh. A ¶ 9) (errors in original) (emphasis added):

> The Receiving party shall keep all details including drawings and part suppliers of the Head Mounted Display confidential and shall not aid any other person or entity in the design of a Head Mounted Display other than the disclosing party. *Unless within a twelve month period from 1st July 2011 the receiving party has not received a minimum payment in royalties of 10,000 US dollars by the disclosing party.* The exclusivity shall remain in place for a period of 10 years providing a minimum of 10,000 US dollars is paid from the disclosing party to the receiving party per annum.

Luckey's argument that the nondisclosure and exclusivity provisions of the agreement never took effect turns on the interpretation of the italicized sentence fragment above. Luckey contends that the ten thousand dollar payment contemplated therein was a contingent event that had to occur before the exclusivity and nondisclosure obligations could take effect. Seidl's (and Total Recall's) failure to make such a payment, Luckey argues, is fatal to Total Recall's claim that Luckey breached the contract. Total Recall responds that its payment obligation was excused by Luckey's alleged breach.

8

1    The use of the word "unless" tends to support Luckey's construction of the agreement;
2 however, the grammatical defect in the provision renders it ambiguous at the Rule 12 stage.
3 One possibility is that the fragment was a condition subsequent, meaning the duty to maintain
4 confidentiality evaporated after one year (if the payment was not made). Another is that it was
5 a condition precedent, meaning the duty never arose in the first place (since no payment was
6 made). And, while it seems clear that zero payment was ever made, the idea that Luckey
7 frustrated such payment and thus excused it is plausible (if barely so) at the Rule 12 stage.

*(2)    Prohibition on Covenants Not to Compete.*

Luckey contends that the exclusivity provision of the agreement violates California's prohibition on covenants not to compete. Cal. Bus. & Prof. Code § 16600. Section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." It does not, however, void "agreements designed to protect an employer's proprietary information . . . ." *Fowler v. Varian Associates*, 196 Cal. App. 3d 34, 44 (1987); *see also Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003).

Here, the agreement prohibited Luckey from "aid[ing] any other person or entity in the design of a Head Mounted Display other than the disclosing party [sic]" (Second Amd. Compl., Exh. A ¶ 9). Although the capitalized term "Head Mounted Display" is not defined in the agreement, it is ambiguous whether the term as used here is intended to refer only to the prototype Luckey designed for Seidl or to all similar devices. For now, this order resolves that ambiguity in Total Recall's favor (*i.e.*, limiting it to the prototype so as to avoid interpreting it to prevent Luckey from contracting to design a different prototype display for any other company, which would implicate Section 16600), as it must on a motion to dismiss. Accordingly, Total Recall has adequately alleged a claim for breach of contract.

9

### B.     Implied Covenant of Good Faith.

Total Recall's second claim is that Luckey breached the implied covenant of good faith and fair dealing by "falsely promising" to perform the duties set forth in his agreement with Seidl.

The undersigned has previously held that "absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery." *American Marine Corporation v. Blue Shield of California*, No. 11-00636, 2011 WL 1399244, *3 (N.D. Cal. Apr. 13, 2011) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990)); *see also Nasseri v. Wells Fargo Bank, N.A.*, No. 15-4001, 2015 WL 7429447, at *4 (N.D. Cal. Nov. 23, 2015) (same).

> If the allegations in a breach of implied covenant claim do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.

*Careau*, 222 Cal. App. 3d at 1395 (internal citation omitted).

So too here. Total Recall's implied covenant claim relies solely on Luckey's alleged false promise to perform under the contract. Total Recall does not allege that Luckey had any duty beyond his contractual duties to Seidl pursuant to which it could seek a separate tort recovery. The breach of the implied covenant is therefore duplicative of Total Recall's breach-of-contract claim. Total Recall's claim is subsumed under its breach-of-contract claim, and it may pursue its implied covenant theory through its contract claim. The jury will be instructed that the contract included the covenant of good faith and fair dealing.

Total Recall's citation to *Cobb v. Ironwood Country Club*, 233 Cal. App. 4th 960, 966 (2015), for the contention that it can plead its implied covenant theory in the alternative is misplaced. That decision held that the defendant breached the implied covenant by exercising discretion granted to it under the agreement in a manner that frustrated the purpose of the

10

agreement. Specifically, the defendant unilaterally amended an arbitration provision to apply to an action that had already accrued and proceeded to litigation. The agreement apparently allowed that conduct, so it could not give rise to a claim for a breach of contract. Nevertheless, the plaintiff was allowed to pursue an independent claim for breach of the implied covenant based on conduct beyond the reach of any claim for breach of contract.

