QUINN EMANUEL URQUHART & SULLIVAN, LLP
Robert P. Feldman (Bar No. 69602)
bobfeldman@quinnemanuel.com
Robert W. Stone (Bar No. 163513)
robertstone@quinnemanuel.com
Brian Cannon (Bar No. 193071)
briancannon@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Total Recall Technologies*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Total Recall Technologies,<br><br>Plaintiff,<br><br>vs.<br><br>Palmer Luckey and Oculus VR, LLC, as successor-in-interest to Oculus VR, Inc.,<br><br>Defendants. | CASE NO. 3:15-cv-02281-WHA<br><br>SECOND AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Total Recall Technologies ("TRT" or "Partnership") alleges as follows:

## NATURE OF THE ACTION

1. TRT brings this action for Defendants' breach of contract and wrongful exploitation of TRT property in connection with TRT's development of affordable, immersive, virtual reality technology. Defendants have breached duties relating to the exclusive use of designs for head mounted displays, as well as, separately, duties relating to confidential information.

**PARTIES**

2. Plaintiff TRT is a partnership by and between individuals Ron Igra ("Igra") and Thomas Seidl ("Seidl"), which conducts business in Hawaii.

3. Igra and Seidl were resident in the State of Hawaii at the formation of the Partnership and have been for all relevant times thereafter.

4. On information and belief, Defendant Oculus VR, LLC ("Oculus") is a Delaware corporation with its principal place of business in Menlo Park, California. On information and belief, Oculus is the corporate successor to Oculus VR, Inc. and Oculus LLC, a California limited liability company.

5. On information and belief, Defendant Palmer Luckey ("Luckey"), a founder of Oculus, is an individual who resides in Palo Alto, California, and who may be served with process at his place of employment, Oculus (together with Luckey, "Defendants").

**JURISDICTION AND VENUE**

6. The Court has jurisdiction in this Action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship amongst the parties to this action, and the amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

7. Venue is proper in this District because a substantial part of the events giving rise to the claims occurred in this District, Oculus VR, LLC's principal place of business is within the District, and the Defendants are otherwise subject to personal jurisdiction in the District pursuant to 28 U.S.C. § 1391(b), (c).

**INTRADISTRICT ASSIGNMENT**

8. Pursuant to Civil L.R. 3-5(b) and Civil L.R. 3-2(c)-(d), there is a basis for assigning this civil action to the San Francisco Division or Oakland Division, as a substantial part of the events giving rise to the claims occurred in San Mateo County, and Oculus VR, LLC's principal place of business is located in San Mateo County.

## BACKGROUND

9. In 2010, Igra and Seidl began their partnership with the aim of developing immersive 3D technology, including cameras and head mounted displays.

10. In particular, Igra and Seidl sought to develop a head mounted display with, among other things, the following attributes: (1) immersive stereoscopic 3D rendering, (2) an ultra-wide field of view such that the user could not see the edges of the screen, (3) head tracking with low latency, and (4) a price point attractive to the consumer mass market.

11. As of late 2010, on information and belief, no head mounted display on the market had each of these characteristics. As a result, Igra and Seidl sought to develop a prototype. In that regard, in December 2010, Seidl contacted Luckey in connection with developing head mounted displays and began an exchange of information about TRT's project with a goal of building a head mounted display that had each of these characteristics.

12. During 2010 and 2011, Seidl and Luckey exchanged dozens of emails relating to the development of the foregoing head mounted display. In those discussions, Seidl disclosed, among other things, the four primary characteristics that were crucial to TRT's head mounted display that Luckey was supposed to build.

13. On May 27, 2011, Igra and Seidl filed a patent application, entitled "System and method for creating a navigable, three-dimensional virtual reality environment having ultra-wide field of view." That application later issued as United States Patent No. 9,007,430.

