QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Robert P. Feldman (Bar No. 69602)
  bobfeldman@quinnemanuel.com
  Robert W. Stone (Bar No. 163513)
  robertstone@quinnemanuel.com
  Brian Cannon (Bar No. 193071)
  briancannon@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:      (650) 801-5000
Facsimile:      (650) 801-5100

*Attorneys for Plaintiff Total Recall Technologies*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| TOTAL RECALL TECHNOLOGIES,<br><br>*Plaintiff*,<br><br>vs.<br><br>PALMER LUCKEY and OCULUS VR, LLC,<br>as successor-in-interest to OCULUS VR, Inc.,<br><br>*Defendants*. | Case No. 15-cv-02281-WHA<br><br>**TOTAL RECALL'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date: June 2, 2016<br>Time: 2:00 p.m.<br>Location: Courtroom 8, 19th Floor<br>Judge: Hon. William H. Alsup |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................................1

STATEMENT OF FACTS ............................................................................................................2

     A.   Igra and Seidl formed Total Recall to pursue 3D immersive technology, including a 3D 360 degree camera and a head mounted display. ............................2

     B.   Seidl entered into an agreement with Luckey to develop a head mounted display on behalf of Total Recall. ..................................................................3

     C.   Seidl confronted Luckey when he breached the agreement with Total Recall..............................................................................................................4

     D.   In 2013 and 2014 Igra and Seidl disagreed on whether to pursue legal claims against Luckey and Oculus. ...............................................................5

     E.   In 2015 Igra and Seidl *agreed* to pursue legal claims against Luckey and Oculus. ...................................................................................................6

     F.   Seidl still believes that Luckey is in breach of the agreement with Total Recall............................................................................................................9

ARGUMENT ...............................................................................................................................10

I.    DEFENDANTS LACK STANDING TO CHALLENGE TOTAL RECALL'S AUTHORITY TO SUE BASED ON THE CONTRACT DISPUTE BETWEEN TOTAL RECALL'S TWO GENERAL PARTNERS ...........................................10

II.   DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE TOTAL RECALL HAS BOTH THE CAPACITY AND THE AUTHORITY TO SUE...................................12

     A.   Total Recall Has Capacity to Sue ...........................................................12

     B.   Total Recall Has Authority To Sue ........................................................13

          1.   Seidl Agreed to File a Lawsuit Against Luckey and Oculus in January 2015. .........................................................................13

               (a)   Igra and Seidl Reached Agreement In January 2015 .....................13

               (b)   Igra and Seidl Contacted Luckey In February 2015 In Accordance With Their Agreement ...................................................14

               (c)   In January 2015, Seidl Denied Exercising A Veto And Is Bound By That Denial.................................................................15

               (d)   Defendants' "Evidence" Of A Veto Is Insufficient As A Matter Of Law ................................................................................15

          2.   Total Recall Has Authority to Sue Under RUPA...........................................17

     C.   The Legal Authority Relied Upon by Defendants is Inapposite .............................18

III.     ANY FACT ISSUES REGARDING TOTAL RECALL'S AUTHORITY TO SUE
         ARE NOT PROPERLY BEFORE THE COURT...............................................................20

CONCLUSION ...................................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adams v. Land Services*,
   194 P.3d 429 (Colo. App. 2008) ...............................................................18, 19, 20

*Ambers v. Wells Fargo Bank, N.A.*,
   No. 13-cv-03940-N ...............................................................................................11

*Andrew Smith Co. v. Paul's Pak, Inc.*,
   754 F. Supp. 2d 1120 (N. D. Cal. 2010) ...............................................................11

*Casey Ranch Ltd. P'ship v. Casey*,
   773 N.W.2d 816 (S.D. 2009) .................................................................................17

*Delbon Radiology v. Turlock Diagnostic Center*,
   839 F. Supp. 1388 (E.D. Cal. 1993) .........................................................11, 17, 20, 21

*FDIC v. Main Hurdman*,
   655 F. Supp. 259 (E.D. Cal. 1987) ........................................................................12

*Hatchwell v. Blue Shield of Cal.*,
   198 Cal. App. 3d 1027 (1988) ...............................................................................10

*Hauer v. Bankers Trust Group*,
   65 F.R.D. 1 (E.D. Wis. 1974) ..........................................................................19, 20

*Klebanow v. New York Produce Exchange*,
   344 F.2d 294 (2d Cir. 1965) ..................................................................................21

*Kono Enters., Inc. v. Estate of Bishop ex rel. Peters*,
   243 F. Appx. 274 (9th Cir. 2007) ..........................................................................12

*Lane v. Krein*,
   297 S.C. 133 (S.C. Ct. App. 1988) ...............................................................18, 19, 20

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
   801 F.3d 92 (2d Cir. 2015) .............................................................................10, 11

*Princeton Strategic Inv. Fund, LLC v. United States, No. C 04-04310 JW*,
   2011 WL 6176221 (N.D. Cal. Dec. 7, 2011) ........................................................12

*United States v. Dunifer*,
   997 F. Supp. 1235 (N.D. Cal. 1998) .....................................................................12

*Victory Carriers, Inc. v. Stockton Stevedoring Co.*,
   388 F.2d 955 (9th Cir. 1968) .................................................................................16

*Wright v. F.B.I.*,
   241 F. App'x 367 (9th Cir. 2007) ..........................................................................17

## Statutes and Rules

Fed. R. Civ. P. 17(b).................................................................................12

Cal. Civ. Proc. Code § 369.5................................................................13, 19

Colorado Uniform Partnership Law (UPL), §§ 7-60-101 to 154, C.R.S. 2007 ...............18

Colorado Uniform Partnership Law (UPL), §§ 7-64-1205(1)(a), C.R.S.2007 ...............18

Haw. Rev. Stat. §§ 425-120 ...............................................................17

Haw. R. Civ. P. 13............................................................................15

Haw. R. Civ. P. 13(a) ........................................................................17

S.C. Code Ann. §33-41-10 ...................................................................19

Wis. Stat. § 178 .............................................................................19

## Other Authorities

1 Alan Bromberg & Larry Ribstein, *Bromberg and Ribstein on Partnership* § 5.03(c),
   (1st ed. 1991).........................................................................17, 20, 21

1 Alan Bromberg & Larry Ribstein, *Bromberg and Ribstein on Partnership* § 5.03[C]
   at 5-18 (2d ed. Supp. 2015) ...........................................................17, 18

**INTRODUCTION**

Defendants' Motion for Summary Judgment should be denied in its entirety.  First, Defendants are not the proper parties to challenge Total Recall's authority to bring this case. Neither Oculus nor Palmer Luckey is entitled to step into the shoes of Thomas Seidl to assert a contractual "veto" right that Mr. Seidl himself has denied in the Hawaii litigation and has not asserted in this lawsuit.  Defendants are not parties to Total Recall's Partnership Agreement, nor are they third party beneficiaries, hence they have no role in any partnership dispute may exist. Defendants' effort to avoid their own liability for breach of contract and fraud by attempting to rely on a contract to which they are not a party is without justification.  On that basis alone, Defendants' Motion should be denied.

