**United States District Court**
For the Northern District of California

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10    TOTAL RECALL TECHNOLOGIES,

11              Plaintiff,                          No. C 15-02281 WHA

12        v.

13    PALMER LUCKEY and OCULUS VR,                  **ORDER GRANTING MOTION**
      LLC, as successor-in-interest to Oculus      **FOR SUMMARY JUDGMENT**
14    VR, Inc.,                                     **SUBJECT TO STATED**
                                                    **CONDITIONS**
15              Defendants.

16    ─────────────────────────────────────/

17                            **INTRODUCTION**

18        A partnership agreement between two persons provided that no lawsuit would be

19    maintained without the approval of both.  Over the objection of one, the other brought a lawsuit

20    in the name of the partnership against third parties, who now move to dismiss the suit as

21    unauthorized.  Subject to certain conditions, their motion is **GRANTED**.

22                            **STATEMENT**

23        **1.    TOTAL RECALL TECHNOLOGIES.**

24        Plaintiff Total Recall Technologies ("TRT") is a general partnership of Thomas Seidl

25    and Ron Igra formed in 2010 in Hawaii for the purpose of developing virtual reality technology.

26    Seidl and Igra entered into a written partnership agreement to govern TRT.  Paragraph 19 of the

27    partnership agreement provided:

28              Thomas Seidl or Ron Igra has the right to Vito [sic].  This means
               that for any decision regarding the company Ron Igra and Thomas

United States District Court

For the Northern District of California

Seidl have to agree on any action with the exception of an event
laid out in point 20.

The partnership agreement did not define the uncapitalized word "company"; however, there is no dispute that Paragraph 19 referred to decisions involving TRT. The exception detailed in Paragraph 20 concerned a buy-out, which all agree is not applicable here. The partnership agreement contained an integration clause and stated that it could be amended "only by the written agreement" of all partners (Exh. A ¶¶ 16, 19–20).[1]

### 2.   PALMER LUCKEY.

In August 2011, Seidl entered into an agreement with defendant Palmer Luckey pursuant to which Luckey was to make a prototype for a head-mounted virtual reality display according to certain specifications supplied by Seidl. That agreement included various provisions relating to confidentiality and exclusivity. Although Seidl negotiated the agreement with Luckey and ultimately signed it in his own name, Igra provided the funding for materials for Luckey's prototype. This order presumes for the sake of argument that Seidl made the agreement on behalf of TRT.

In April 2012, without informing anyone at TRT, Luckey formed Oculus LLC (later re-registered as defendant Oculus VR, LLC), and he raised more than one hundred million dollars through crowd-funding and venture financing in order to commercialize head-mounted virtual reality displays.

The complaint herein contends that Luckey violated the confidentiality and exclusivity terms of the agreement between Seidl and Luckey and misappropriated Seidl's design features.

### 3.   SEIDL'S OBJECTION.

After Oculus and its fabulous financing became public, a running dispute ensued between Seidl and Igra over whether to sue Luckey for supposedly stealing their prototype ideas. Igra wanted to sue. Seidl did not. Here are the details.

---

[1] All lettered exhibits cited herein are appended to the declaration of Mark F. Lambert or his supplemental declaration and submitted in support of defendants. Numbered exhibits 1–5 are appended to the declaration of Ron Igra and submitted in support of plaintiff. Numbered exhibits 6–15 are appended to the declaration of Charles M. Stiernberg and submitted in support of plaintiff.

2

**United States District Court**
For the Northern District of California

1    Igra requested that Seidl provide him with a copy of his agreement with Luckey.  Seidl

2    complied, via email, as follows (Exh. E) (emphasis in original):

3            Here is the [P]almer contract.

4            DO NOT CONTACT HIM OR START ANY LEGAL ACTION
             WITHOUT TALKING TO ME FIRST.

5            We need him.  Much more useful as an ally.

6    Two months later, Seidl repeated that admonition in the following exchange on Skype, a text

7    messaging platform (Exh. F at 16038) (errors in original):

8            [IGRA]:  Hi Tom.  As I mentioned on Friday, I need to talk to you

9            about our case with Palmer Luckey.  The matter is urgent and I've
             waited for over 3 weeks to hear from you, I can wait no longer.

