UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TOTAL RECALL TECHNOLOGIES,

    Plaintiff,

v.

PALMER LUCKEY, et al.,

    Defendants.

No. C 15-02281 WHA

**CONTRACT CONSTRUCTION ORDER, DENIAL OF *DAUBERT* MOTIONS, AND TRIAL SETTING ORDER (TENTATIVE)**

Palmer Luckey frequented Internet forums on virtual reality and head-mounted displays, *i.e.*, modern electronic versions of the old View Master. He sold his models and kits online. Then eighteen, he came to the attention of Thomas Seidl, an entrepreneur in his mid-thirties. Seidl had developed a 3D 360° camera and he wanted to pair it with a head-mounted display to view its footage, then market the combination. He contacted Luckey to design the head-mounted display.

They exchanged many emails. These emails canvassed, among other things, the pixel count of the panel (another word for screen), the physical dimensions of the panel, the advantages and disadvantages of a single panel versus multiple panels, the weight of the overall unit, whether it should be hand-held versus helmet-style versus glasses-style, variations in the eyepiece lens, the field of view, cost, and various tradeoffs among those factors.

Luckey said he would build two prototypes for Seidl, one with a single panel and the other with two panels, so that Seidl could "demo both units." He said he needed $798 for parts and Seidl said he would send the money. Before doing so, Seidl emailed Luckey:

> Just so we are on the same page. With the initial payment to you
> I would like exclusive rights to your design unless we decide not
> to use it. I need to cover myself if we pay for development and
> then end up paying for a competitor. If our product goes like we
> think it will you will have enough money from our product to keep
> you very happy . . . .

Luckey replied:

> Yes, we are on the same page here. Once your patent hits pending,
> I am sure we can put together a contract of some sort to finalize it
> all.

This exchange occurred on April 8, 2011. The "patent" referred to Seidl's ongoing effort to obtain a patent on his 3D 360° camera. Seidl had already revealed that he was pursuing a patent on his invention but had not yet revealed to Luckey that it involved a camera, but he had said it would *not* involve gaming.

The email exchange provided no compensation for Luckey. Seidl only agreed to advance the $798 for parts. Seidl, however, alluded to unspecified riches in store for both of them (and had earlier alluded to a potential long-term "on board" role for Luckey). Until then, Luckey would be donating his time. Luckey ordered the parts and began building.

Fast forward four months.

On August 1, 2011, Seidl sent Luckey a one-and-a-half page document entitled "Nondisclosure, exclusivity and payment agreement." Its introductory paragraph stated that the agreement's "purpose" was "preventing the unauthorized disclosure of Confidential Information." Its first few paragraphs tracked conventional NDA language, all running in Seidl's favor. Tacked on at the end came paragraphs 9 and 10, which Seidl composed as follows:

> 9. Exclusivity. The Receiving party [Luckey] shall keep all
> details including drawings and part suppliers of the Head Mounted
> Display confidential and shall not aid any other person or entity in
> the design of a Head Mounted Display other than the disclosing

2

> party [Seidl]. Unless within a twelve month period from 1st july
> 2011 the receiving party has not received a minimum payment
> in royalties of 10,000 US dollars by the disclosing party. The
> exclusivity shall remain in place for a period of 10 years providing
> a minimum of 10,000 US dollars is paid from the disclosing party
> to the receiving party per annum.
>
> 10. Payments. A royalty of 2.5% shall be paid of the net profit
> made by the disclosing party from sales of the head mounted
> display to the receiving party.

Yes, that was indeed a sentence fragment in the middle of paragraph 9, the part beginning with "Unless within . . . ." And, yes, initial caps were used for "Head Mounted Display" in paragraph 9 but, no, no definitions were provided.

Luckey signed without objection or change.

The written agreement, interestingly, ignored some important points, such as:

- The document failed to expressly commit Luckey to build a prototype or anything at all. Luckey, however, had already undertaken to build two prototypes and had received money from Seidl to buy parts, although the document made no reference to this circumstance.

- The document failed to require Seidl to try to sell the product. Even though it said Luckey would receive 2.5% of any net profit from sales, the document called out no duty by Seidl to try to market or promote. What if Seidl and his successors simply sold their start-up for millions? Luckey would get none of that bonanza.