Total Recall's claim bears no resemblance to the claim in *Cobb*. It is based solely on Luckey's alleged violation of his agreement with Seidl. Accordingly, Total Recall's claim for breach of the implied covenant of good faith and fair dealing is hereby **DISMISSED**. The separate claim based on the implied covenant will be treated as part of the contract claim.

### 3. TORT CLAIMS.

Total Recall's remaining claims are for conversion, constructive fraud, common law unfair competition, and violation of the Unfair Competition Law. Total Recall also seeks leave to amend its complaint to include a claim for actual fraud. Defendants argue that Total Recall's claims are superseded by the California Uniform Trade Secret Act. Defendants further argue that to the extent Total Recall's claims are not superseded by CUTSA, such claims fail substantively.

#### A. CALIFORNIA UNIFORM TRADE SECRETS ACT.

By strategy, Total Recall has studiously avoided assertion of any trade secret claims. Defendants contend that the California Uniform Trade Secrets Act supersedes Total Recall's tort claims. "CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies based upon misappropriation of a trade secret." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 236 (2010), as modified (May 27, 2010), disapproved on other grounds by *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 337 (2011) (addressing the *Silvaco* decision's treatment of standing under the UCL); Cal. Civ. Code § 3426.74. Although CUTSA does not supersede contractual remedies, it supersedes "claims based on the same nucleus of facts as the misappropriation of trade secrets claim for relief." *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 958

11

(2009). *This includes "information that does not fit [the] definition [of a trade secret], and is not made property by some provision of positive law . . . ."* *Silvaco*, 184 Cal. App. 4th at 239 n.22. Judge Lucy Koh addressed this aspect of *Silvaco* in *SunPower Corp. v. SolarCity Corp.*, 12-0694, 2012 WL 6160472, at *9 (N.D. Cal. Dec. 11, 2012) (internal quotations omitted):

> In light of *Silvaco*, the Court concludes that SunPower's claims based on its non-trade secret proprietary information are superseded unless one of the following conditions is met: (1) SunPower can allege facts that show that the non-trade secret proprietary information was made property by some provision of positive law on grounds that are qualitatively different from the grounds upon which trade secrets are considered property, or (2) it can otherwise be concluded that SunPower's Non-Trade Secret Claims allege wrongdoing that is materially distinct from the wrongdoing alleged in a CUTSA claim.

Similarly, in *Heller v. Cepia, L.L.C.*, 11-01146, 2012 WL 13572, at *7 (N.D. Cal. Jan. 4, 2012), Judge Jeffrey S. White held:

> [The plaintiff's] common law claims against [the defendant] premised on the wrongful taking and use of confidential business and proprietary information, regardless of whether such information constitute trade secrets are superseded by the CUTSA.

Every district court in our circuit to consider this aspect of *Silvaco* has held that CUTSA supersedes claims based on the misappropriation of non-trade secret information, except where there is some other provision of positive law granting a property right in that information. *See, e.g.*, *Loop AI Labs Inc., v. Gatti*, No. 15-00798, at *3 (N.D. Cal. Sept. 2, 2015) (Judge Haywood S. Gilliam, Jr.); *RSPE Audio Sols., Inc. v. Vintage King Audio, Inc*., 12-06863, 2013 WL 1120664, at *3 (C.D. Cal. Mar. 18, 2013) (Judge Dean Pregerson); *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 986 (C.D. Cal. 2011) (Judge David O. Carter).

Based on 25 years of practice in California and 16 years on the bench in California, the undersigned judge finds the preemptive sweep of *Silvaco* extraordinarily surprising as a development in California law. Nevertheless, it must be respected and applied.

Total Recall has not alleged that it has any other property interest in the allegedly misappropriated information. Accordingly, to the extent Total Recall's claims rely on the alleged misappropriation of Confidential Information, any such claims are superseded by

12

CUTSA. Total Recall primarily contends that each of its claims relies on conduct *other than* the misappropriation of information, thereby avoiding any conflict with CUTSA. Each claim is addressed in turn.

### B. Conversion.

Total Recall's third claim is for conversion against both Luckey and Oculus for the conversion of *tangible property* only (*i.e.*, not the conversion of intangible Confidential Information, which claim, as stated, would be superseded by CUTSA). Specifically, Total Recall contends that Luckey and Oculus converted the prototype single-panel head-mounted display that Luckey designed for Seidl for their own use.