14. In April 2011, Seidl requested that Luckey build a prototype to Seidl's specifications with parts paid for by the Partnership. Igra and Seidl agreed that the Partnership would have exclusive rights to that prototype. In that regard, Seidl explained to Luckey that with the Partnership's initial payment to Luckey, he expected exclusive rights to the design. Seidl emailed Luckey to confirm this

understanding on April 8, 2011 stating, among other things: "Just so we are on the same page. With the initial payment to you I would like exclusive rights to your design unless we decide not to use it. I need to cover myself if we pay for development and then end up paying for a competitor."

15. Luckey agreed that same day via e-mail: "Yes, we are on the same page here. Once your patent hits pending, I am sure we can put together a contract of some sort to finalize it all."

16. Thereafter, in reliance on Luckey's promises, on April 11, 2011, Ron Igra transferred via PayPal a payment of $798.00 to Luckey. The payment was used to purchase parts for the TRT prototype. On information and belief, Luckey understood as of at least this date that Igra was Seidl's partner in connection with development of the head mounted display and the prototype work that Luckey performed.

17. At all relevant times, Luckey understood that the information used by him concerning, among other things, all details, drawings, and parts suppliers for the head mounted displays being built by Luckey for TRT was to be kept confidential and that TRT expected the information to remain confidential.

18. To that end, on June 16, 2011, Seidl, on behalf of TRT, presented Luckey with a written "Nondisclosure, exclusivity and payments agreement (the "Agreement"). Luckey executed the Agreement on August 1, 2011. On information and belief, two witnesses also executed the Agreement at Luckey's direction: Tom Allan and Jeff Bacon. A true and correct copy of the Agreement is attached hereto as Exhibit A.

19. Pursuant to the terms of the Agreement, Luckey agreed, among other things, to maintain confidential information he received in the strictest confidence and not to use confidential information received for his own benefit. Furthermore, Luckey agreed: "The Receiving party [Luckey] shall keep all details including drawings and part suppliers of the Head Mounted Display confidential and shall not

aid any other person or entity in the design of a Head Mounted Display other than the disclosing party." The exclusivity provision with respect to the Head Mounted Display was an obligation additional to Luckey's confidentiality obligations pursuant to the Agreement.

20. On August 23, 2011, Luckey shipped a Head Mounted Display to Seidl pursuant to the Agreement. The Head Mounted Display was later returned to Luckey for further improvement. That Head Mounted Display was never returned to the Partnership.

21. Throughout the latter half of 2011 and into 2012, TRT provided confidential feedback and information to Luckey in order to improve the design of the Head Mounted Display.

22. Despite his contractual obligations, and without informing Seidl or the Partnership, on information and belief, Luckey did not keep all details concerning the Head Mounted Display confidential. Furthermore, Luckey breached the exclusivity provisions of the Agreement by setting off to design and commercialize the Head Mounted Display for himself and Oculus rather than the Partnership. On information and belief, Luckey called the Partnership's Head Mounted Display the Oculus Rift.

23. On or about April 15, 2012, without informing the Partnership, Luckey registered the domain name oculusvr.com.

24. Without informing the Partnership, on or about April 15, 2012, on information and belief, Luckey made his first post on oculusvr.com, claiming, among other things, that:

> The 'RIFT' page contains information on the first piece of hardware I hope to bring to market through Oculus, the RIFT. In a nutshell: A wide field of view, highly immersive stereoscopic head mounted display at a price I can afford. After a quick glance at my bank account, I am sure that if I can afford it, you can too! ($500 is the target price).

25. On April 15, 2012, Luckey also posted on the Meant to Be Seen 3D ("MTBS3D") online message board concerning his plan to pursue a Kickstarter campaign in June 2012, during the term of the Agreement, for the Rift:

> Oculus "Rift" : An open-source HMD for Kickstarter. Hey guys, I am making great progress on my HMD kit! All of the hardest stuff (Optics, display panels, and interface hardware is done, right now I am working on how it actually fits together, and figuring out the best way to make a head mount. It is going to be out of laser cut sheets of plastic that slide together and fasten with nuts and bolts. . . . The goal is to start a Kickstarter project on June 1st that will end on July 1st, shipping afterwards as soon as possible. . . .