On the merits, Total Recall has both the "capacity" and the "authority" to sue.  It has "capacity" to sue because it is a partnership, which California law permits to file legal actions.  It has the "authority" to sue because Ron Igra and Thomas Seidl, the two general partners that make up Total Recall, agreed in January 2015 that the suit could be filed.  Consistent with that agreement, Seidl, in his answer to the second Hawai'i Action brought by Mr. Igra, formally denied exercising a veto over this action.  Mr. Seidl's judicial admission that he did not exercise a veto is the operative legal event.

In their Motion, Defendants make much of the correspondence between Messrs. Seidl and Igra from 2013 and 2014 – long before the partners' agreement to sue in 2015 and preceding Mr. Seidl's January 2015 denial in a Hawai'i litigation answer that he vetoed this suit.  At its core, however, Defendants' Motion relies almost entirely on a 15-second deposition snippet in which Mr. Seidl, in explaining a private Skype chat between him and Palmer Luckey (to which Mr. Igra was never a party), indicates there was a veto against Igra "at the time."  This testimony does not establish that Mr. Seidl "vetoed" Total Recall's lawsuit: the record is devoid of any evidence suggesting that Mr. Seidl ever communicated that "veto" to Mr. Igra.

1   Finally, if there were any issues of material fact as to Total Recall's authority to sue, this

2   action should be stayed in its entirety so that the Second Circuit Court of the State of Hawai'i can

3   resolve them..

## STATEMENT OF FACTS

### A.   Igra and Seidl formed Total Recall to pursue 3D immersive technology, including a 3D 360 degree camera and a head mounted display.

In late 2010, Thomas Seidl discussed with Ron Igra a conical camera lens he was developing to capture three-dimensional ("3D") video that could be depicted on a flat video monitor.  (Ex. K at ¶ 5).  After driving around Maui capturing video in his truck with Seidl and seeing samples of Seidl's 3D video, Igra suggested that they should develop a head-mounted display system to create a more immersive 3D effect when viewing the 3D videos.  (Ex. K ¶ 6). Igra thought that using a head mounted display in that fashion would allow the user to feel like they were actually transported to a different location.

Thereafter, Ron Igra and Thomas Seidl entered into a verbal agreement to form a partnership to develop "3D immersive technology" (Ex. 7, Igra Dep. 22:23-23:1; *Id.* at 31:18-32:14),[1] which technology included "the combination of 360 filming technology, incorporating 360 movies, videos, with software that was going to process those videos, a head-mounted display to view the videos, and a tracking system."  (Ex. 7, Igra Dep. 23:7-13; *id.* at 59:12-60:1).

On March 28, 2011, Seidl and Igra memorialized their agreement by entering into a written partnership agreement (Ex. A) to form Total Recall Technologies (Ex. 6, Seidl Dep. 20:1-3), which is headquartered in Hawai'i.  (Ex. 7, Igra Dep. 126:15-20).  The Partnership Agreement has a "vito" provision, which provides:

> 19. Thomas Seidl or Ron Igra has the right to Vito.  This means that for any decision regarding the company Ron Igra and Thomas Seidl have to agree on any action with the exception of an event laid out in point 20.

(Ex. A at TR00001908).

---

[1]   Unless otherwise noted, all cited alphabetical exhibits (e.g., "Ex. A") are attached to the Lambert Decl. (Dkt. 136), filed with Defendants' motion, and all cited numerical exhibits (e.g., "Ex. 1") are attached to the Igra Decl. or the Stiernberg Decl., filed concurrently herewith.

In furtherance of the partnership's goal to develop 3D immersive technology, Igra and Seidl jointly applied for, and were granted, U.S. Patent No. 9,007,430, titled "System and Method for Creating a Navigable, Three-Dimensional Virtual Reality Environment Having Ultra-Wide Field of View." (Ex. 8). Igra and Seidl are co-inventors of all the claims contained therein. (Ex. 7, Igra Dep. 56:12-15). Igra has contributed approximately $25,000 to the partnership to cover the cost of obtaining the patent. (Ex. 7, Igra Dep. 39:23-40:5).

**B.    Seidl entered into an agreement with Luckey to develop a head mounted display on behalf of Total Recall.**

In pursuit of Total Recall's development of 3D immersive technology, on December 12, 2010, Seidl posted on the Meant To Be Seen 3D online discussion forum ("MTBS3D") that he was looking for "a good design with some high res[olution] high [field of view] HMD" that could be sold "as part of a bundle" and asking for "any solutions [or] ideas." (Ex. 9). Defendant Palmer Luckey responded that same day to Seidl's message, stating "███████████████████ ███████████████████████████" (Ex. 10).

A series of email exchanges between Seidl and Luckey followed, discussing the specifications of the HMD that Igra and Seidl desired for their business. (Ex. 11). Seidl has testified that this work with Luckey was on Total Recall's behalf. (Ex. 6, Seidl Dep. 159:1-5) ("Q: Do you recall a point where the work you were doing with Palmer in connection with HMDs was a part of your partnership with Total Recall Technologies? A: Yes."). As the relationship with Luckey progressed, Igra "specifically asked that [Total Recall] make a contract with Mr. [Luckey], which would give [Total Recall] exclusive rights to the design." (Ex. 7, Igra Dep. 97:15-22).

To that end, Seidl sent a "Nondisclosure, exclusivity and payments agreement" to Luckey, which Luckey executed on August 1, 2011 (Ex. D) (the "August 2011 Agreement"). The August 2011 Agreement required, among other things, that Luckey "keep all details including drawings and part suppliers of the Head Mounted Display confidential and shall not aid any other person or entity in the design of a Head Mounted Display other than the disclosing party." (Ex. D at

LUCKEY0147688).  Seidl testified that he entered into the August 2011 Agreement with Luckey on behalf of Total Recall:

> [Seidl]: So you're asking me at the time of signing the agreement with Palmer, did I believe that to be part of Total Recall? . . .
> Q: That's correct.
> [Seidl]: That's your question?
> [Objection]
> [Seidl]: Yes.

(Ex. 6, Seidl Dep. 164:3-10).  Igra concurs.  (Ex. 7, Igra Dep. 164:19-23) ("Q: You believe, don't you, that Palmer Luckey signed a contract where he owes duties, and you believe he owes duties to Total Recall Technologies under that agreement, right?  A: I do believe that.")

**C.     Seidl confronted Luckey when he breached the agreement with Total Recall.**

Total Recall first became aware of Luckey's possible breach of contract shortly after Oculus' Kickstarter campaign raised approximately $2.4 million (Dkt. No. 129 ¶ 35) in August and September 2012.  (Ex. 7, Igra Dep. 165:1-166:22; Ex. 6, Seidl Dep. 265:1-7).