10           I've hired a litigation lawyer [REDACTION].  Please send me
             copies of the emails or skype conversations you had with him

11           concerning the [head-mounted display].  I'm going to give you until
             5 pm tomorrow to respond to me and if I don't get your

12           cooperation, I will take legal action against you as well.

13           [SEIDL]:  Sure take legal action aghainst me and see what happens

14           [SEIDL]: what you going to sue me for?

15           [obscenities omitted]

16           [SEIDL]:  as I told you don't sue palmer

17       In March 2014, Facebook Inc. announced that it would acquire Oculus for more than

18   two billion dollars.  Igra then followed up with Seidl, again seeking his cooperation in a lawsuit

19   against Luckey so they could "both get rich," but Seidl responded, "my views on taking

20   [P]almer to court are the same as before that it makes bad financial sense for you and me"

21   (Exh. F at 16042).  Nevertheless, Igra retained counsel.

22       In April 2014, Igra commenced an action against Seidl in Hawaii state court (where

23   TRT was founded and based) seeking the production of certain documents and information

24   pertaining to the agreement with Luckey.  Igra dismissed that action without prejudice once

25   Seidl provided documents.  Then, Igra wrote the following email to Seidl (Exh. I at 8658–59):

26           I hope you will cooperate with me on this and withdraw your veto
             and give us your support so that Robert [Stone of Quinn Emanuel,

27           Igra's counsel,] and I can continue working on getting us the
             damage settlement.

28

3

United States District Court

For the Northern District of California

1

2

> The way I see it is that you have a choice to make between 2 options:
>
> 1. If you cooperate with us on this case against Palmer we can get rich from a damage settlement and I promise to make it worthwhile for you in the future business we will be doing together.
>
> 2. You choose not to cooperate — in which case I will go to great effort to get what I feel belongs to me and we will both waste time and money fighting against each other in court and veto actions. The chances of our business succeeding together would be slim to none and eventually I will hold you responsible for the damages that both you and Palmer caused me.

To this "get rich" proposal, Seidl responded, in pertinent part, regarding the veto and the progress on TRT's camera technology (Exh. I at 8655) (errors in original):

> My thoughts on the vito have not changed. Especially as video is this close and option from two sources.
>
> You said Palmer breached the contract, where was that? You said Palmer stole our ideas, which ideas were those?

In a subsequent exchange, Seidl further admonished Igra for pushing this litigation (Exh. J at 8651):

> You carry on the way with threatening Palmer you will burn the one advantage we have from dealing with Palmer, that he feels he owes us on a moral level. Because he does not owe us on a legal level. Don't go messing things up.

In December 2014, Igra filed a second lawsuit against Seidl in Hawaii over his refusal to agree to what became this very lawsuit. The Hawaii suit asserted claims for breach of fiduciary duty, breach of the partnership agreement, and wrongful appropriation of partnership opportunities. Igra sought specific performance compelling Seidl to authorize action against Luckey and to allow Igra to hire the law firm of his choice to that end. Alternatively, Igra sought an order divesting Seidl of his veto power. Igra did not seek damages (Exh. K at 9–10) (Complaint in Second Hawaii Action). The second Hawaii action remains pending. Although trial in Hawaii was originally scheduled to occur in May 2016, the parties recently agreed to continue the trial until December — *after* the trial then scheduled herein.