- The document left Seidl free to deal simultaneously with another source for head-mounted displays and to discard Luckey if Seidl liked someone else's work better. Put differently, the exclusivity was a one-way street.

- The document failed to expressly address ownership of the design or the prototypes or their parts and never mentioned the word "license."

Luckey built and sent the single-panel prototype first, a design they called the Mk1. On September 24, Seidl received it. He disliked it. Seidl said, "I think we really need to switch to 2 displays at this stage." Seidl's reasoning was that "Humans have about 2:1 aspect ratio but the displays are producing a 1:2 ratio" (Dkt. 349-4 at 25, Luckey 0140135). He felt two panels would better fit the viewing aspect pleasing to the human eye. Two panels, he said, would also allow for a wider field of view.

3

On October 1, by way of reply, Luckey agreed to give up on the single-panel design and to build a two-display prototype:

> Two displays it is! I was hoping that one display would be enough, but it does look like two of them might be the only option. Will start on that right away.
>
> \* \* \*
>
> The single panel solution seems ill-suited to your application but it is still something I want to play around with on my own time.
>
> Too bad that we cannot go single panel but hey, that is what testing is for! Now we know.

In February 2012, Seidl returned the Mk1 to Luckey so that he could re-use the parts. Later in February, while the next prototype remained unfinished, Seidl put pressure on Luckey to hurry up with the Mk2, saying he needed to show investors his invention and pronto too. Part of that thread went as follows (Dkt. 323-78, TR 00919) (emphasis added):

*Seidl:* *The single HMD is no use to me.*

*Luckey:* I know that now.

*Seidl:* Let's get the panel out of it [referring to the screen in the Mk1], as it can't be any use to you. The fov [field of view] was so bad.

*Luckey:* Heh, like I said, I fixed that. All the way up to 110 degrees now. But okay, I can get the panel out.

*Seidl:* If we are both going to be multimillionaires I need to raise another $20k in 6 weeks time, that's on top of the $20k I already got in this. *Will need a dual panel HMD to do that.*

On May 30, Seidl received the Mk2 (a multi-screen version) and liked it but had to wait for further footage from the 3D 360° camera before the Mk2 could be tested. No evidence has come to the Court's attention that Seidl had any problems with the Mk2. All indications are that he accepted it. Seidl's product, however, never came to market. Luckey never received any money from Seidl (other than the $798 for parts).

4

Meanwhile, Luckey had continued working for his own account on single-display units. In April 2012, Luckey went live with his Oculus website, posted about it in a virtual reality forum, and announced a Kickstarter for what he called the "Rift," which he touted as an affordable head-mounted display with a wide field of view using a single display. In June 2012, Luckey formed Oculus LLC and met with a potential business partner to discuss financing and structuring for Oculus to market the Rift. Luckey launched a successful Kickstarter for "Dk1," an assemble-yourself developer kit for the Rift on August 1, 2012.

Less than two years later in 2014, Facebook acquired Oculus for two-plus billion dollars.

After the successful Kickstarter for the Dk1, Seidl accused Luckey in September 2012 of having violated the Exclusivity provision in the August 1 contract, which Luckey denied. After news of the two-plus billion emerged in 2014, plaintiff Total Recall Technologies, Seidl's successor, filed this civil action, eventually alleging that Luckey had been obliged under the August 1 contract to offer an exclusive on the Rift to Seidl and that had he done so, the two-plus billion would have gone to plaintiff. TRT commenced this lawsuit over Seidl's objection that Luckey did "not owe [TRT] on a legal level" (Dkt. 350-10, TR 008651).

\* \* \*

The main purpose of this order is to construe the "Nondisclosure, exclusivity and payments agreement" dated August 1, 2011, the center-piece of the lawsuit. This will be a tentative ruling, and counsel will have an opportunity to critique it. This order will not determine whether or not the agreement was violated.

Interpretation of a written instrument is solely a judicial function rather than a jury function when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, and even when conflicting inferences may be drawn from extrinsic evidence so long as that evidence is not in material dispute. *Wolf v. Walt Disney Pictures & Television*, 162 Cal.App.4th 1107, 1126 (2008). In other words, if there is a credibility conflict on a point that would make a difference, then the credibility conflict must be resolved by the jury but when, as here, credibility of witnesses will not affect the inferences to be drawn

therefrom, then the judge must weigh the conflicting inferences and construe the contract. *See City of Hope Nat. Medical Center v. Genentech, Inc.*, 43 Cal.4th 375, 395 (2008).