To state a claim for conversion, Total Recall must allege: (1) it owned or had a right to possess a specific item of property, (2) defendants wrongfully dispossessed it of that property, and (3) it suffered damages as a result. *G.S. Rasmussen & Associates v. Kalitta Flying Services, Inc.*, 958 F.2d 896, 906 (9th Cir. 1992). Total Recall concedes that Seidl returned the prototype to Luckey for further improvements based on Seidl's feedback. Its conversion claim rests on the allegation that Luckey never returned the prototype to Seidl thereafter, although no one requested its return (First Amd. Compl. ¶ 20).

A "request for return" is not an element of a conversion claim, nevertheless, Seidl's and Total Recall's failure to request the return of the prototype is fatal to Total Recall's claim here, inasmuch as it defeats the second element — wrongful dispossession. Seidl's agreement with Luckey only entitled him to the return of "tangible items in [Luckey's] possession . . . *if Disclosing Party requests it in writing*" (*id.*, Exh. A ¶ 3) (emphasis added). That is, Seidl *voluntarily* dispossessed himself (and Total Recall) of the prototype by returning it to Luckey, and because neither Seidl nor Total Recall ever demanded its return, Luckey's possession and use of the prototype never became wrongful.

Total Recall has failed to allege a necessary element, wrongful dispossession, of its conversion claim, and that claim is therefore **DISMISSED**. Nevertheless, Total Recall may seek leave to amend its complaint as to this claim.

13

### C. Constructive Fraud.

Total Recall's fourth claim, for constructive fraud, is against both Luckey and Oculus. To state a claim for constructive fraud, a party must allege: (1) a fiduciary or confidential relationship, (2) an act, omission, or concealment involving a breach of that duty, (3) reliance, and (4) resulting damage. *Assilzadeh v. California Federal Bank*, 82 Cal. App. 4th 399, 414 (2000). Total Recall's constructive fraud claim relies on the allegation that Luckey entered the agreement with Seidl without ever intending to abide by its terms; however, the only allegations of Luckey's intent to breach the agreement are based on events that occurred long after entering the agreement. Particularly in light of the heightened pleading standard for fraud pursuant to Rule 9(b), a "plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548–49 (9th Cir. 1994) (superseded by statute on other grounds).

Total Recall has failed to plead facts showing that Luckey harbored, much less concealed, an intent to breach the contract *at the time it was made*. Accordingly, Total Recall's claim for constructive fraud is **DISMISSED**. Even if Total Recall could plead such intent, the constructive fraud claim would remain superseded by CUTSA, inasmuch as the claim cannot stand absent Luckey's alleged disclosure of Confidential Information in breach of his contractual duties. *See Silvaco*, 184 Cal. App. 4th at 239 n.22. Nevertheless, Total Recall may seek leave to amend its claim for constructive fraud both to allege (with particularity) facts demonstrating Luckey harbored an intent to breach the agreement at the time it was made and to allege a property interest in the Confidential Information (if possible to do so in good faith).

### D. Actual Fraud.

Total Recall seeks leave to amend its complaint to add a claim for actual fraud against Luckey under a theory of either fraudulent concealment or intentional misrepresentation. This proposed claim primarily relies on the following conversation between Luckey and Seidl, which

14

allegedly occurred on the instant messaging platform, Skype, in May 2012 (Lambert Decl., Exh. B, LUCKEY0113386)[5]:

> Luckey:  I am going to open-source that old single panel design, I think
>
> Luckey:  A few VR nerds want to make their own
>
> Seidl:  ok
>
> Luckey:  seems like good karma points

Total Recall contends that Luckey committed actual fraud by seeking and receiving Seidl's permission to open-source the prototype, when in fact Luckey had taken steps to launch that prototype as the Oculus Rift and had begun working with a video-game developer, John Carmack, without disclosing those facts to Seidl or anyone else at Total Recall.

Any injury to Total Recall due to Luckey's alleged fraud flowed from his alleged disclosure of Confidential Information to his partners in developing and marketing the Rift. Although Luckey allegedly made such disclosures under the guise of Seidl's consent, Total Recall's claim remains reliant on the misappropriation of information and is therefore superseded by CUTSA. Thus, Total Recall's motion for leave to amend is **DENIED**.

The alleged conversation, if fraudulent, may have a role in the case as a means to vitiate the defense of consent. That is, if Luckey asserts consent as an affirmative defense to the

---

[5] Total Recall quotes portions of this conversation in its proposed second amended complaint. Defendants have provided the log of Luckey and Seidl's entire history of Skype conversations, including the May 2012 conversation. A "court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). Total Recall's proposed actual fraud claim relies primarily on this conversation, and it does not dispute the authenticity of the Skype log. Accordingly, this order considers the text of the May 2012 conversation referenced in the complaint as if it was set forth therein.