26. On information and belief, as a result of these posts and others, John Carmack ("Carmack"), a ZeniMax employee and videogame developer, discovered the Rift. In violation of the Agreement, Luckey provided the Rift to Carmack on or about May 17, 2012.

27. On May 17, 2012, Carmack posted on the MTBS3D message board about his experience with the Rift:

> I am going to be giving several demos in the next month, and Palmer graciously loaned me one of his test HMDs to go with the other things I have to show. Here are my impressions after a day of working with it:
>
> . . . I measured the horizontal field of view as a bit under 90 degrees per eye (full binocular overlap), but when you first look through the lenses you clearly feel the edge of the screen on the sides. The vertical field of view is plenty, and you really have to push into the lenses to catch a glimpse of the screen edge. . . .
>
> With everything dialed in, the immersion level is so good that I can give myself a type of simulator sickness that I'm not used to seeing . . . .
>
> Bottom line:
>
> After dialing everything in, this is by far the most immersive HMD of the five I have here. If Palmer comes close to his price target, it will

> also be the cheapest. I will be including full support for this in the next new PC title we release.

28. Carmack tweeted about the Rift on that same day. "This is a lot cooler than it looks – Palmer Luckey's 90+ FOV HMD, soon to be available as a cheap kit." A true and correct copy of this tweet is attached as Exhibit B.

29. On information and belief, on May 24, 2012, Luckey signed a Non-disclosure Agreement with Carmack's employer ZeniMax to allow further discussions between Luckey, Carmack, and ZeniMax about the Rift.

30. On information and belief, during the June 5-7, 2012 Electronic Entertainment Expo ("E3") held in Los Angeles, California, Carmack used the Rift to showcase a specially configured version of ZeniMax's videogame Doom 3. On information and belief, the Rift was nominated for the E3 Game Critic Award for "Best Hardware/Peripheral."

31. On June 12, 2012, during the term of the Agreement, Luckey formed Oculus LLC.

32. On information and belief, by late June 2012, Luckey, Brendan Iribe ("Iribe"), Nate Mitchell ("Mitchell"), and Michael Antonov ("Antonov") agreed to form a company to commercialize the Rift.

33. At no time prior to July 1, 2012, did Luckey inform Seidl or the Partnership that he had had discussions with Carmack, ZeniMax, Iribe, Mitchell, or Antonov concerning the Rift.

34. In September 2012, Seidl wrote to Luckey claiming that Luckey was in breach of the parties' Agreement. In response, on September 7, 2012, Luckey acknowledged his obligations under the parties' Agreement but denied that he was in breach claiming, among other things:

> I should not be in breach of contract. I kept all the details (schematics, parts lists, etc.) of my HMD designs to myself until mid-July, which is also when I filed my LLC. The exclusivity only lasted until July 1st, I was free to design something for myself after that exclusivity ended.

35. On information and belief, Luckey's Kickstarter campaign raised $2.4 million. Subsequently, Oculus raised nearly $100 million in venture financing. In March 2014, Facebook announced that it would acquire Oculus for more than $2 billion.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**(Breach of Contract)**

**(As Against Luckey)**

36. TRT realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 35.

37. Under the terms of the Agreement, Luckey agreed, among other things, to the following: "The Receiving party [Luckey] shall keep all details including drawings and part suppliers of the Head Mounted Display confidential and shall not aid any other person or entity in the design of a Head Mounted Display other than the disclosing party."

38. Luckey breached this provision of the Agreement by, among other things: First, Luckey did not keep all details including drawing and part suppliers of the single Head Mounted Display confidential. To the contrary, Luckey disclosed information about the Head Mounted Display publicly on the oculusvr.com Web site and on the MTBS3D message boards, and also to third parties including Carmack. Second, Luckey aided himself and his entity, Oculus, as well as others including at least Carmack, Iribe, Mitchell, and Antonov, in the design of the Head Mounted Display for his own benefit.

39. TRT performed all conditions, covenants, and promises required to be performed on its part.

40. As a result of Luckey's contractual breach, TRT has been injured in an amount to be determined.

41. TRT will suffer irreparable injury by reason of the acts, practices, and conduct of Luckey alleged above until and unless the Court enjoins such acts, practices, and conduct.