Seidl confronted Luckey on September 7, 2012, stating: "█████████████████████ ██████████████████████████████████████."  (Ex. 12 at LUCKEY0140131).  Luckey responded: "████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████████████████."  (*Id*).  Seidl disagreed:

> ██████████████████████████████████████
> █████████████████████████████████████
> █████████████████████████████████████████
> █████████████████████████████
> ██████████████████████████████████████
> ██████████████████████████████████████████.

(*Id*. at LUCKEY0140130).  Seidl informed Igra of this confrontation.  (Ex. 7, Igra Dep. 169:17-18).

1    Seidl confronted Luckey again in December 2012: "██████████████████

2    ████████████████████████████████████████████████████████████

3    ████████████████████████████████████."  (Ex. 13 at

4    LUCKEY0094033).  Further, Seidl told Luckey that "████████████████████

5    ████████████████████████████████████████████████."  (*Id.* at

6    LUCKEY0094034).

7    At this point, Seidl believed he could have sued Luckey "very easily," (Ex. 7, Seidl Dep.

8    284:20-24), but Luckey strung him along.  █████████████████████████

9    ████████████████████████████████████████████████████████████

10   █████. (Ex. 13 at LUCKEY0094037; Ex. 6, Seidl Dep. 283:18-23).  That demonstration did not

11   ultimately take place.  (Ex. 6, Seidl Dep. 279:19-21).  Later, in 2013, █████████████

12   ████████████████████████████████████████████████████. (Ex. 13 at

13   LUCKEY0094040) ("████████████████████████████████████████████

14   ██████████████████").

15   **D.    In 2013 and 2014 Igra and Seidl disagreed on whether to pursue legal claims**

16   **against Luckey and Oculus.**

17   In the months that followed, "communications . . . between [Seidl] and [Igra] were not

18   great."  (Ex. 7, Igra Dep. 197:1-8).  There were "periods, sometimes weeks, when [they] didn't

19   speak," mostly due to "[Seidl] not wanting to talk to [Igra]."  (*Id.* at. 197:12-14).  Though not

20   related exclusively to the partnership's relationship with Luckey, these internal disputes prevented

21   Total Recall from taking action against Luckey and Oculus.  (*Id.* at 203:1-6).  At the same time,

22   Igra believed that "Luckey was dragging [Seidl] along just so that [Total Recall] wouldn't sue and

23   [Total Recall] would cross the statute of limitations" and that "[Luckey] didn't really have any

24   intention of investing in a 3D 360 camera."  (*Id.* at 219:15-19).

25   Eventually, Igra filed suit against Seidl in the Second Circuit Court of the State of Hawai'i

26   on April 11, 2014, No. 14-1-0230(2) (the "first Hawai'i Action"), seeking, in principal part, that

27   Seidl "be ordered, pursuant to statute, to preserve, disclose and divulge to [Igra] all

28   communications with others in whatever form regarding partnership business, ideas or products."

1  (Ex. H at 3).  Because Seidl thereafter produced to Igra his email communications with Luckey,

2  the first Hawai'i Action was dismissed.  (Ex. K. at ¶ 34; Ex. O at ¶ 22).

3        Throughout 2014, Igra and Seidl continued to discuss Total Recall's breach-of-contract

4  claims against Luckey.  After Seidl indicated that he still would not cooperate with a lawsuit

5  against Luckey or Oculus, Igra again filed suit against Seidl in the Second Circuit Court of the

6  State of Hawai'i on December 5, 2014, No. 14-1-0699(2) (the "second Hawai'i Action").  (Ex. K).

7  Igra alleged in paragraph 31 of his complaint that "SEIDL asserted his right to 'veto' any legal

8  action by the Partnership to pursue claims against Luckey" and alleged in paragraph 37 of his

9  complaint that "SEIDL has and continues to refuse to authorize IGRA, or any other person or

10  entity, to pursue the Partnership's legal claims."  (Ex. K at ¶¶ 35, 37).  As described *infra*, in his

11  Answer Seidl denied that he asserted a veto and denied that he refused to authorize a lawsuit.  Igra

12  furthermore asserted a claim for breach of the Partnership Agreement against Seidl, alleging:

13  
14  
15  

> 51.  SEIDL has wrongfully refused to take any steps to protect Partnership assets, to include Partnership Technology and contractual rights under the [August 2011 Agreement], thereby allowing Luckey and others to use Partnership assets, to include Partnership Technology for their own profit, without any gain to the Partnership.
> . . .

16  
17  

> 53. Second, IGRA is entitled to an order of specific performance requiring SEIDL to approve legal action to protect Partnership assets, or removing SEIDL's ability to veto such action.

18  (Ex. K at ¶¶ 51, 53).

19        **E.   In 2015 Igra and Seidl *agreed* to pursue legal claims against Luckey and Oculus.**

20        Defendants' motion focuses on the interactions in 2013 and 2014 in which Seidl and Igra

21  disagree about how to handle the claims against Luckey and Oculus.  After these discussions,

22  however, Luckey and Igra agreed to proceed with the lawsuit, a fact that is formally reflected in

23  the record of the second Hawai'i Action.

24        Thus, on January 16, 2015, Seidl answered Igra's Complaint in the second Hawai'i Action,

25  **denying** that he had asserted his right to "veto" and denying that he refused to "authorize" Igra to

26  pursue claims against Luckey.  (Ex. O at ¶¶ 20, 25).

27  
28

1        The following day, on January 17, 2015 (Ex. 7, Igra Dep. 221:8-10), Igra and Seidl met to

2   discuss how a lawsuit against Luckey and Oculus could proceed:

3            Q:  You believe that Mr. Seidl agreed that TRT should file the lawsuit
             when it did on May 20th, 2015?
4            A:  I do.
             Q:  What is your basis for believing that?
5            A:  [Seidl] and I had a meeting; we discussed it.  I don't remember exactly
             the date, but it was several months before that.
6                    And he said to me – I said to him, look, the statute of limitations
             on this is coming up.  And he said to me, I need another couple weeks.
7            I'm going to try to sell this to Facebook.  I think I can make – I think
             they'll want to buy it for $600 million, and I need two weeks.  Just give
8            me two weeks before your file.
                     I said, okay, and we shook hands.  I gave him, I think it was, 12
9            weeks.
                     He couldn't – he couldn't get any offer from Facebook or Oculus
10           or Palmer Luckey or anything.

11   (*Id.* at 214:4-215:3)

12       On January 18, 2015, the day after their meeting, Seidl confirmed that he would "make a

13   letter that will cover us against [Luckey] to insure we lose no legal rights on the case."  (Ex. 1 at

14   TR00003847).  Igra likewise summarized their "meeting minutes" as follows:

15           1. You said that the demo video was ready to send out and you are
             confident that Facebook will want to buy the partnership for somewhere in
16           the vicinity of 600 mil. We agreed to give Palmer 2 weeks to provide us
             with his highest and best offer.
17           2. If we do not receive a significant offer within 2 weeks you agreed to
             cooperate with the lawsuit against Palmer/Oculus and thereby remove
18           your veto.
             3. We also agreed that if there is no offer from Palmer on the table we will
19           proceed to file our complaint of breach of contract and patent infringement
             as soon as possible.
20           . . .
             Please send me that letter protecting our partnership rights for my
21           approval before you sent it out to Palmer.