On January 18, 2015, at a time when the Hawaii suit was underway, Igra and Seidl met to discuss the possibility of a lawsuit against Luckey and Oculus as well as a strategy to pursue an opportunity to demonstrate to Luckey and Facebook TRT's own camera technology (which

United States District Court

For the Northern District of California

1  could capture video for use on virtual reality displays).  That night, Seidl sent Igra "minutes" of

2  the meeting stating that Seidl would write a letter to Luckey seeking to preserve rights against

3  him while also arranging a demonstration (Exh. 1 at 3847).  Igra responded on the morning of

4  January 19, adding that they planned to give Luckey two weeks to arrange for Facebook to offer

5  to acquire TRT, and "[i]f we do not receive a significant offer within 2 weeks you agreed to

6  cooperate with the lawsuit against Palmer/Oculus and thereby remove your veto" (Exh. 1

7  at 3846).

8         Still on the 19th, Seidl's response then retreated from Igra's characterization of the

9  terms, stating (Exh. 1 at 3845) (errors in original):

10             About the 2 weeks, lets see how fast we get to [Facebook CEO
              Mark Z]uckerberg.  If we are having one to one dialogue with

11            Zuckerberg in 3 week of video to palmer.  Then we should extend
              to 6 weeks that gives us enough time before statute of limitations

12            don't you think?

13            [REDACTION].  We can play by ear.  But I assure you.  If we
              getting nothing from Palmer prior to the end date to file.  I will

14            file.  I cant believe you think I am that stupid.

15            Is all about how palmer responds.  If we get zero feedback from
              Palmer after 2 weeks we go there lawyered up to facebook.  We

16            have to see how fast to zuckerberg.  That is the goal.

17         Later on January 19, Igra again pushed the two-week deadline, responding "[w]e

18  agreed to wait 2 weeks for a response and there will be no extensions unless there is an offer or

19  a very positive sign of getting one.  Let us not forget that we can still negotiate a buyout after

20  the complaint has been filed and our leverage will also be much better" (Exh. 1 at 3845).  That

21  afternoon, Seidl responded, "Happy with that.  If no positive signs in 2 weeks of contacting

22  him" (Exh. 1 at 3844).

23         Also on January 19, in a separate fork of the same email exchange, Seidl reminded Igra

24  of a further condition (Exh. Q at 8047) (errors in original):

25            Opps.  Forgot an important note to the minutes.  Think we should
              do minutes now always.

26

27            You agreed to go and see an independent attorney to evaluate the
              case.  The attorney must be made clear to that they will receive no
              money from settlement.

28

5

**United States District Court**
For the Northern District of California

1   Please CC me on all emails.  Then lets conference call.  I will give
2   him all info.  But make it clear to him from the start he is not
    getting anything from any settlement.  Must be an attorney you not
3   used in the past.

4   You should do that before making any legal play towards palmer.
    We will know how aggressive can be then.  Should only take a few
5   days for an attorney to go over the emails.  Could save $500k in
    legal bills.

6       On January 22, Igra informed Seidl by email that upon further reflection he "concluded

7   there [was] no intent on [Seidl's] part to cooperate in the case against Palmer" (Exh. S

8   at 2329).

9       Sometime in February, both Igra and Seidl contacted Luckey about arranging a

10  demonstration of TRT's camera technology.  On February 22 (after they had contacted

11  Luckey), Seidl restated his position to Igra that the priority was a business deal with Luckey,

12  "We don't need legal action against [P]almer for a deal.  We would always bluff that the case

13  is strong.  Stop wasting my time" (Exh. U at 3737).  Later that day, Seidl wrote to Igra,

14  "Again.  Do not take any legal action against [P]almer" (Exh. T at 7970).  Igra acknowledged

15  Seidl's refusal to agree regarding this action and wrote, "[u]nfortunately, your refusal to

16  cooperate in making our legal claims against Luckey are stopping the partnership from getting

17  what it is rightfully due" (Exh. U at 3736).  These were the final communications between

18  Seidl and Igra regarding this lawsuit prior to its commencement.

19      On February 24, Seidl emailed Luckey and asked him to sign a letter acknowledging

20  TRT's reservation of rights under their prior agreement in conjunction with the planned

21  demonstration, noting "Ron [Igra] says I could not speak to you without it."  The reservation of

22  rights specifically concerned TRT's rights to assert the very claims in this action but also