This order finds that there were two agreements in play. The first was the April 8 email exchange (and emails leading up to it). The second was the written agreement dated August 1. The latter, though enigmatic standing alone, has a clear meaning when construed in light of the former. Here follow the details (with apologies for some repetition).

* * *

Early on, around December 23, 2010, Luckey asked, "Are you looking for . . . ownership of the design?" Seidl responded, "We would have option to license the product off you on an exclusive rights basis, provided we met some sales targets . . . ." Luckey replied, "Licensing all sounds good."

Prior to the April 8 exchange, Luckey emailed that he would build two prototypes for Seidl to demo, one with a single panel and one with two panels. He needed money for parts so he itemized a list for Seidl and it came to $798. This led to the April 8 exchange. Before sending the money, as stated, Seidl wanted the following assurance:

> Just so we are on the same page. With the initial payment to you I would like the exclusive rights to your design unless we decide not to use it. I need to cover myself if we pay for development and then end up paying for a competitor.

To which Luckey replied:

> Yes, we are on the same page here. Once your patent hits pending, I am sure we can put together a contract of some sort to finalize it all.

This sequence of events formed a contract as follows:

- Seidl would supply $798 for parts.

- Luckey would build two prototypes for Seidl, one with a single-panel design and the other with two panels.

- Seidl would have an option to acquire an exclusive license to Luckey's design until Seidl decided not to use it.

6

- Seidl might decide against both prototypes and it was left open as whether Luckey would or would not build yet more prototypes (or whether Seidl would or would not entertain more than two submissions). It was entirely possible that they would never reach agreement on a final design.

- Seidl would *not* pay Luckey for his time and effort other than to give him an unspecified share of the net profits from the future sales of any final design.

- They would eventually memorialize their agreement in a written contract.

Luckey was under no explicit deadline to finish the prototypes other than, as the law would infer, to do so within a reasonable time, taking into account the attendant circumstances, which included the fact that both sides knew Luckey was working on other VR projects, and that Seidl was paying him no immediate compensation, and that Luckey had bills to pay. For his part, Seidl was under no explicit deadline, once he received a prototype, to make a decision whether or not to exercise his option to use the prototype other than, as the law would infer, to do so within a reasonable time, taking into account the attendant circumstances.

\*        \*        \*

The August 1 written contract came along four months later. It was put together by Seidl without input from Luckey. At his deposition, Seidl could remember very little concerning how it came together but it seems clear that he found a conventional NDA on the Internet, copied it verbatim, composed and added paragraphs 9 and 10 (grammatical errors and all), and sent it to Luckey who signed without objection or modification.

This order will turn first to the pre-printed integration provision, paragraph 7, which read:

> 7. Integration. This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both parties.

This order holds that the "subject matter" was the three items in the title of the document, namely, nondisclosure, exclusivity and payments. We must also remember that paragraph 7 came from a pre-printed form off the Internet. Normally, its "subject matter" would have

merely been the conventional NDA terms.  Paragraphs 9 and 10, however, were ad hoc paragraphs added by Seidl.  They supplied "subject matter."  Even so, we should not allow the pre-printed form language of paragraph 7 to exclude consideration of the emails that led up to the August 1 agreement, given the manifest vagueness that would otherwise exist. *See* California Civil Code § 1651.  In fact, both sides agree that the April 8 exchange should be considered as permissible extrinsic evidence.

This order next addresses paragraph 9 entitled "Exclusivity," the main provision in dispute, which, to repeat, read:

> 9. Exclusivity.  The Receiving party shall keep all details including drawings and part suppliers of the Head Mounted Display confidential and shall not aid any other person or entity in the design of a Head Mounted Display other than the disclosing party.  Unless within a twelve month period from 1st july 2011 the receiving party has not received a minimum payment in royalties of 10,000 US dollars by the disclosing party.  The exclusivity shall remain in place for a period of 10 years providing a minimum of 10,000 US dollars is paid from the disclosing party to the receiving party per annum.