Defendants further seek to incorporate the entire log of the Skype conversations between the parties, which spans over a year (and eighty-seven pages), on the basis that the log was stored in a single computer file, in order to show that in February 2012 Seidl rejected the prototype that allegedly became the Rift. It is within the discretion of the district court whether to consider a document incorporated by reference. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012). This order does *not* consider the contents of the Skype log beyond the May 2012 "open-source" conversation referenced in the complaint. The full log is best considered on a fully-developed record, once both sides have had the opportunity to present evidence of any interactions that may have occurred on other platforms or face-to-face over the time period reflected on the Skype log.

contract claim (on which defense he would have the burden of proof), then Total Recall may seek to vitiate any otherwise enforceable consent by showing it was procured by fraud.

### E. Common Law Unfair Competition.

Common law unfair competition involves passing off one's goods as those of another or exploiting another's trademarks or trade names. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008). Total Recall has not alleged passing off as the basis for this claim; it has alleged *reverse* passing off (*i.e.*, passing off the Seidl prototype as Oculus's product). Accordingly, Total Recall's common law unfair competition claim is **DISMISSED**. Total Recall has made no showing that it could plead facts to support a claim based on passing off, accordingly, leave to amend this claim may not be sought.

### F. Unfair Competition Law.

Total Recall's final claim, against both defendants, is for violation of California's Unfair Competition Law, Section 17200 of the California Business and Professionals Code. Total Recall's claims under the "unlawful" and "unfair" prongs of the UCL each directly rely on Luckey's alleged disclosure of the Confidential Information in the process of developing the Rift, and such claims are therefore superseded by CUTSA. Nevertheless, Total Recall may seek leave to amend to assert a property right in the allegedly misappropriated information that could give rise to a UCL claim.

Total Recall contends that it has stated a claim under the "fraudulent" prong based on defendants' statements to the public regarding their product, the Rift (namely, that the product originated with Oculus, rather than with Total Recall). To state a claim under the "fraudulent" prong, Total Recall must allege that it was injured by defendants' deceptive business practices that were likely to mislead the public. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). Total Recall argues that its claim is based on defendants' alleged misrepresentations to the public of the origins of the design of the Rift, but its injuries do not actually stem from such statements (which, it is worth noting, are not pled with any particularity). Rather, Total Recall's injuries stem from the alleged misappropriation of the design (again, superseded by

16

CUTSA). This cannot make out a claim under the "fraudulent" prong of the UCL, inasmuch as such misappropriation was not likely to mislead the public. *Ibid.* In other words, had Oculus and Luckey marketed the Rift with a disclaimer that the design originated with Total Recall, Total Recall's injuries would be the same.

Accordingly, Total Recall's claim under the Unfair Competition Law is **DISMISSED**. Total Recall may seek leave to amend this claim only to the extent it seeks to plead that some provision of positive law created a property right in its Confidential Information.

### 4. DAMAGES.

Finally, defendants argue that Total Recall has failed to adequately allege damages because it has not alleged that it has ever sold a product. Defendants cite *Fisher v. Hampton*, 44 Cal. App. 3d 741, 748 (1975), for the contention that a "loss of anticipated profits from a new business" is too speculative, absent evidence both that such profits would have been realized and of the extent of such profits. The decision in *Fisher* was a judgment issued after a bench trial, not a decision on a Rule 12 motion. Moreover, Total Recall's allegations, namely, that Oculus raised $2.4 million on Kickstarter and another $100 million in venture financing for a product allegedly based on Total Recall's Confidential Information, to the exclusion of Total Recall, provide adequate metrics for damages at the pleading stage (First Amd. Compl. ¶ 35).

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART**. Total Recall's motion for leave to amend to add a claim for actual fraud is **DENIED**. Total Recall may seek leave to amend its conversion claim, constructive fraud, and UCL claims, to the extent described above within **FOURTEEN DAYS** of this order. If Total Recall does not intend to seek leave to amend with regard to those claims, it shall file an amended complaint asserting its claim for breach of contract consistent with this order within **FOURTEEN DAYS** of the date of this order.

There shall be no more Rule 12 motions without first obtaining permission of the Court. Such permission may be sought via a formal five-page (maximum) application and précis

17

Case 3:15-cv-02281-WHA   Document 82   Filed 01/16/16   Page 18 of 18

explaining the proposed Rule 12 motion and what it will accomplish. Within two court days of any such application, the other side may respond.

**IT IS SO ORDERED.**

Dated: January 16, 2016. 
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

18