**SECOND CAUSE OF ACTION**

**(Constructive Fraud)**

**(As Against All Defendants)**

42. TRT realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 41.

43. Because of their contractual and personal relationship as evidenced by the parties' Agreement, Luckey gained the confidence of TRT.

44. Luckey, assisted by those acting in concert with Luckey including Oculus, breached that confidence by failing to disclose to TRT that he was aiding his company Oculus and others, in the design of a Head Mounted Display in contravention of the exclusivity provisions of the parties' Agreement.

45. In particular, Luckey, despite being in repeated contact with TRT prior to July 1, 2012, failed to disclose that he had (1) created a Web site – oculusvr.com -- in April 2012, (2) provided a Head Mounted Display to Carmack in May 2012, (3) signed an NDA with ZeniMax concerning the Head Mounted Display in May 2012, (4) permitted Carmack to display the Head Mounted Display at the E3 convention in Los Angeles in June 2012, and (5) formed Oculus LLC in June 2012 for the purpose of commercializing the Head Mounted Display which Luckey dubbed the Oculus Rift.

46. Oculus substantially assisted Luckey in his breach of duty by, during the term of Luckey's Agreement with TRT, providing the corporate form necessary for Luckey to design and monetize TRT's Head Mounted Display.

47. TRT relied on Defendants' breach of confidence to its detriment. Had Luckey disclosed his omissions with respect to the Head Mounted Display, TRT would have acted differently. It would have paid Luckey under the Agreement

thereby securing exclusive rights to the Head Mounted Display known as the Oculus Rift.

48. As a result of Defendants' actions, TRT was damaged, and Defendants were unjustly enriched with the proceeds of their wrongdoing. In addition to other damages as yet incapable of precise determination, TRT was denied the opportunity to commercialize the Head Mounted Display, which was its goal in working with Luckey.

49. Defendants are jointly and severally liable for the wrongful conduct set forth herein because they aided and abetted each other and/or conspired to commit such wrongful conduct.

50. The conduct by Defendants was fraudulent, oppressive, and malicious, and as such constitutes the basis for the award of punitive damages pursuant to California Civil Code § 3294.

**<u>THIRD CAUSE OF ACTION</u>**

**(Unfair Competition in Violation of California Business & Professions Code Section 17200, *et seq.*)**

**(As Against All Defendants)**

51. TRT realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 50.

52. Pursuant to the parties' Agreement, Luckey agreed that he would not aid any other person or entity in the design of a Head Mounted Display. In contravention of that exclusivity provision, Luckey, together with Oculus, designed and monetized TRT's Head Mounted Display for themselves.

53. Furthermore, as set forth in paragraphs 42-50, Luckey, assisted by those acting in concert with Luckey including Oculus, constructively defrauded TRT by failing to disclose to TRT that he was aiding his company Oculus and others, in the design of a Head Mounted Display in contravention of the exclusivity provisions of the parties' Agreement.

54. The foregoing conduct constituted unlawful business acts or practices in violation of California Business and Professions Code Section 17200, *et seq*.

55. As a result of Defendants' actions, TRT was damaged, and Defendants were unjustly enriched with the proceeds of their wrongdoing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

A. For compensatory damages;

B. For disgorgement of any proceeds obtained by wrongful act;

C. For constructive trust;

D. For an accounting;

E. For interest to the extent permitted by law;

F. For an award of exemplary and punitive damages;

G. For injunctive relief; and

H. For such other and further relief as the Court may deem proper.

Dated: March 21, 2016

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Robert W. Stone*

Robert W. Stone
Robert P. Feldman
Brian Cannon

*Attorneys for Plaintiff TRT*

## DEMAND FOR JURY TRIAL

Plaintiff Total Recall Technologies hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

Dated: March 21, 2016

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By: /s/ *Robert W. Stone*

Robert W. Stone
Robert P. Feldman
Brian Cannon