22   (Ex. 1 at TR00003846).

23       Seidl agreed and expressed the partners' shared concern that Total Recall have "enough

24   time before statute of limitations" in which to approach Luckey and Oculus, writing to Igra:

25           We can play by ear. But I assure you. **If we getting nothing from Palmer
             prior to the end date to file. I will file**. I cant believe you think I am that
26           stupid.
             Is all about how palmer responds. If we get zero feedback from Palmer
27           **after 2 weeks we go there lawyered up to facebook**.

28

1   (Ex. 1 at TR00003845) (emphasis added).  Igra reiterated that they "agreed to wait 2 weeks for a

2   response and **there will be no extensions** unless there is an offer or a very positive sign of getting

3   one."  (*Id.* at TR00003845) (emphasis added).  Seidl responded the same day stating that he was

4   "[h]appy with that. If no positive signs in 2 weeks of contacting him."  (*Id.* at TR00003844).

5       Igra then contacted Luckey by telephone, on February 11, 2015 (Ex. 7, Igra Dep. 251:10-

6   12).  During their two-hour conversation they discussed, among other things, "the demo that

7   [Seidl] wanted to present to [Luckey]," (*Id.* at 275:13-14) including "footage from [Total Recall's]

8   camera, which could be viewed on the Oculus" (*Id.* at 276:4-7).

9       Seidl contacted Luckey next on February 24, 2015, by sending a letter (and copying Igra),

10  stating that his "company would like to demonstrate the footage and system to you and your

11  company an you have expressed an interest in the past in seeing the system and the images that it

12  is capable of capturing for later display."  (Ex. 2 at TR00000997).  Seidl further requested that

13  Luckey acknowledge certain conditions before such a demonstration could take place:

14          First, I and my company have and continue to reserve all rights that I and
            it have concerning **claims arising from the breach of your agreement**
15          with me dated [August 1, 2011].  While I do not expect you to agree that a
            breach occurred, I and my company do expect you and your company to
16          agree that should I and my company can meet with you about the camera
            system, such meeting will be **without waiver of any rights and claims**
17          **that I and it have against you and/or your company**, all of which rights
            and claims are being reserved.
18

19  (*Id.* at TR00000997) (emphasis added).  Seidl asked Luckey to sign and return the letter agreeing

20  to its terms.  (*Id*).

21      Luckey replied on February 25, 2015 that he could not "sign that document" and instead

22  sent Seidl and Igra "the standard Oculus VR NDA."  (Ex. 3 at TR00000988).

23      On February 27, 2015, Igra replied (copying Seidl) that before Total Recall could sign the

24  Oculus NDA, "we need you [Luckey] to sign the attached letter as well before the demo can be

25  presented."  (Ex. 4 at TR00001934).  That letter asked that Luckey "countersign below confirming

26  that neither the NDA nor the proposed demonstration waives or limits Total Recall, Ron Igra,

27  and/or Thomas Seidl's rights to make any claim against you or any other party, expressly

28

1   including but not limited to, any claims Total Recall may have for breach of the agreement you

2   entered into with the Partnership." (*Id.* at TR00001935).

3        On March 9, 2015, Luckey replied that "[t]he NDA I sent over should be clear cut.  I

4   cannot sign any other amending agreements outside of it." (Ex. 5 at TR00001932).

5        As more than two weeks had passed, Total Recall filed suit against Luckey and Oculus on

6   May 20, 2015 (Dkt. 1), pursuant to the January 2015 agreement between Seidl and Igra.

7        At no time between January 2015 and the filing of the instant lawsuit did Seidl express an

8   intent to exercise his veto power over Total Recall's lawsuit against Luckey and Oculus.  (Dkt.

9   108-3 at ¶ 7).  Nor has Seidl filed any counterclaims against Igra in the second Hawai'i Action

10  seeking to enjoin Total Recall's lawsuit or otherwise.  (Ex. O).

11       **F.   Seidl still believes that Luckey is in breach of the agreement with Total Recall.**

12       Seidl believes to this date that he is a part-owner of the Oculus Rift design:

13              A:  I viewed it to be our design at that [Kickstarter] stage and still do.
                Q:  You believed the Oculus Rift to be your design?
14              A:  Our design. Not mine exclusively. Our design.
                . . .
15              Q:  You believed that you were a part owner of the Oculus Rift design?
                A:  Yes.
16              . . .
                Q:  What – do you have a particular Oculus Rift design in mind?
17              . . .
18              THE WITNESS:  No, not a particular one. The concept of putting an actual
                wide field-of-view lens in front of a panel, I believe that was a concept we
19              created together; and hence, I believe part of that design and that
                brainstorming has gone into all three designs and the Carmack design and
20              the – and also the – the Samsung design, the Samsung Gear VR.

21  (Ex. 6, Seidl Dep. at 246:22-248:12).  Igra agrees that Seidl was one of the "inventor[s]" of the

22  Oculus Rift.  (Ex. 7, Igra Dep. 208:2-5).  In particular, Igra believes, as does Seidl, that Total

23  Recall "gave him, [Luckey], a recipe which helped him build the Rift," which included among

24  other things a "[w]ide field of view, tracking system, light-weight, [and] low price point." (*Id.* at

25  208:10-21).

26       Seidl has unambiguously testified that his claim of ownership in the Oculus Rift is based

27  on the August 2011 Agreement because "[t]hat was the understanding of this [exclusivity] part of

28

1   the contract."  (Ex. 6, Seidl Dep. 249:12-23).  Seidl testified that what he "wanted to assert when

2   [he] wrote the contract" was that Luckey "was meant to focus on [Total Recall's] design and

3   [Total Recall's] display over his others and should not be designing for himself." (*Id.* at 251:5-11).

4   Seidl also testified that the $10,000 "payment" referenced in the exclusivity provision (¶ 9) of the

5   August 2011 Agreement "could be either from royalties or from money received.  I was not

6   limiting that part of the agreement to be proceeds just from the sales.  It could be money from my

7   own pocket."  (*Id.* at 190:21-191:10).  Seidl believes that the Oculus Rift that Luckey

8   commercialized "functioned near identical as the prototype [Luckey] sent to [Seidl], the only

9   difference being the brand name."  (*Id.* at 257:17-19).

10   According to Seidl, he "helped him [Luckey] make it [the Oculus Rift] . . . That's basically

11   what it boils down to."  (*Id.* at 267:3-4).  By the instant Motion, Defendants seek to avoid all

12   liability by asserting rights they do not have based on Plaintiff's Partnership Agreement.