23  included certain confidentiality provisions relating to the technology Seidl hoped to

24  demonstrate (Exh. 2 at 997).  Although Igra is listed as a recipient of the email, Seidl's email to

25  Luckey also included a laundry list of complaints about Igra's conduct, noting that Igra's

26  counsel served "legal documents trying to stop the demo [from] going ahead," that Igra had

27  failed to deliver on promises of financial backing, and that he had refused to appear at a trade

28  conference (Exh. 2 at 994–95).  Seidl sent Luckey a second email on the 24th (Exh. 3):

United States District Court

For the Northern District of California

1
2

> Just got another letter from Ron[']s attorney trying to prevent me
> from showing you a demo.  Luckily there is nothing that stops
> me from showing you a demo.  That guy is mad.

3      The next day, Luckey responded to Seidl, with Igra copied, asking about the logistics of

4  the demonstration and stating that he couldn't sign the reservation of rights.  Instead, Luckey

5  appended the standard form Oculus nondisclosure agreement in furthering a potential

6  demonstration (Exh. 3).  Igra, as a copy recipient, then replied on February 27, stating that

7  Luckey would have to sign a rider on the nondisclosure agreement, providing that neither the

8  Oculus form agreement nor the proposed demonstration waived or limited TRT's rights to any

9  claim against Luckey or Oculus, nor would it limit the information TRT could use in

10  investigating its claims (Exh. 4 at 1935).  On March 9, Luckey refused (Exh. 5).  No further

11  communication about the demonstration occurred before Igra commenced this action in TRT's

12  name.

13        **4.      PROCEDURAL HISTORY.**

14        In May 2015, Igra commenced this action in the name of TRT against Palmer Luckey

15  and Oculus.  Immediately following the commencement of this action, Seidl told Luckey via

16  Skype text message, "just seen what Igra filed.  Was without my knowledge or permission [sic].

17  . . . .  What he has done seems to be illegal to me.  I have not signed anything or let him take

18  action against you" (Exh. M).  At his recent deposition, Seidl stated that he did not agree to

19  Igra's pursuit of this action and that he does not consider TRT's counsel herein to represent

20  him (Seidl Dep. at 21–22, 28–30).

21        Originally, counsel herein advised this Court that the Hawaii litigation (in which Igra

22  alleges Seidl breached various duties by refusing to agree to this lawsuit) would go to trial in

23  May 2016.  Based thereon, this Court allowed this action to progress, thinking that the

24  authorization issue would be resolved before an inordinate investment of time was made.  But

25  as the May 2016 trial in Hawaii approached, Seidl and Igra stipulated to postpone that trial to

26  December, evidently waiting to see how the instant case turned out, which was then set for trial

27  in September.  An order herein in May 2016 then stayed the instant case pending resolution of

28  the Hawaii litigation.

United States District Court

For the Northern District of California

1       The order staying the instant case allowed defendants to move for summary judgment

2   on the limited issue of Igra's authority to bring this action in TRT's name in light of Seidl's

3   failure to consent to this action.  The stay followed the close of fact discovery during which

4   extensive discovery was taken on the veto issue, including the depositions of both Seidl and

5   Igra.  The stay order also permitted the resolution of certain then-pending discovery disputes

6   that bore on the issues relating to this motion.  This order follows full briefing and oral

7   argument.

8                                    **ANALYSIS**

9       Igra, acting in TRT's name, argues that the email flurry on January 18–19, 2015,

10  between Seidl and Igra constituted an agreement to commence this action.  Igra also argues

11  that defendants lack standing to challenge Igra's authority and TRT's capacity to sue.