In paragraph 9, the first sentence required Luckey to keep confidential all details including drawings and part suppliers of "the Head Mounted Display."  This went a step further than the conventional NDA paragraphs 1 through 4, which protected information received *from* Seidl.  This extra step in paragraph 9 required that Luckey keep confidential the drawings and part suppliers of "the Head Mounted Display," *i.e.*, information generated by Luckey himself.

Although the initial capitalizations in paragraph 9 usually would have indicated a defined term, "the Head Mounted Display" went undefined in the document.  Nor did the document state any design specifications or in any way identify what "the Head Mounted Display" meant or include criteria previously discussed or defined between the parties.  Nor had any email ever defined that term.  The written agreement presupposed that the contracting parties already knew what it meant.

This order holds that reasonable persons in the positions of the parties at the time would have understood the phrase "the Head Mounted Display" in the written agreement to mean the final Luckey design, if any, accepted by Seidl for production and marketing.  The article "the"

8

indicated that, although more than one Luckey prototype might be considered, the term "*the* Head Mounted Display" referred to *the* final design. Seidl had an *option* for an exclusive license. He wasn't required to exercise it or to accept any of the prototypes. But if he did, that prototype would become "the Head Mounted Display." The drawings and part suppliers for that final design would be kept confidential, meaning Luckey could not reveal the drawings and part suppliers to others. The parties would then presumably execute a written license agreement covering the final design. This is all consistent with Seidl's December email explaining that "We would have option to license the product off you on an exclusive rights basis, provided we met some sales targets" and Seidl's April 8 email that "I would like the exclusive rights to your design unless we decide not to use it." And, it is consistent with the use of the term "the head mounted display" as used in the royalty provision.

By contrast, "a Head Mounted Display" in the second half of the same sentence referred to *any* of the prototypes tendered for Seidl's consideration. To protect exclusivity pending decision on the final design, Luckey would not aid anyone else with respect to a prototype design until Seidl decided not to use it (or the exclusivity period otherwise expired). This exclusivity would give Seidl time to evaluate a prototype before settling on the final design. Seidl could even keep both prototypes under exclusivity until he vetted them side by side. Or, he could decide right away not to use one and to wait on the other. If and when Seidl selected "a Head Mounted Display" as the final design, it would become "the Head Mounted Display."

The third (and last) appearance of the term came in the royalty provision, paragraph 10, calling for a "royalty of 2.5% . . . of the net profit . . . from sales of the head mounted display . . . ." This time, initial capitalization was not used but "the" was used. Plainly, "the head mounted display" in paragraph 10 meant the same as "the Head Mounted Display" in paragraph 9. Both meant the final design, if any, that would go into production and marketing. In other words, if Seidl used a Luckey prototype for the final design, Seidl would pay a royalty to Luckey equal to 2.5% of any net profit from sales of that specific design. Yes, for consistency, Seidl should have used initial caps in both places, but his failure to do so was

9

accidental, not meaningful. (The term "Receiving party" also got initial caps on "Received" sometimes but other times not.)

The written agreement, as stated, failed to expressly require a "license" from Luckey to Seidl or an option for one. The word "license" wasn't used. But since paragraph 10 referenced a "royalty," we may infer from the term "royalty" that an option for a license was intended and implied. The April 8 email exchange had agreed that Seidl would acquire "exclusive rights to your design unless we decide not to use it." And, as stated, a December email had earlier referenced an "option" for a "license." When considered with the no-aid restraint, the intent was to entitle Seidl to an option for an exclusive license on whatever specific prototype Seidl finally opted to use. If he decided not to use any prototype tendered for Seidl's consideration, Luckey would simply keep them all and get nothing for his trouble. Seidl had an option only on those designs tendered by Luckey for Seidl's consideration. Seidl did not have an option on any other designs in Luckey's portfolio.

To pause and to summarize, this order finds important the difference between "the Head Mounted Display" versus "a Head Mounted Display." When it came to "the Head Mounted Display," there would be, if any, but one, namely, the finalist selected by Seidl for production and marketing. Royalties to Luckey would flow *only* from it. An exclusive license would cover that specific finalist (once Seidl exercised his option for it). The drawings and part suppliers for that specific finalist would be kept confidential. By contrast, "a Head Mounted Display" referred to any Luckey prototype submitted to Seidl for evaluation. Luckey could not aid anyone else as to that same design until Seidl had decided not to use it (or led Luckey to reasonably believe that he had so decided). If Seidl decided to use a Luckey prototype as the final design, then the no-aid restraint persisted as to that design. (All exclusivity, however, remained further subject to the minimum royalty, as soon discussed.)