### ARGUMENT

**I.    DEFENDANTS LACK STANDING TO CHALLENGE TOTAL RECALL'S AUTHORITY TO SUE BASED ON THE CONTRACT DISPUTE BETWEEN TOTAL RECALL'S TWO GENERAL PARTNERS**

16   Defendants are neither parties to the Partnership Agreement nor are they third party

17   beneficiaries of the Partnership Agreement.  Defendants nonetheless seek to assert Seidl's rights

18   under that agreement – rights that Seidl himself has not asserted.[2]  Defendants are attempting to

19   avoid liability for breach of contract and fraud by stepping into the shoes of Seidl and asserting his

20   rights in the Partnership Agreement.  Defendants lack standing to do so, and their Motion should

21   be denied.  *Hatchwell v. Blue Shield of Cal.*, 198 Cal. App. 3d 1027, 1034 (1988) ("Someone who

22   is not a party to the contract has no standing to enforce the contract or to recover extra-contract

23   damages for wrongful withholding of benefits to the contracting party."); *see also NAF Holdings,*

---

25   [2]  Not only are Defendants improperly seeking to assert Seidl's rights – they are seeking to
26   assert rights that Seidl no longer has.  As discussed, *infra*, because he did not bring any
     counterclaims in the second Hawai'i Action, Seidl cannot make any claim that Igra breached the
27   Partnership Agreement.  If Seidl cannot bring a claim for breach of the Partnership Agreement,
     surely Defendants cannot.

1  *LLC v. Li & Fung (Trading) Ltd.*, 801 F.3d 92, 95 (2d Cir. 2015) (questioning whether Defendant

2  had standing to enforce the contractual right to bar suit when it was not a party to the contract);

3  *Ambers v. Wells Fargo Bank*, N.A., No. 13–cv–03940–N C, 2014 WL 883752, at *4 (N. D. Cal.

4  Mar. 3, 2014) ("A person who is not a party to a contract does not have standing [] to seek its

5  enforcement"); *Andrew Smith Co. v. Paul's Pak, Inc.*, 754 F. Supp. 2d 1120, 1133 (N. D. Cal.

6  2010) ("A third party who is only incidentally benefited by a contract does not have standing to

7  enforce the contract.").[3]  Since there can be no dispute that Luckey and Oculus are neither parties

8  to, nor third party beneficiaries of, Total Recall's Partnership Agreement, they lack standing and

9  the Motion should be denied.

10       *Delbon Radiology v. Turlock Diagnostic Center*, 839 F. Supp. 1388, 1392 (E.D. Cal. 1993)

11  is instructive.  There, defendants brought a summary judgment motion on the grounds that

12  plaintiff did not have the management authority to cause the partnership to bring suit under the

13  partnership agreement.  *Id.* at 1391.  Plaintiff challenged defendants' standing to assert the defense

14  that the lawsuit was unauthorized.  *Id.* at 1392.  The court agreed: "Third-party defendants are

15  naturally concerned with avoiding liability, but their only properly cognizable concern is avoiding

16  multiple suits on the same claims.  This concern is satisfied if the first suit has preclusive effect.

17  Consequently there will be little or no justification for recognizing a third-party defendant's

18  objection that fewer than all the partners are trying to enforce the partnership's claim."  *Id.* (citing

19  Bromberg & Ribstein, *Bromberg and Ribstein on Partnership*, § 5.01(d), at 5:7 (1st ed. 1991)).

20  The court specifically declined to rely on the very authority relied on by Defendants here, because

21  those cases did not address the defendants' standing to assert the authorization defense.  *Id.*at

22  1392-93.

23       Here, like in *Delbon*, there is no risk to Defendants of multiple suits, as Total Recall's

24  lawsuit against Defendants will preclude other suits on the same claim.  Under the doctrines of *res*

25  *judicata* and collateral estoppel, and because there is privity between partners and partnerships,

---

[3]   Defendants know this law well as they previously challenged Total Recall's standing to
bring this suit on a similar basis.  (Dkt. No. 29).

there is no risk to Defendants of multiple suits.  *See Princeton Strategic Inv. Fund, LLC v. United States*, No. C 04-04310 JW, 2011 WL 6176221, at *4 (N.D. Cal. Dec. 7, 2011) ("In considering what types of substantive legal relationships justify non-party preclusion, the Ninth Circuit has stated that privity traditionally arose from a limited number of legal relationships in which two parties have identical or transferred rights with respect to a particular legal interest.  The relationship between partners and their partnerships is among the relationships the Ninth Circuit described as meeting this criteria.") (citations and quotation marks omitted); *see also Kono Enters., Inc. v. Estate of Bishop ex rel. Peters,* 243 F. Appx. 274, 278 (9th Cir. 2007) (finding privity between general partner and partnership).  Thus, Defendants cannot show a legally cognizable interest in challenging Total Recall's authority to sue.  *Cf. United States v. Dunifer*, 997 F. Supp. 1235, 1239-40 (N.D. Cal. 1998) (concluding that the defendant was required to demonstrate standing because "[w]here the defendant asserts an affirmative defense requiring the litigation of issues not encompassed in the plaintiff's case-in-chief, the defendant is in a similar situation on those issues to a plaintiff who is invoking the jurisdiction of the court") (citing *FDIC v. Main Hurdman*, 655 F. Supp. 259, 268 (E.D. Cal. 1987) (a defendant must have Article III standing to pursue an affirmative defense)).

Thus, defendants lack standing to step into the shoes of Seidl and attempt to enforce a contract right in an agreement to which they are neither a party nor a third party beneficiary.

## II.    DEFENDANTS' MOTION SHOULD BE DENIED BECAUSE TOTAL RECALL HAS BOTH THE CAPACITY AND THE AUTHORITY TO SUE

### A.    Total Recall Has Capacity to Sue

Defendants' Motion should be denied because Total Recall has both the capacity and the authority to sue.  Although Defendants attempt to draw a distinction between "capacity to sue" and "authority to sue" (Mot. at 9-10), Defendants ultimately conflate the two concepts.  The concepts, however, are distinct.  "Capacity" to sue relates to whether a plaintiff has the power to litigate in a certain court, for example, the power to bring suit.  The issue of capacity to sue is analyzed under the law of the state in which the case is pending.  FED. R. CIV. P. 17(b).  Here, there can be no question that Total Recall has capacity to sue.  It is hornbook law that a partnership may sue or be

sued in the name of the partnership.  Cal. Civ. Proc. Code § 369.5; *see also* Alan Bromberg, *Enforcement of Partnership Rights – Who Sues For The Partnership?*, 70 Neb. L. Rev 1, 29 (1991) ("Common name provisions [i.e., statutes authorizing that partnerships may sue in the partnership name] eliminate any basis for a defendant's objection that the plaintiff partnership lacks capacity to sue.").  Thus, to the extent Defendants argue that Total Recall lacks capacity to sue, their Motion should be denied.