12      **1.     IGRA AND SEIDL DID NOT AGREE.**

13      Paragraph 19 of the partnership agreement provided, "for any decision regarding the

14  company Ron Igra and Thomas Seidl have to agree on any action," subject to certain

15  exceptions not applicable here.  The evidence is clear:  Seidl did not agree to commence this

16  action and maintains his objection under oath.  Contrary to Igra, the email exchange between

17  Seidl and Igra on January 18–19, 2015, following their meeting on January 18 did not override

18  Seidl's express objection.[2]

19      Seidl and Igra met on January 18 to discuss the possibility of pursuing this lawsuit

20  against Luckey and Oculus.  They then exchanged emails about a plan about which they did

21  not fully agree.  Both agreed that they intended to reach out to Palmer Luckey to set up a

22  demonstration of their ongoing video-capture technology to Mark Zuckerberg, the CEO of

23  Facebook (Oculus's parent company).  For his part, Igra insisted that if they did not have an

24  offer from Facebook to acquire TRT within two weeks, they would sue.  On the other hand,

25  Seidl resisted Igra's hard deadline and suggested they would "play it by ear" unless they got

26

27          [2] Defendants argue that TRT's evidence of Seidl and Igra's emails in January 2015 is inadmissible
    hearsay.  Defendants are correct that the email exchange is inadmissible for the purpose of proving what was
28  said at the meeting between Seidl and Igra.  (Though the exchange is described as the "minutes" of the meeting,
    there was no formalized procedure for keeping and approving minutes, so the emails do not constitute business
    records.)  The emails *are* admissible, however, to prove up the transaction represented by the emails themselves.

United States District Court

For the Northern District of California

1    "zero feedback" from Luckey.  Seidl also reminded Igra that he had to get an independent

2    assessment of the lawsuit.

3          The email exchange remained subject to certain conditions.  *First*, both partners agreed

4    to reach out to Luckey to try to demonstrate footage from their camera technology at Facebook

5    (preferably to Mark Zuckerberg) in the hopes of negotiating a buy-out of their partnership and

6    their camera technology.  The lawsuit would commence if discussions with Luckey produced

7    "no positive signs," but Seidl intended to revisit the deadline if they got traction with Luckey.

8    *Second*, Igra needed to get an independent attorney to review the viability of their claims.

9          Although Igra and Seidl dispute whether Igra ever got an independent attorney to

10   review the case (*compare* Igra Dep. at 281–84 *with* Exh. R at 2284), the first condition is the

11   main problem with Igra's January 18–19 argument.  Luckey *did* respond to Seidl and Igra, and

12   the parties began the process of arranging a demonstration of TRT's video-capture technology,

13   meaning "positive signs" appeared.  The next step stalled because Igra insisted on

14   inflammatory terms in a nondisclosure agreement.  Luckey proposed a normal nondisclosure

15   agreement, but Igra refused it.  Thus, at least one necessary condition — "no positive signs" —

16   wasn't met, for there were positive signs.

17         Most significantly, on February 22, in Seidl's final statement to Igra about this lawsuit

18   before it was filed, Seidl made very clear his objection to this suit:  "Again.  Do not take any

19   legal action against [P]almer" (Exh. T at 7970).  Igra plainly understood, responding:

20   "[u]nfortunately, your refusal to cooperate in making our legal claims against Luckey are [sic]

21   stopping the partnership from getting what is rightfully due" (Exh. U at 3736).  This veto was

22   Seidl's last word to Igra before Igra filed the instant claim.  Seidl maintains his objection

23   today.

24         This order finds on the undisputed facts that this lawsuit was filed without the mutual

25   authorization required by Paragraph 19.

26         **2.    AUTHORITY AND CAPACITY TO SUE.**

27         Under FRCP 17(b)(3), a plaintiff's capacity to sue or be sued on state law claims is

28   determined by the law of the forum state.  Both sides, therefore, agree that California law

United States District Court
For the Northern District of California

1   controls the threshold capacity and authority issues.  Both sides also agree that the law of

2   Hawaii — the place of formation for TRT and its home — controls any underlying issues

3   involving the interpretation of the partnership agreement.  In other words, the issue of whether

4   Igra alone had authority to cause TRT to sue is controlled by Hawaii law, but the effect of that

5   lack of any authority is controlled by California law.  (Both California and Hawaii have

6   enacted the Revised Uniform Partnership Act.)