The foregoing is important, for the Court reads the contract more narrowly than plaintiff, who gives broad meaning to "a Head Mounted Display." Section 1642 of the Civil Code requires that "Several contracts relating to the same matters between the same parties, and made as parts of substantially one transaction, are to be taken together." This is the approach

this order has and tried to take, thereby melding the April 8 and August 1 transactions into a coherent whole.

Paragraph 9 further set forth a minimum-royalty limitation on "exclusivity":

> Unless within a twelve month period from 1st july 2011 the receiving party has not received a minimum payment in royalties of 10,000 US dollars by the disclosing party. The exclusivity shall remain in place for a period of 10 years providing a minimum of 10,000 US dollars is paid from the disclosing party to the receiving party per annum.

Despite being a grammatically flawed sentence fragment, the "Unless" clause was clearly intended to relieve Luckey from "exclusivity" in the event Seidl failed to market the final design sufficiently to reach $10,000 per annum in royalties from the 2.5% of net sales.

This order holds, contrary to defendants, that the sentence fragment beginning with "Unless" and ending with "by the disclosing party" modified the entire preceding sentence, so as to extend the confidentiality duty and the no-aid restraint until at least June 30, 2012. In other words, Seidl would have all the way to June 30, 2012, to pay Luckey at least $10,000 out of royalties during that first period (ending June 30, 2012). Meanwhile, Luckey would have to honor his exclusivity duty as to any prototype Seidl still had under consideration. The $10,000 in royalties was a condition precedent to any continuing exclusivity obligation by Luckey *after* June 30, 2012. If $10,000 in royalties were *not* paid by June 30, 2012, exclusivity would then evaporate. If $10,000 in royalties were paid to Luckey by June 30, 2012, then exclusivity would extend another year. If another $10,000 in royalties were paid in the second year, then exclusivity would extend for a third year, and so on.

However, contrary to TRT, the money would have to come *from royalties*, not from petty cash or the deep pockets of Seidl's associates. The first reason is that the words said so — "a minimum payment in royalties of 10,000 US dollars." And, Seidl himself had said so in his December 2010 email when he said that the exclusive license would be subject to meeting "some sales targets." As importantly, Luckey had a good reason, and both sides knew it, to want the minimum payment to come *from royalties from sales*. His only upside would come from the bonanza intimated by Seidl. For Luckey to become a "millionaire," as Seidl had

11

suggested, the package would have to take off in the consumer market. The agreement fixed his royalty at 2.5% of net profits from *sales* of "the head mounted display." That the minimum payment had to come from real royalties from real sales improved Luckey's chance of collecting on his upside and, correspondingly, provided an incentive for Seidl to actually get out there and sell the product in order to maintain his exclusivity.

True, the next sentence referred to $10,000 without adding the phrase "in royalties" but that did not change the explicit meaning of the key phrase "a minimum payment in royalties of $10,000 US dollars." The follow-on sentence merely indulged in short hand, the source of the money already having been stated.

*     *     *

Now, let's turn to plaintiff TRT's broader construction. Attempting to ensnare the Rift, plaintiff TRT insists that the term "Head Mounted Display" meant any commercial display by Luckey "based on five specific criteria," namely, "low-cost, light weight, low latency, 3D, with a wide field of view that the user would not see the edge of the screen" (Dkt. 322–4 at 2). This would read on a broad swath of the industry. Here are the reasons this order rejects this construction:

    (i)    The extrinsic evidence is crystal clear that Seidl said he wanted, once a prototype was evaluated, an "option to license *the* product off you on an exclusive rights basis" (Dec. 2010). He repeated the same singular tense on April 8 in asking for "exclusive rights to *your design* unless we decide not to use *it*" (emphasis added). The phrases "*the* product," "your *design*," and "not to use *it*" all referred to a single design, a unique design, as would be represented by the final design selected for production and marketing. Section 1648 of the California Civil Code provides, "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." Here, the parties contemplated a handful of prototypes with one or the other (or possibly none) becoming the finalist. Those few specific

12

designs were the *only* ones in contemplation, and the contract should be limited to them.