### B.      Total Recall Has Authority To Sue

Defendants' Motion should also be denied because Total Recall has the authority to sue Mr. Luckey and Oculus.  *First*, Total Recall has authority to sue because Seidl has not exercised a "vito" [sic] under the Partnership Agreement.  To the contrary, Seidl agreed to such a suit.  *Second*, Total Recall has authority to sue under the Revised Uniform Partnership Act ("RUPA") to the extent the Court deems it necessary to look beyond the four corners of the Partnership Agreement.  Total Recall has authority to sue under RUPA because (i) the decision to sue was in the "ordinary course" as defined by RUPA and the authority interpreting it, and (ii) Igra could direct the suit as long as a majority of Total Recall's partners did not oppose him doing so.

Total Recall has the authority to sue, and Defendants' Motion should be denied.  To the extent the Court finds any factual dispute over whether or not Total Recall has the authority to sue, the case should be stayed until such factual issues are decided in the Hawai'i state court.

### 1.      Seidl Agreed to File a Lawsuit Against Luckey and Oculus in January 2015.

Contrary to Defendants' assertions, Seidl did not exercise his power to "vito" Total Recall's lawsuit against Luckey and Oculus prior to the filing of the lawsuit under paragraph 19 of the Partnership Agreement.  (Dkt. 108-3 at ¶ 7).

### (a)      Igra and Seidl Reached Agreement In January 2015

After Igra brought suit against Seidl in December 2014 to seek his cooperation with a lawsuit against Luckey and Oculus, Igra and Seidl agreed in January 2015 that Total Recall would pursue its claims against Luckey and Oculus.  Specifically, and unambiguously, Igra and Seidl

1   agreed that if Luckey failed to respond positively within two weeks of their contacting him, Total

2   Recall would file suit.  (Ex. 1 at TR00003846 (Igra: "We agreed to wait 2 weeks for a response

3   and there will be no extensions unless there is an offer or a very positive sign of getting one."); *Id.*

4   at TR00003844 (Seidl: "Happy with that. If no positive signs in 2 weeks of contacting him.")).

5     Igra and Seidl also agreed that Total Recall would file suit with "enough time before [the]

6   statute of limitations" ran on its claims.  (*Id.* at TR00003845; *see also* Ex. 7, Igra Dep. 214:4-

7   215:3 ("[Igra] said to [Seidl], look the statue of limitations on this is coming up.")).  Seidl

8   explicitly assured Igra that he would file the lawsuit **himself** if necessary:

9       We can play by ear. But I assure you. **If we getting nothing from Palmer
10       prior to the end date to file. I will file**. I cant believe you think I am that
    stupid.
    Is all about how palmer responds. If we get zero feedback from Palmer
11       **after 2 weeks we go there lawyered up to facebook**.

12   (Ex. 1 at TR00003845) (emphasis added).

13       (b)  <u>Igra and Seidl Contacted Luckey In February 2015 In Accordance</u>
14         <u>With Their Agreement</u>

15     Accordingly, Igra contacted Luckey on February 11, 2015 by telephone to discuss Total

16   Recall's claims against Luckey and Oculus as well as a potential demonstration of Total Recall's

17   technology.  (Ex. 7, Igra Dep. 251:10-12).  Seidl then contacted Luckey on February 24, 2015,

18   asking that Luckey acknowledge in writing that such a demonstration would be "without waiver of

19   any rights and claims that I and [Total Recall] have against you and/or your company." (Ex. 2 at

20   TR00000997).  Luckey declined.  (Ex. 3 at TR00000988 ("I can't sign that document.")).

21     Igra again contacted Luckey on February 27, 2015 asking that before any demonstration of

22   Total Recall's technology, he "countersign below confirming that neither the NDA nor the

23   proposed demonstration waives or limits Total Recall, Ron Igra, and/or Thomas Seidl's rights to

24   make any claim against you or any other party, expressly including but not limited to, any claims

25   Total Recall may have for breach of the agreement you entered into with the Partnership." (Ex. 4

26   at TR00001935).  On March 9, 2015 Luckey again declined.  (Ex. 5 at TR00001932).

27

28

Having received no offer from Luckey, Total Recall proceeded with the instant suit on May 20, 2015 – nearly three months after contacting Luckey – and consistent with the January 2015 agreement between Seidl and Igra.  At no time between January 2015 and May 2015 did Seidl exercise his veto rights.  (Dkt. 108-3 ¶ 7).

(c)     In January 2015, Seidl Denied Exercising A Veto And Is Bound By That Denial

Seidl's January 2015 Answer to Igra's December 2014 complaint in the second Hawai'i Action is unambiguous.  There, Seidl denied (Ex. O at ¶¶ 20, 25) both the allegation in paragraph 31 of Igra's complaint that "SEIDL asserted his right to 'veto' any legal action by the Partnership to pursue claims against Luckey" (Ex. K at 5) and the allegation in paragraph 37 that "SEIDL has and continues to refuse to authorize IGRA, or any other person or entity, to pursue the Partnership's legal claims" (*Id.* at 6).

Given that Igra seeks as relief in the second Hawai'i Action "an order of specific performance compelling SEIDL to authorize legal action . . . to pursue the Partnership's claims against Luckey" (*Id.* at 9-10),  a counterclaim by Seidl seeking to halt the instant litigation would be compulsory under Hawai'i law.  *See* Haw. R. Civ. P. 13 ("A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . .").  Yet Seidl has filed no counterclaims against Igra in the second Hawai'i Action, has not sought to enjoin Total Recall's lawsuit, and has not sought to intervene in the instant litigation.  (Ex. O).

(d)     Defendants' "Evidence" Of A Veto Is Insufficient As A Matter Of Law

Defendants' only evidence of Seidl's supposed "vito" of Total Recall's action against Luckey and Oculus consists of 15 seconds of deposition testimony concerning a May 22, 2015 private Skype chat between Luckey and Seidl.  There is no claim that Igra was a participant in this conversation.  As discussed *supra* the record establishes that Seidl not only formally denied in court pleadings that he vetoed Total Recall's action against Luckey and Oculus, but on January 19,

2015, Seidl wrote to Igra in no uncertain terms: "If we getting [sic] nothing from Palmer [Luckey] prior to the [statute of limitations] date to file. I will file. I cant [sic] believe you think I am that stupid." (Ex. 1 at TR00003845). By contrast, on May 22, 2015 (two days after the instant action was filed), Seidl told Luckey in a private Skype chat that Total Recall's lawsuit "[wa]s without my knowledge or permission" and that "I swear on my mothers life [I] did not know about it." (Ex. M at LUCKEY0113302). Seidl's testimony that "there was a veto against Igra at the time, preventing him from filing the case" (Mot. at 8, citing Seidl Dep. at 28:22-30:25),[4] does not establish that Seidl "vetoed" the action against Luckey and Oculus because the record is devoid of any evidence that Seidl ever communicated the supposed "veto" to Igra.