7        As for internal governance, the Hawaii Uniform Partnership Act of 1999 provides the

8   default rules for partnerships.  Haw. Rev. Stat. §§ 425-101–425-144.  A partnership may set

9   aside these default rules, however, in a partnership agreement, subject to certain exceptions not

10  relevant here.  Haw. Rev. Stat. § 425-103(a).  Both sides agree that the partnership agreement,

11  not the default rules, controls the governance of the partnership between Seidl and Igra.

12       Although Section 425-112 of the Hawaii Revised Statutes provides that a partner has

13  authority to act as an agent of the partnership for the purpose of the business (*i.e.*, without

14  seeking unanimous approval of all partners), Paragraph 19 of the partnership agreement

15  unambiguously set aside that default rule.  It stated that either partner had the right to veto, *and*

16  *it expressly defined what that meant*:  "This means that for any decision regarding the company

17  Ron Igra and Thomas Seidl *have to agree* on any action . . . ."  Without Seidl's concurrence,

18  therefore, Igra lacked authority to cause TRT to commence or to continue this litigation.

19       This order turns now to the question of the *effect* of Igra's lack of authority to

20  commence this action on behalf of TRT, a point both sides agree is controlled by California

21  law.  Defendants contend that Igra's lack of authority deprives TRT of its capacity to sue

22  herein.  Igra counters that his authority (or not) is an internal partnership dispute and

23  defendants lack standing to challenge TRT's capacity on that basis.

24       At common law, a partnership was merely an aggregate of its partners, and an action

25  could only be brought in the names of all partners.  Section 369.5 of the California Code of

26  Civil Procedure did away with the common law rule and provided that a partnership had

27  capacity to sue and be sued in "the name it has assumed or by which it is known."  The

28  statutory rule did not, however, vitiate the rule that a partner can only act within the scope of

10

**United States District Court**
For the Northern District of California

1    his or her authority as allowed by the partnership agreement (or, absent an agreement, as

2    allowed by the default rules of the Uniform Partnership Act).

3         No decision from our court of appeals or from any California appellate court has

4    directly addressed whether a defendant has standing to challenge a partnership's capacity to

5    sue based on the lack of authority of the partner pursuing the action.  Several decisions relating

6    to capacity (which California law controls) in other contexts are instructive.

7         In *Pillsbury v. Karmgard*, 22 Cal. App. 4th 743 (1994), a beneficiary of a trust

8    commenced an action in his own name on behalf of the trust, contending that a letter sent by

9    the trustee authorized him to commence the action.  The defendants challenged the plaintiff's

10   authority to sue.  The plaintiff argued that the defendants lacked standing to challenge his

11   authority to sue, inasmuch as it was an "internal trust affair." *Id.* at 497.  The California Court

12   of Appeal rejected that argument and held that the plaintiff lacked standing to sue as a

13   beneficiary without authorization from the trustee.

14        In *Anmaco, Inc. v. Bohlken*, 13 Cal. App. 4th 891, 898–901 (1993), the California Court

15   of Appeal held that the director of a corporation, also a 50% shareholder, and also its president

16   had no authority to bring a suit in the name of the corporation against the other 50% owner and

17   director.  That decision rejected the contention of the director-president-half-owner that as

18   president he had implied authority to cause the corporation to sue in the event of a deadlock

19   among the directors.  The court also found the bylaws subjected the president's authority to the

20   control of the board of directors.  That decision particularly noted:

21            Pressing the corporation into litigation as a plaintiff is
             inappropriate where the other shareholder-director could claim
22           equal authority to bring suit in the corporate name.

23   *Id.* at 900.  Thus, *Anmaco* affirmed the trial court's decision to dismiss the action in light of the

24   president's lack of express or implied authority.

25        By analogy, if one partner could unilaterally cause a partnership to sue on a claim,

26   another partner could unilaterally cause a partnership to release and settle the same claim.  But

27   that, of course, would be absurd.  Those outside the partnership have a legitimate need to be

28   able to know who can act for and bind a partnership.