(ii) When Seidl asked for an exclusive in the April 8 exchange, he explained, "I need to cover myself if we pay for development and then end up paying for a competitor," meaning Seidl didn't want to pay for parts or a design that Luckey might wind up shopping to a competitor. Seidl was talking about $798 in parts, and two prototypes, not the huge swath of technology his successor-in-interest now posits. (This is probably why, when this lawsuit was filed by TRT, Seidl himself wanted no part, saying that "Luckey did not owe [TRT] on a legal level" (Dkt. 350-10 at 3, TR 008651).)

(iii) Once Seidl's bundled product hit the market, the head-mounted display part would fall into the public domain and could be copied by anyone, there being no patent protection on the head-mounted-display. This would result in the absurd result, under TRT's "based on" theory, that the entire world could copy and sell exactly its final head-mounted design but Luckey himself would be barred, for up to ten years, not only from aiding anyone in designing that very unit but also in aiding anyone in designing *any* head-mounted display "based on" the five criteria. Under Civil Code § 1638, which abhors absurdities in contract construction, this absurdity must be rejected.

(iv) The phrase "based on" is far too vague. Many films, for example, claim to be "based on a true story" but are all fiction save for a kernel of truth. Two films can be "based on" the same historical event yet be very different. The phrase "based on" is vague as can be and thus inherently overbroad and uncertain. In this regard, head-mounted displays necessarily share many similarities. They all have panels. They all have eyepieces. They all reside in mounts to block ambient light. They all are

head-mounted. Despite their similarities, there are important differences in their details, yet it still would be easy to claim one version was "based on" another.

(v) Luckey made his way in life designing head-mounted displays. Seidl knew this yet was paying him nothing for his work. Yes, it's true that Seidl told Luckey that he might later get rich, but that upside depended on Seidl's product actually getting to market, actually hitting big, and actually hitting big enough to generate large net profits (none of which ever happened). Even then, as long as Luckey received a mere $10,000 annually from royalties, he would be subject to the restraint. Given that the design of head-mounted displays remained his future, no one could have reasonably expected Luckey to promise (for up to ten years) to forego work on any head-mounted designs "based on" TRT's criteria.

(vi) For the same reason, TRT's "based on" theory would violate Section 16600 of the California Business and Professions Code, which provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." TRT's "five specific criteria" would capture a wide swath of commercially viable head-mounted displays. Under the rule of reason required under Section 16600, Seidl had no reasonable need to restrain Luckey's occupation beyond the two prototypes in question and even then for so long as Seidl had them under consideration or had the finalist under license.

\*      \*      \*

TRT's "five specific criteria" have simply been cherry-picked from the emails. As stated, TRT contends that by August 1, 2011, "Seidl and Luckey had determined that the prototype head-mounted display must have five specific criteria: low-cost, light weight, low latency, 3D, with a wide field of view that the user would not see the edge of the screen" (Dkt. 322–4 at 3). To be sure, all of these worthies lurk here and there, some more than others,

14

among the thousands of words and phrases exchanged. But, upon examination, it is obvious that counsel have cherry-picked the emails to make a list of generic criteria to read on the Rift (as well as a huge swath of VR technology). The Court has read all the emails. There never was any actual list of any such "five specific criteria." The only list of criteria Seidl ever sent was very different. That list appeared in Seidl's email dated December 13, 2010, wherein he set forth these criteria (quoted exactly):

1. Not used for military;

2. Only used indoors;

3. Need to be reasonably light weight. Something like a head-play visor kind of weight;

4. Mass market product;

5. Will need head tracking;

6. Minimum RES 720p;

7. Minimum FOV 40 degrees diagonal. Really hoping for allot more.

The next day, he added, "It will not be used for gaming," a characteristic that became important to the design because Seidl's (film) application needed lower distortion. There was less leeway to correct for distortion as to 3D 360° footage than for a video game. And, Seidl said, the interface would be "PC based only to start with" (as opposed to console based).

Here are representative examples from the emails leading up to August 1, 2011 (some of which do mention TRT's criteria):

- By December 23, Seidl had confirmed that the device would need two inputs and that they "do not want to see the edges is this possible?" to which Luckey replied, "I can easily make it so you cannot see the edges."