The testimony on which Defendants rely directly contradicts the oral and written statements that Seidl made to Igra in 2015 and it directly contradicts his answer in the second Hawai'i Action. As such, it cannot overcome the unambiguous denials in his pleading, nearly a year-and-a-half after the fact. *See Victory Carriers, Inc. v. Stockton Stevedoring Co.*, 388 F.2d 955, 959 (9th Cir. 1968) ("[I]f a party makes a crucial admission in his formal pleading, or in

---

[4] At the time Seidl made these statements in May 2015, he was eager to please Luckey in in an effort to cause Luckey to convince Facebook's CEO Mark Zuckerberg to come to Hawai'i to view Seidl's video demonstrations for his camera business. Nothing in the May 2012 Skype log constitutes communication of a "veto" to Igra, nor does it address in any way the contemporaneous correspondence between Seidl and Igra or Seidl's previous judicial admissions. The text on which Defendants rely is as follows:

Statements from Seidl to Luckey on Dec 17, 2014:
- "Hey. At last got a funking amazing demo for you. For sure best solution in the world. […] Think **Mark** for sure will be interested in it."

Statements from Seidl to Luckey on May 20, 2015:
- "all is damn funkin amazing mate"
- "2 videos done and the 3d done today"
- "I am trying to pull together a Vr conference here with all teh [sic] big boys will only be blue chip companies"
- "Needs to be a joint effort to really get video and Vr working together"
- "pretty sure will get teh [sic] ceo of nvidia over, got a guy from Fox, the CEO of Red, and this guy palmer luckey might attend and nick woodman"
- "I want to get the video out to a few people and see what works. **Would love to get Zuckerberg here.** He has a lot of interest in Hawai'i."
- "**If I can get Zuckerberg here, everyone else will come**"

(Ex. M at LUCKEY0113301) (emphasis added).

response to a formal request for admissions, then the admitted fact is to be taken as established, absent a timely request for, and the granting of, relief therefrom."); *cf. Wright v. F.B.I.*, 241 F. App'x 367, 368 (9th Cir. 2007) ("Statements made at a deposition, unlike statements made in response to requests for admission, are not binding on the deponent.").  In other words, even if Seidl were attempting to retroactively assert a veto via his deposition testimony, as Defendants appear to contend, it is simply too late.  *See* Haw. R. Civ. P. 13(a); 1 Alan Bromberg & Larry Ribstein, *Bromberg and Ribstein on Partnership* § 5.03[C] at 5-18 (2d ed. Supp. 2015) ("The disagreement should be manifested early in the suit (otherwise it is waived).").

## 2.     Total Recall Has Authority to Sue Under RUPA

Total Recall agrees with Defendants that analysis under RUPA is not necessary, because the Partnership Agreement controls.  However, to the extent that RUPA may apply, Defendants' hypothetical analysis of Total Recall's authority to sue under RUPA misses the mark.  Under RUPA, Total Recall is authorized to bring this suit.  Under Hawai'i's Revised Statute § 425-120 (codifying RUPA § 401), enforcement of a right is an "ordinary" matter which any partner can enforce.  "Given the prevalence of American litigation, enforcement of a Partnership's claim will often be an ordinary matter."  *Delbon*, 839 F. Supp. at 1392 (citing 1 Alan Bromberg & Larry Ribstein, *Bromberg and Ribstein on Partnership* § 5.03(c), at 5:20–21 (1st ed. 1991)).  There is no requirement that any other partners agree with a decision to sue, as long as it is in the "ordinary course."

Total Recall's decision to sue Luckey and Oculus is in the "ordinary course."  The Partnership Agreement defines the purpose of Total Recall as being the "[d]evelopment of 3D immersive technology" (Ex. A at TR00001903); the instant lawsuit is squarely within Total Recall's pursuit of developing of 3D immersive technology, because Total Recall is seeking to enforce its rights under a contract with Luckey that was entered into in pursuit of Total Recall's main purpose.  *See Delbon*, 839 F. Supp at 1392; *see also Casey Ranch Ltd. P'ship v. Casey*, 773 N.W.2d 816, 822 (S.D. 2009) ("Additionally, initiating suit to collect a partnership debt is generally considered to be within the ordinary course of the business of a partnership."); *Lane v.*

1    *Krein*, 297 S.C. 133 (S.C. Ct. App. 1988) (cited by Defendants) (treating suit against third parties

2    as an ordinary matter).  Thus, there having been no veto, Igra did not need Seidl's consent to bring

3    the lawsuit.

4            Under RUPA, Igra did not need Seidl's consent to bring suit for Total Recall, even if the

5    partners disagreed over whether to do so.  Total Recall was authorized to file suit because a

6    majority of partners did not disagree with the decision to sue.  The RUPA provision cited by

7    Defendants requiring a decision by a "majority of the partners" when a difference arises as to a

8    matter in the ordinary course of business (Mot. at 12) has been interpreted to mean that "a partner

9    cannot maintain a suit to enforce a partnership claim if a **majority** of the partners **disagree** with

10   the enforcement."  1 Alan Bromberg & Larry Ribstein, *Bromberg and Ribstein on Partnership*, §

11   5.03[C], 5-18 (2nd. Ed. Supp. 2015) (emphasis added).  As long as the majority of partners do not

12   disagree to a decision in the ordinary course, a general partner may pursue it.  As Defendants point

13   out, Seidl could not constitute a "majority" in a two-person partnership; thus, a majority of the

14   partners did not disagree with Igra's decision to file suit, and the decision was authorized under

15   RUPA.

16        **C.**     **The Legal Authority Relied Upon by Defendants is Inapposite**

17           The cases cited by Defendants do not support their arguments that Total Recall lacks

18   "capacity" or "authority."  Each of Defendants' cases addresses disputes involving very different

19   procedural postures from the instant case.

20           For example, *Adams v. Land Services*, 194 P.3d 429 (Colo. App. 2008), cited by

21   Defendants, is readily distinguishable from the instant matter.  *Adams* analyzed the question of

22   whether a general partner plaintiff has standing to sue derivatively on behalf of the partnership

23   under Colorado law.[5]  *Id.* at 430-31.  The trial court held – and the appellate court affirmed – that

24   Colorado law[6] did not afford general partners the derivative action remedy available to corporate

25

26   ───────────────
        [5]  This Court has already found that Total Recall has standing to bring suit.  (Dkt. No. 82.)

27      [6]  While Colorado eventually adopted RUPA, the contract at issue in *Adams* was formed
     before such adoption and was thus governed by Colorado Uniform Partnership Law.  *Adams*, 194

28

1    shareholders, and dismissed the suit for lack of standing.  *Id.* at 431.  The court found that

2    plaintiffs could not show injury-in-fact to a legally protected interest when managing general

3    partners had made a good faith business decision to enter into the challenged transaction.  *Id.* at

4    432-33.  Even though the minority partners disagreed with the managing partners' decision, they

5    were bound by that decision and had no standing to bring a derivative suit.  *Id.* at 432.