United States District Court

For the Northern District of California

1    In *V & P Trading Co., Inc. v. United Charter, LLC*, 212 Cal. App. 4th 126, 135–36

2   (2012), the plaintiff was a corporation that had its corporate powers suspended at the time it

3   filed the complaint.  The California Court of Appeal held the plaintiff lacked capacity to sue at

4   the time it filed the complaint.  It had not revived those powers (and thus regained the capacity

5   to sue) until after the statute of limitations had passed.  Thus, the appellate court affirmed the

6   trial court's decision finding the claims therein time barred.

7    In *Estate of Garcia-Vasquez v. County of San Diego*, No. 06-1322, 2008 WL 4183913,

8   at *6 (S.D. Cal. Sept. 9, 2008) (Judge Larry Alan Burns), a decedent's common-law wife

9   (under the law of Mexico) brought claims allegedly on behalf of the estate arising out of the

10   decedent's fatal shooting against sheriff's deputies involved in the shooting.  The district court

11   held that the estate itself (as opposed to an executor or administrator) lacked capacity to sue,

12   inasmuch as it was not a legal entity, and that the decedent's common-law wife lacked

13   authority to sue on his behalf as a personal representative.  Accordingly, summary judgment

14   was granted in favor of the defendants.

15    Courts and parties being sued have a legitimate need to determine if a suit has been

16   properly authorized by a plaintiff entity, and inquiry into such authority (or not) is proper.

17   Were this not so, to repeat, one partner could cause a partnership to sue while another partner

18   could cause it to settle and release the very same claim.  Courts and parties have a legitimate

19   need to know as well who has authority to settle a case.  Here, for example, wouldn't a

20   settlement require both Igra's and Seidl's consent to be reliable?

21    Igra cites *Delbon Radiology v. Turlock Diagnostic Center*, 839 F. Supp. 1388, 1392

22   (E.D. Cal. 1993) (Chief Judge Robert Everett Coyle), for the proposition that a defendant lacks

23   standing to challenge a partnership's capacity to sue except to avoid the concern of multiple

24   suits on the same claims (such as by multiple partners).  There, as here, the defendants argued

25   that the plaintiff lacked authority to commence a suit on behalf of a partnership under the

26   partnership agreement because one partner objected to the suit, so the remaining partner did

27   "not have the management authority to bring suit."  The partnership agreement in *Delbon* did

28   not include a veto clause.  It merely provided that each partner had an "equal voice" in the

12

United States District Court

For the Northern District of California

1   management of the partnership.  The plaintiffs responded that defendants lacked standing to

2   assert the partner's lack of authority, citing only the following excerpt from Bromberg &

3   Ribstein, *Bromberg & Ribstein on Partnership* § 5.01(d), at 5:7 (1991) (omissions in *Delbon*):

4           Third-party defendants are naturally concerned with avoiding
            liability, but their only properly cognizable concern is avoiding
5           multiple suits on the same claims.  This concern is satisfied if the
            first suit has preclusive effect . . . .  Consequently there will be
6           little or no justification for recognizing a third-party defendant's
            objection that fewer than all the partners are trying to enforce the
7           partnership's claim.

8   The treatise cited no authority.  Relying only on *Bromberg & Ribstein*, Chief Judge Coyle

9   adopted this quotation in his case and noted there was no risk of multiple suits because the

10  dissenting partner had been named as a necessary party in the action and would be bound

11  by the suit's outcome, *and* he had released any claims of liability beyond those asserted in the

12  *Delbon* action.  Thus, Chief Judge Coyle held that "[p]laintiffs' contention that defendants

13  have no colorable standing to challenge plaintiffs' authorization is reasonable." *Delbon*,

14  839 F. Supp. at 1392.  He went further, however, and held that the dissenting partner's conflict

15  of interest nullified his vote to withhold authorization of the suit, rendering the ruling on the

16  issue of standing superfluous. *Id.* at 1393.