- On January 23, Seidl said, "Of key importance is that they are light weight and we can fit them into a sunglasses style affair rather than something [that] looks like a crash helmet."

15

- By March 1, Seidl was still refusing to "go into much more detail to the product that will be launched with your HMD until the latest patents are filed," but said, "I like that your design can be small and lite weight. This is imperative. We could almost live with the 40 degrees FOV if it meant reducing the weight/size by 30–50%."

- On March 4, Seidl emphasized, "Would really like to keep the minimum RES of the display to 800x600 even in the 50 Degrees [prototype].

- On April 7, Seidl wrote, "I do like the idea of the very wide FOV."

- On April 20, Seidl reiterated that he intended to "run off PC" rather than a battery support system.

- On May 5, Luckey advised Seidl to check with Seidl's programmers as to the drivers to be used to render the image. On May 5, Seidl wrote that, "We should be able to supply you with a software demo after Patent pending status."

- On June 16, Seidl wrote, "A problem with using one display is that we found our code when generating the images to the buffer for the head play device will sometimes get them the wrong way around . . . ."

- On July 30, Luckey wrote, "So, now that I have that NDA to you, could I have more info about your company/patent/project. I am messing around with the HMD a bit, trying to decide between two different lens sets, information about your application would be helpful . . . ."

The point is that counsel's "five specific criteria" are cherry-picked from numerous considerations and tradeoffs mentioned by Seidl and Luckey. The emails could just as easily be read to support "high resolution," "not for gaming," and "PC based." Counsel's "five specific criteria" are simply a collection of snippets to pair with "based on" to try to read on the Rift.

\*      \*      \*

Deserving of a chapter all its own is TRT's assertion of lies and deceit by Luckey. TRT insists that Luckey lied to Seidl and shined him on, leading him to believe that Luckey was working on the Mk2 when, in truth, Luckey was aiding others in the design of the Rift, all before the exclusivity period expired on June 30. The alleged lies began on Day One with

16

resume fraud, continued through August 1 with forgery of signatures of witnesses to the written agreement, then mushroomed into a studied pattern of concealment from Seidl of his work on the Rift as well as the trade show and attendant publicity that launched the Rift to stardom, all while the Exclusivity provision remained in force. From this, TRT argues, a jury could conclude that Luckey did so because he felt he was breaching his duty of exclusivity. In turn, TRT insists that the judge should let the jury decide this issue and then take the jury's finding into account in construing the contract.

On its merits, TRTs narrative has some holes. The resume fraud and signature forgery, for example, had nothing to do with the meaning of the written agreement. And, the alleged pattern of concealment is largely anchored in public statements by Luckey with the concealment part being a failure to copy them to Seidl. One may ask: Is the author of an op-ed guilty of concealment for failing to send reprints to her friends and associates?

Nevertheless, this order assumes, *arguendo*, that there is sufficient evidence from which a jury could find that Luckey misled Seidl concerning his work on the Rift. Here are some different inferences that could be drawn from such concealment:

(i) Luckey did so because he knew that work was in breach of the Exclusivity provision (TRT's preferred inference);

(ii) Luckey did so because he feared Seidl would accuse that work of breaching the Exclusivity provision (even though Luckey himself felt it was not in breach);

(iii) Luckey finally got around to studying the August 1 contract and could not be sure what it meant, given its problematic wording, but worried that Seidl would accuse him of breach;

(iv) Luckey felt overdue in finishing the Mk2 and felt it would look even worse if Seidl knew fully about his own projects;

(v) Luckey did not feel overdue on the Mk2 but expected Seidl would feel otherwise and would not want Luckey working on side projects; and

(vi) Luckey felt his own work on his own time was none of Seidl's business.

Let's assume that, in the first phase of our trial, the jury were to return a special verdict in TRT's favor that Luckey concealed his work on the Rift from Seidl and did so because he felt that work violated the no-aid clause of the Exclusivity provision. In that event, such a finding and verdict would become one of several competing inferences from the extrinsic evidence to be reconciled by the judge in construing the contract. Would that special finding and verdict upset the calculus set forth earlier in this order as to the meaning of "the Head Mounted Display" versus "a Head Mounted Display"? Or any other meaning?