6        A similar scenario was presented in *Hauer v. Bankers Trust Group*, 65 F.R.D. 1, 4 (E.D.

7    Wis. 1974), where the court framed the issue – whether a general partner can bring a derivative

8    suit on behalf of the partnership – as a question of capacity to sue.  There, a minority partner

9    individually asserted claims on behalf of the partnership against the partnership's lender for breach

10   of contract and fraud.  *Id.*  Under Wisconsin law,[7] the court found that minority partner plaintiff

11   did not have the capacity to sue derivatively on behalf of the partnership and dismissed the case.

12   *Id.*

13       Unlike in *Adams* or *Hauer*, Total Recall has brought suit directly.  Total Recall has the

14   capacity to do so under California law.  Cal. Civ. Proc. Code § 369.5.  *Adams* and *Hauer* are thus

15   inapposite.  Furthermore, plaintiffs in both *Adams* and *Hauer* were minority interest holders

16   attempting to bring suit after the majority members had already considered – and made a good

17   faith business decision to reject– the minority members' position.  Here, Seidl is not a minority

18   partner, and there is no evidence before this Court that there was a good faith business judgment in

19   declining to cooperate with the instant litigation.[8]

20       The last case cited by Defendants, *Lane v. Krein*, 297 S.C. 133 (S.C. 1988) (also a

21   derivative suit brought by a minority partner) is similarly distinguishable.  Plaintiff sued his

22   majority partners and the partnership derivatively, claiming conversion of the partnership's

23

24

25   P.3d at 431 (citing Colorado's Uniform Partnership Law (UPL), §§ 7–60–101 to—154,
     C.R.S.20070); se*e also* § 7–64–1205(1)(a), C.R.S.2007.

26       [7]   Wisconsin has not adopted RUPA.  Wis. Stat. § 178 (UPA current through 2015).

27       [8]   In fact, the evidence shows the opposite, and Igra has brought claims against Seidl in
     Hawai'i for misappropriation of partnership opportunities and self-dealing.  (Ex. K, ¶¶ 39, 54-58.)

28

property.  The court found that, under South Carolina law,[9] plaintiff could not bring a claim against his partners on behalf of the partnership when the majority partners had decided not to pursue the claim.  *Id.* at 135.  The court noted that plaintiff was not without redress, as plaintiff had stated a claim for accounting against his partners, and if the partners were involved in the alleged conversion, they would be found to have breached their fiduciary duties and would be held accountable.  *Id.*

In sum, *Adams* and *Hauer* hold that minority partners cannot bring derivative claims under Colorado and Wisconsin state law, respectively.  *Lane* holds that under South Carolina law, a minority partner cannot pursue claims against his majority partners on behalf of the partnership where the majority partners declined to pursue the suit, but that the minority partner could state a claim for an accounting.  *Lane*, 297 S.C. at 135.  None of the cases is analyzed under RUPA.  Here, Igra is not a minority partner, and he has not brought a derivative action against the business judgment of the majority partners.  Rather, Igra has directed a lawsuit by Total Recall – which he has the authority to do both under the Partnership Agreement and under California law.

## III.    ANY FACT ISSUES REGARDING TOTAL RECALL'S AUTHORITY TO SUE ARE NOT PROPERLY BEFORE THE COURT

As set forth above, the undisputed facts establish there was no "veto" communicated to Igra under paragraph 19 of the Partnership Agreement prior to the filing of this lawsuit.  Were the Court to disagree with that assertion, the record precludes a finding that the undisputed facts establish a "veto" under paragraph 19.  In addition, a further factual dispute would exist about whether any such "veto" would have effect, and the Motion should be denied and the case stayed so that any factual issues can be resolved in Hawai'i, where Seidl and Igra are both parties.

If the matter proceeds in Hawai'i, the Hawai'i court may determine whether Seidl's alleged "veto" would have any effect.  Even if a majority or unanimity requirement for enforcement of a partnership right might otherwise apply, a court "may create an exception by disregarding partners

---

[9]   South Carolina has not adopted RUPA.  S.C. Code Ann. §33-41-10 (UPA current through 2016)

1  who are defendants or otherwise have a conflict of interest as to the claim being sued on."

2  *Delbon*, 839 F. Supp. at 1393 (citing 1 Alan Bromberg & Larry Ribstein, *Bromberg and Ribstein*

3  *on Partnership* § 5.04(b), at 5:26-27 (1st ed. 1991)).  In effect, when there is a conflict between a

4  general partner and a defendant, the partnership's claim may be enforced by a majority of the

5  disinterested partners.  *Id.*

6      *Delbon*, and the cases cited therein, is again instructive.  There, like here, defendants

7  argued that one of the general partners of a two-partner partnership did not have the management

8  authority to cause the partnership to bring suit, because one of the general partners objected to

9  bringing the lawsuit.  *Id.* at 1391.  The court found that the objecting partner's authorization of the

10 lawsuit was not necessary, because the objecting partner had a contractual relationship with and

11 derived income from the third party defendant, which created a conflict of interest.  *Id.* at 1393.

12 Surveying cases where courts had allowed for suit without a majority consent to bring suit, the

13 *Delbon* court found that sufficient connection with the defendant would create a conflict of

14 interest.  *Id.*  "[W]hen state law returns only a murky answer to the question of capacity, federal

15 judges are entitled to resolve the doubt in a way that permits assertion of the federal claim."  *Id.*

16 (citing *Klebanow v. New York Produce Exchange*, 344 F.2d 294 (2d Cir. 1965).)

17     Igra alleges in the second Hawai'i Action that Seidl "entered into one or more agreements

18 with Luckey that would benefit Seidl at the expense of the Partnership and Igra" and that "Seidl

19 wrongfully allowed Luckey to utilize Partnership assets in exchange for benefits flowing directly

20 to Seidl that have not been disclosed to the Partnership and will not be shared with the Partnership

21 or Igra."  (Ex. K at ¶¶ 39, 56.)  Relatedly, Seidl recently testified that Luckey's success is

22 generally advantageous to him.  (Ex. 6, Seidl Dep 139:24-140:9).  Thus, Seidl's comment may

23 render his agreement to pursue the litigation against Luckey and Oculus unnecessary under

24 *Delbon*.  Thus, should the Court believe that there may have been a veto, until that predicate

25 question is decided under Hawai'i law by the Hawai'i court, this Court should stay this action in

26 its entirety and deny summary judgment.

27

28

### CONCLUSION

For the foregoing reasons, Total Recall respectfully requests that the Court deny Defendants' Motion for Summary Judgment, or, alternatively, stay this matter pending the outcome of the second Hawai'i Action.

DATED:  May 6, 2016                    QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP


                                       By  /s/ Robert W. Stone
                                           Robert W. Stone

                                       Attorneys for Plaintiff TOTAL RECALL
                                       TECHNOLOGIES