17          Contrary to *Bromberg & Ribstein* (which, again, cited no authority), this order holds

18  that even one unauthorized lawsuit is too many.  Moreover, the district court has an

19  independent interest in being spared of civil actions that are unauthorized.  And, juries should

20  not have to sit through long trials to decide unauthorized civil actions.  Thus, a partner may not

21  unilaterally maintain an action in the name of the partnership where the defense demonstrates

22  (and timely asserts), as here, that the partnership agreement deprives him of authority to do so.

23          This holding is not at odds with *Delbon*.  *Unlike the dissenting partner in* Delbon*, Seidl*

24  *has not been named as a party herein and he has not released claims against our defendants.*

25          California law allows a single shareholder to bring a derivative action on behalf of a

26  corporation subject to strict demand, adequacy, and procedural rules.  The same is true for

27  limited partnerships (which are like corporations but in partnership form, mainly for tax

28

13

1  pass-through reasons).  Cal. Corp. Code §§ 800, 15910.02.  Significantly, however, derivative

2  actions are *not* allowed for general partnerships.[3]

3      With apologies for repetition, if Igra were deemed authorized unilaterally to assert

4  claims on behalf of TRT, then Seidl would have to be deemed authorized unilaterally to release

5  claims on behalf of TRT.  As in *Anmaco*, that result would be untenable.  Instead, the

6  partnership must have one authoritative voice.  Paragraph 19 of the partnership agreement

7  provided that the authoritative voice was conditioned on Igra and Seidl's concurrence.

8      Igra argues that defendants lack any rights under the partnership agreement and so

9  cannot avoid liability based on Seidl's refusal to agree to this suit.  Counsel cite numerous

10  decisions supporting the proposition that a third party lacks standing to enforce rights under a

11  contract, but defendants, to repeat, do not seek to assert rights under the partnership agreement,

12  so Igra's authorities are inapposite.  Defendants instead challenge the capacity and authority of

13  TRT to sue them.

14      Paragraph 19 of the partnership agreement plainly provided, "Ron Igra and Thomas

15  Seidl have to agree on any action . . . ."  The record is also clear — Seidl did *not* agree to Igra's

16  launching this lawsuit.  This is fatal.

17                                    **CONCLUSION**

18      To the extent stated above and subject to the following conditions, defendants' motion

19  for summary judgment will be **GRANTED**.  Rather than dismissing the action immediately,

20  however, this order will, for the time being, merely maintain the stay and give counsel an

21  opportunity to cure the authorization problem.  To that end, the stay previously entered will

22  remain in effect (i) until such time as Ron Igra and Thomas Seidl, the partners of Total Recall

23  Technologies, file a sworn declarations herein affirmatively and without qualification stating

24  that both authorize and agree to the maintenance of this civil action in the name of Total Recall

25  Technologies against Palmer Luckey and Oculus VR, LLC, that both ratify all actions taken

26  herein so far on behalf of Total Recall Technologies, and that both consent to continued

27

28      [3] Although it does not apply to the question of capacity, Hawaii law also provides for derivative actions for corporations and limited partnerships but not general partnerships.  *See* Haw. Rev. Stat. §§ 414-171, 425E-1002.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   prosecution of the case by the law firm of Quinn Emanuel Urquhart & Sullivan, LLP, *or*

2   (ii) until such time as a final order arrives from the Hawaii courts to the same legal effect.

3   The stay will not last indefinitely but will last at least until the end of December to allow the

4   trial in Hawaii to conclude.  A further case management conference herein will be held on

5   **JANUARY 12, 2017, AT 11:00 A.M.**  The parties shall file a joint status update no later than

6   **SEVEN CALENDAR DAYS** prior to the conference.

7          Both counsel shall promptly forward a copy of this order to Seidl's attorney.

8

9          **IT IS SO ORDERED.**

10

11   Dated:   June 16, 2016.

                                        WILLIAM ALSUP
12                                      UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28