The answer is no. Any contention that Luckey's projects beyond the Mk1 and Mk2 violated the no-aid clause would fail in the face of Section 16600 of the California Business and Professions Code. Under the rule of reason analysis required by *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal.5th 1130 (2020), there was no reasonable need for the contract to restrain Luckey's work other than, of course, as to those specific prototypes made for Seidl's consideration, the Mk1 and the Mk2. Therefore, it would make no difference on the question of contract construction for TRT to succeed in proving its proffer of lies and deceit, for it would only lead to a door sealed shut by Section 16600.

A second, independent reason would lead to the same result. Any such special verdict could at most create an ambiguity caused by conflicting inferences in the extrinsic evidence. The "tie breaker" of Civil Code Section 1654, which resolves ambiguities against the drafter, would apply in spades here. Seidl drafted paragraphs 9 and 10. He's the one who glommed them onto a boilerplate NDA form with an integration clause. He's the one responsible for the sentence fragment, for using initial capitalizations of "Head Mounted Display" without providing any definition, for the inconsistency in usage, *i.e.*, "head mounted display" in the royalty provision, but "Head Mounted Display" in the Exclusivity paragraph and for the use of "the" versus "a" before "Head Mounted Display." If any doubt remains as to the proper construction, all doubt should be resolved against Seidl and in favor of Luckey.

*   *   *

Given that the alleged pattern of lies and deceit, even if proven, could not possibly matter on the issue of the meaning of the contract, there remains no credibility issue for jury

determination. The extrinsic record consists of emails and instant messages. It's in writing. It's fixed. No witness has testified to anything admissible that would affect the inferences to be drawn from that fixed and written record. Self-serving "understandings" not disclosed to the other side at the time that mattered are all inadmissible. *Patel v. Liebermensch*, 45 Cal.4th 344, 352 (2008). At most, there are conflicting *inferences* to be drawn from the fixed record, but those are not *credibility* issues, so the Court must give those inferences such weight as they deserve to make sense of the contract.

This order finds that the most compelling considerations are (i) the step-by-step development of the parties' communications leading up to August 1, 2011, (ii) in light of those steps, the reasonable expectations of the parties on that date, and (iii) the writing itself. The Court's construction is the one that is most consistent with the words used, the structure of the agreement, and the inferences to be drawn from the extrinsic evidence. Of all the constructions in play, plaintiff TRT's construction is, by far, the *least* consistent with the words used and the reasonable inferences available from the extrinsic evidence.

*          *          *

Both sides have had many opportunities to set forth their competing arguments and evidence concerning contract interpretation. Nevertheless, both sides may file a critique of this order, limited to 25 pages (no attachments or declarations, please) quoting any extrinsic evidence or other passage of importance and citing precisely to the record by **NOON ON JUNE 14** (again, please, no new declarations — stick to the record). If you contend there are other specific issues of credibility that must be submitted to the jury concerning contract interpretation, please specify them and the evidence in support of your side of the issue. A rebuttal of no more than half the length of the other side's opening may be filed by **NOON ON JUNE 17**. A final construction order will then issue.

Both sides are now given an opportunity to adjust their expert reports to conform to the Court's construction. The party with the burden of proof on the issue shall do so by **NOON ON JULY 1** and that expert shall sit for deposition by **JULY 9**. The opposing report shall be due by

**NOON ON JULY 22** and that expert shall sit for deposition by **JULY 30**. There will be no reply reports.

All pending *Daubert* motions are **DENIED** without prejudice to new motions directed at the new reports. All new *Daubert* motions regarding damages likely will be decided in between the liability phase and the damages phase. There will not be time for revisions, so be reasonable from the start. The same jury will decide both phases. The jury trial will begin on **OCTOBER 4, 2021, AT 7:30 A.M.**, with a final pretrial conference at **NOON ON SEPTEMBER 29**.

No further Rule 56 motions will be allowed, but Rule 50 motions may be granted at trial.

The Court will consider all evidence received in the liability phase of the trial and then evaluate whether any adjustment to the final construction is warranted. The expert reports should take this possibility into account. It will also consider the possibility, despite the foregoing, of asking the jury to return a special verdict or interrogatory answer with respect to the alleged lies and concealment by Luckey and the reason(s) therefor, or possibly with respect to some other issue.

**IT IS SO ORDERED.**

Dated: June 7, 2021.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE