UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TOTAL RECALL TECHNOLOGIES,

    Plaintiff,

    v.

PALMER LUCKEY,

    Defendant.

No. C 15-02281 WHA

**FINAL CHARGE TO JURY IN PHASE ONE**

1. Members of the jury, it is my duty to instruct you on the law that applies to this case. A copy of these instructions will be available in the jury room for you to consult. It is your duty to find the facts from all the evidence in the case. To those facts, you must apply the law as I give it to you.

2. You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case. In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important. You must not read into these instructions or into anything the Court may have said or done as suggesting what verdict you should return — that is a matter entirely up to you.

3. The evidence from which you are to decide what the facts are consists of:

    (a) The sworn testimony of witnesses, on both direct and cross-examination, regardless of who called the witness;

    (b) The exhibits which have been received into evidence;

    (c) The sworn testimony of witnesses in depositions, read into evidence or shown by video; and

    (d) Any facts to which all the lawyers have stipulated here in the courtroom before you. You must treat any stipulated facts as having been conclusively proven.

4. Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on garden hose, may explain the presence of water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

5. In reaching your verdict, you may consider only the types of evidence I have described. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

    (a) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2

  (b) A suggestion in a question by counsel or the Court is not evidence unless it is adopted by the answer. A question by itself is not evidence. Consider it only to the extent it is adopted by the answer.

  (c) Objections by lawyers are not evidence. Lawyers have a duty to their clients to consider objecting when they believe a question is improper under the rules of evidence. You should not be influenced by any question, objection, or the Court's ruling on it.

  (d) Testimony or exhibits that have been excluded or stricken, or that you have been instructed to disregard, are not evidence and must not be considered. In addition, some testimony and exhibits have been received only for a limited purpose; where I have given a limiting instruction, you must follow it.

  (e) Anything you may have seen or heard when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

6. In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it or none of it. In considering the testimony of any witness, you may take into account:

  (a) The opportunity and ability of the witness to see or hear or know the things testified to;

  (b) The witness's memory;

  (c) The witness's manner while testifying;

  (d) The witness's interest in the outcome of the case and any bias or prejudice;

  (e) Whether other evidence contradicted the witness's testimony;

  (f) The reasonableness of the witness's testimony in light of all the evidence; and

  (g) Any other factors that bear on believability.

3

7. The weight of the evidence as to a fact does not depend on which side called witnesses or produced evidence. You should base your decision on all of the evidence regardless of which party presented it.

8. You are not required to decide any issue according to the testimony of a number of witnesses, which does not convince you, as against the testimony of a smaller number or other evidence, which is more convincing to you. The testimony of one witness worthy of belief is sufficient to prove any fact. This does not mean that you are free to disregard the testimony of any witness merely from caprice or prejudice, or from a desire to favor either side. It does mean that you must not decide anything by simply counting the number of witnesses who have testified on the opposing sides. The test is not the number of witnesses but the convincing force of the evidence.

9. A witness may be discredited or impeached by contradictory evidence or by evidence that, at some other time, the witness has said or done something or has failed to say or do something that is inconsistent with the witness's present testimony. If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness such credibility, if any, you think it deserves.

10. Discrepancies in a witness's testimony or between a witness's testimony and that of other witnesses do not necessarily mean that such witness should be discredited. Inability to recall and innocent misrecollection are common. Two persons witnessing an incident or a transaction sometimes will see or hear it differently. Consider whether a discrepancy pertains to an important matter or only to something trivial.

11. However, a witness willfully false in one part of his or her testimony is to be distrusted in others. You may reject the entire testimony of a witness who willfully has testified falsely on a material point, unless, from all the evidence, you believe that the probability of truth favors his or her testimony in other particulars.

12. In determining what inferences to draw from evidence you may consider, among other things, a party's failure to explain or deny such evidence.

4

13. In these instructions, I will refer to a party's "burden of proof." Let me explain what that means. When a party has the burden of proof on any issue by a preponderance of the evidence, which is the standard applicable to this case, it means you must be persuaded by the evidence that the allegation is more probably true than not true. To put it differently, if you were to put the evidence favoring a plaintiff and the evidence favoring a defendant on opposite sides of a scale, the party with the burden of proof on the issue would have to make the scale tip somewhat toward its side. If the party fails to meet this burden, then the party with the burden of proof loses on that issue. Preponderance of the evidence basically means "more likely than not."

14. As the plaintiff, Total Recall Technologies has the burden of proof on all issues except for one, which I will identify for you. If you find that plaintiff carried its burden of proof as to each and every element of a particular claim, your verdict should be for plaintiff on that claim. If you find that plaintiff did not carry its burden of proof as to each and every element, you must find against plaintiff on that claim. This same applies to defendant on his affirmative defense. Defendant has the burden of proof as to his affirmative defense that all contract obligations were induced by fraud.

15. You have heard about a patent. There is, however, no claim for patent infringement in this case. Nor is there any claim for misappropriation of intellectual property or trade secrets. Rather, the sole claims before you are for alleged breach of contract and alleged constructive fraud. I will now turn to the specifics of what plaintiff must prove in order to recover on those two claims. It will be for you, the jury, to decide whether or not the claims have been proven.

16. *First*, let's consider the claim for an alleged breach of contract. Plaintiff claims that Luckey breached his contractual obligations. Defendant denies this and counters that he was induced to enter into the contractual obligation by fraud, so that no enforceable contract existed in the first place. I will explain what both sides must prove on these contentions. Then I will explain the contract and its meaning for you.

5

17. To recover damages from Luckey for breach of contract, TRT must prove all of the following:

    (a) That Luckey and TRT entered into a contract;

    (b) That TRT did all, or substantially all, of the significant things that the contract required it to do or that it was excused from having to do so;

    (c) That all conditions required by the contract for performance were done or were excused;

    (d) That Luckey failed to do something that the contract required him to do or that he did something forbidden by the contract;

    (e) That TRT was harmed; and

    (f) That Luckey's breach of contract was a substantial and foreseeable factor in causing TRT's harm.

18. It is stipulated that TRT agreed to pay for parts in exchange for "exclusive rights to Luckey's design unless [TRT] decides not to use it." However, defendant contends he was induced to enter into the arrangement in the first place by fraud.

19. A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.

20. You have heard evidence that in entering into the contractual obligations, the parties contemplated that the prototype design, if accepted by Seidl, would be paired with a product Seidl was developing for production and marketing together. Lawsuits for breach of contract do not permit recovery for injury unanticipated at the time the contract was made. So lawsuits for breach of contract are generally limited to those injuries within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time.

21. In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. However, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.

22. As an affirmative defense to TRT's contract claim, defendant claims that no valid contract was created because Luckey's consent was allegedly obtained by fraud. To succeed on this affirmative defense, defendant must prove all of the following:

(a) That Seidl made representations to Luckey about Seidl's company and/or his project that were untrue and/or were misleading due to omissions;

(b) That Seidl knew that the representation was not true or was misleading;

(c) That Seidl did so to persuade Luckey to agree to the contract;

(d) That Luckey reasonably relied on the representation; and

(e) That Luckey would not have entered into the contract if he had known the truth.

23. If you decide that defendant has proven all of the above, then no enforceable contract was created and you must return a verdict in Luckey's favor on all claims.

24. In this case, you have heard considerable evidence about a two-page agreement entitled "Nondisclosure, exclusivity and payments agreement," dated August 1, 2011. This is Trial Exhibit 100. I will sometimes refer to it as "the August 1 agreement." In a trial, the judge is required to tell the jury the meaning of a contract, and I will do so now and you must follow and accept my interpretation. Remember, however, it is for you to decide if the agreement, as interpreted by me, was or was not invalid by reason of alleged fraud in the inducement and whether, if valid, it was violated.

7

25. Even before the agreement dated August 1, 2011, however, there was an earlier agreement represented by an exchange of emails, so I will start there.

26. Beginning in December 2010, Luckey and Seidl began a long series of emails concerning Seidl's desire to have Luckey design and build a head mounted display to be paired with a product Seidl was developing. Seidl emailed that it would not be used for video gaming. They discussed a number of design tradeoffs including pixel resolution, field of view, weight, cost, latency, head tracking, the number of screens, and inability to see the edges.

27. Because no mention was made of Total Recall Technologies at the time, and all of the negotiations were conducted by Seidl rather than by Total Recall Technologies, I will usually refer to Seidl instead of Total Recall Technologies to conform to the evidence. But, remember, Total Recall Technologies has whatever rights and obligations Seidl had.

28. Eventually, Luckey emailed that he would build two prototypes for Seidl to demo, one with a single panel and one with two panels. He needed money for parts so he made a list for Seidl and it came to $798.

29. On April 8, 2011, before sending the money, Seidl asked for the following assurance:

> Just so we are on the same page. With the initial payment to you I would like the exclusive rights to your design unless we decide not to use it. I need to cover myself if we pay for development and then end up paying for a competitor.

30. To which Luckey replied that day:

> Yes, we are on the same page here. Once your patent hits pending, I am sure we can put together a contract of some sort to finalize it all.

31. This sequence of events formed a contract as follows:

   (a) Seidl would supply $798 so Luckey could buy parts.

   (b) Luckey would use those parts to build and to deliver two prototypes to Seidl, one with a single panel design and the other with a two-panel design.

8

  (c) Seidl would have an option to acquire an exclusive license to one or the other of Luckey's designs, as represented by the prototypes. This option would lapse as to a design if Seidl decided not to use it.

  (d) Seidl might decide against both prototype designs and it was left open as to whether Luckey would or would not build yet more (or whether Seidl would or would not entertain more than two submissions). It was entirely possible that they would never reach agreement on a final design and entirely possible that they would reach no further agreement as to building more prototypes.

  (e) Seidl would not pay Luckey for his time and effort but would give him a share of the net profits from the future sales of any final design, the specific share not yet being stated.

  (f) They would enter into a nondisclosure agreement once a patent Seidl was trying to get on his 3D 360° camera system reached the patent pending stage.

32. At this point, Luckey was under no explicit deadline to finish the prototypes other than, as the law would infer, to do so within a reasonable time, taking into account the attendant circumstances known to both sides, including that both sides knew Luckey was working on other VR projects, that Seidl was paying him no immediate compensation, and that the parties were going to wait until Seidl's patent application became filed and pending before providing more particulars to Lucky about Seidl's product, which turned out to be a 3D 360° camera. For his part, Seidl was under no explicit deadline once he received a prototype to decide on exercising his option to use the prototype other than, as the law would infer, to do so within a reasonable time, taking into account the attendant circumstances known to both sides.

33. After the patent application became filed, Seidl sent Luckey a one-and-a-half-page document dated August 1, 2011, and entitled "Nondisclosure, exclusivity and payments agreement." Luckey signed without objection or change. This is Trial Exhibit 100.

1        34.    Its introductory paragraph stated that the agreement's "purpose" was "preventing the unauthorized disclosure of Confidential Information." Its first few paragraphs tracked conventional NDA language. The agreement defined what would be confidential information under the agreement and what would not be.

35.    Seidl added Paragraph 9 and Luckey accepted it as follows:

> 9. Exclusivity. The Receiving party [Luckey] shall keep all details including drawings and part suppliers of the Head Mounted Display confidential and shall not aid any other person or entity in the design of a Head Mounted Display other than the disclosing party [Seidl]. Unless within a twelve month period from 1st july 2011 the receiving party has not received a minimum payment in royalties of 10,000 US dollars by the disclosing party. The exclusivity shall remain in place for a period of 10 years providing a minimum of 10,000 US dollars is paid from the disclosing party to the receiving party per annum.

36.    The first sentence of paragraph 9 required Luckey to keep confidential all details including drawings and part suppliers of "the Head Mounted Display." This went a step further than the conventional NDA paragraphs 1 through 4, which protected information received *from* Seidl. This extra step in paragraph 9 covered details generated by Luckey himself.

37.    You will note that there is a sentence fragment in the middle of paragraph 9, the part beginning with "Unless within . . . ." You will note also that initial caps (meaning initial capitalizations) were used for "Head Mounted Display" in paragraph 9, which normally would have indicated a term defined in the agreement, but no definition was provided anywhere in the document or in any email (or other document).

38.    I have construed the phrase "the Head Mounted Display" as used in the written agreement to mean the final prototype design, if any, accepted by Seidl for production and marketing with the camera. The article "the" indicated that, although more than one Luckey prototype might be considered, the term "*the* Head Mounted Display" would be *the* one selected for production and marketing with the camera. Seidl had an *option* for an exclusive license. He wasn't required to exercise it or to accept any of the prototypes. But if he did, that specific prototype design would become "the Head Mounted Display." The drawings and part

10

suppliers for that final design would be kept confidential, meaning Luckey could not reveal the drawings and part suppliers to others.

39. By contrast, I have construed "a Head Mounted Display" in the second half of the same sentence in paragraph 9 to refer to *any and all* of the prototype designs delivered to Seidl for his consideration. To protect exclusivity pending decision on the final design, this provision prohibited Luckey from aiding anyone else with respect to the same design of a prototype design delivered to Seidl until Seidl decided not to use it or until Seidl led Luckey reasonably to believe he'd decided not to use it (or until the exclusivity period otherwise expired). This exclusivity would give Seidl time to evaluate a prototype design. Seidl could even keep both prototype designs under exclusivity so that he could, if he wanted, vet them side by side. Or, he could decide right away not to use one. If and when Seidl selected "a Head Mounted Display" as the final design, it would become "the Head Mounted Display" to be produced and marketed with the camera.

40. Turning now to paragraph 10, it called for a "royalty of 2.5% . . . of the net profit . . . from sales of the head mounted display . . . ." This time, initial capitalization was not used but "the" was used in the term "the head mounted display." Despite the inconsistency in capitalization, "the head mounted display" in paragraph 10 meant the same as "the Head Mounted Display" in paragraph 9. Both meant the final design, if any, that would go into production and marketing with the product Seidl was developing. In other words, if Seidl used a Luckey prototype design for the final design, Seidl would pay a royalty to Luckey equal to 2.5% of any net profit from sales of that specific design.

41. The August 1 agreement made no reference to a license or option. But since paragraph 10 referenced a "royalty," we may infer that an option for a license was intended. If Seidl decided not to use any prototype design, Luckey would get nothing for his time and effort. Seidl had an option only on those specific designs delivered by Luckey for Seidl's consideration. Seidl did not have an option on any other designs in Luckey's portfolio or on any other designs Luckey was working on for his own account or for someone else.

11

42. Using the parts purchased with Seidl's $798 or equivalent parts from his own inventory, Luckey was obliged to make a good faith effort to build prototypes designs reasonably suited to Seidl's application and criteria and to deliver them to Seidl for his consideration. In doing so, he was further obliged to take such care as necessary to keep such designs eligible for an exclusive license. The event, however, that identified a particular design being offered for option was the *delivery* of the prototype to Seidl. Until delivery, Luckey remained free to revise his works in progress and Seidl had no option rights on the various unfinished iterations left on the cutting-room floor. Nor did he have option rights on other projects Luckey had underway for himself or other clients.

43. To summarize, the difference between "the Head Mounted Display" versus "a Head Mounted Display" is important. When it came to "the Head Mounted Display," there would be but one, namely, the final design, if any, selected by Seidl for production and marketing with Seidl's product. Royalties to Luckey, if any, would flow *only* from net profits from these sales. The drawings and part suppliers for that specific design would continue to be kept confidential. By contrast, "a Head Mounted Display" referred to any Luckey prototype design delivered to Seidl for evaluation. Luckey could not aid anyone else as to any such design until Seidl decided not to use it or led Luckey to reasonably believe that Seidl decided not to use it or the exclusivity period otherwise expired.

44. Expiration of the exclusivity period was governed by the following language in paragraph 9:

> Unless within a twelve month period from 1st july 2011 the receiving party has not received a minimum payment in royalties of 10,000 US dollars by the disclosing party. The exclusivity shall remain in place for a period of 10 years providing a minimum of 10,000 US dollars is paid from the disclosing party to the receiving party per annum.

Despite being a sentence fragment, the "Unless" clause relieved Luckey from any "exclusivity" in the event Seidl failed to market the final design sufficiently to reach $10,000 per annum in royalties from the 2.5% of net sales. Specifically, the sentence fragment beginning with "Unless" and ending with "by the disclosing party" extended the confidentiality

12

1  duty and the no-aid restraint until at least June 30, 2012.  In other words, Seidl would have all

2  the way to June 30, 2012, to pay Luckey at least $10,000 out of royalties during that first

3  period (ending June 30, 2012).  Meanwhile, Luckey would have to honor his exclusivity duty

4  as to any prototype design delivered to Seidl unless Seidl decided not to use it (or had led

5  Luckey to reasonably believe he had decided not to use it).  If $10,000 in royalties were *not*

6  paid by June 30, 2012, exclusivity would then end under any and all agreements.  If $10,000 in

7  royalties were paid to Luckey by June 30, 2012, then exclusivity would extend another year.  If

8  another $10,000 in royalties were paid in the second year, then exclusivity would extend for a

9  third year, and so on.

10  45. The $10,000 had to come from royalties from actual sales of the Head Mounted

11  Display, not from petty cash or from any other source.

12  46. Plaintiff failed to pay the $10,000 in royalties.  If you find that the cause of the

13  failure to pay was a breach by Luckey, then failure to pay the $10,000 was excused.  If,

14  however, you find that even in the absence of any breach plaintiff would not have paid the

15  $10,000 from royalties to Luckey anyway, then the exclusivity period ended as of June 30,

16  2012.

17  47. The foregoing is my interpretation of the contractual obligations of the parties.

18  You must follow my interpretation.  With the benefit of this interpretation, I will now repeat

19  the elements of proof that plaintiff must prove to prevail on its claim for breach of contract.

20  48. Luckey was obligated to design and to deliver in good faith to Seidl two prototype

21  designs that were reasonable fits for the application and various design tradeoffs Seidl had

22  described, which included resolution, field of view, weight, cost, latency, head tracking,

23  number of screens, and inability to see the edges.  So long as Luckey did so, he was not

24  required to deliver further prototypes unless the parties came to a further agreement for him to

25  do so, a point that had been left open and for future discussion.  Therefore, if you find that

26  Luckey in good faith designed and built two prototypes that were reasonable fits for the

27  application and various design tradeoffs stated by Seidl, then you must find that Luckey

28  fulfilled his contractual obligations.  If you find that plaintiff has proven that Luckey did not do

13

so, then you must find that Luckey breached his contractual obligation. It does not matter that Seidl disliked one or both designs, for both sides understood from the start that Seidl would not be obligated to accept either.

49. You have heard that, for the August 1 agreement, Luckey signed the witnesses' names without permission from the witnesses. This does not affect the validity of the contract in any way, for witness signatures were unnecessary for validity in the first place. Similarly, you heard that Seidl did not sign the agreement at all. This does not affect the validity of the contract either, for no contention is made herein that Seidl was not bound by the contract. The circumstances concerning the witness signatures and the omission of Seidl's signature, however, may be considered by you in assessing credibility or any other issue in the case.

50. You have heard about the Rift and its predecessors. Plaintiff contends that the Rift or its predecessors would have been a better fit for Seidl's stated design considerations than the Mk-1 or Mk-2. I instruct you that Luckey was obligated to supply the Rift (or its predecessor) to Seidl only if at the time Luckey designed the Mk-1 and Mk-2 Luckey did not genuinely believe they were suitable for Seidl's application, did not genuinely believe were reasonable fits for the design tradeoffs stated by Seidl, and further believed the Rift or its then-predecessors would be better suited.

51. You have heard evidence that Luckey may have used parts bought with the $798 for projects other than for Seidl. If you find that this occurred, the legal remedy for such a diversion of parts would be a lawsuit for what the law calls "conversion," on the assumption that the parts bought with the $798 belonged to Seidl rather than Luckey, to recover the original cost or market value of the diverted parts. Plaintiff, however, has made no such legal claim in this case. Therefore, there can be no recovery for conversion. Nevertheless, if Luckey diverted parts bought with TRT's $798 for other projects, then you may consider that diversion with respect to Luckey's credibility and with respect to whether or not he acted in good faith with respect to his contractual obligations to Seidl. You may similarly consider evidence that Luckey used parts in the prototypes that he purchased without reimbursement.

52. Let's now turn to plaintiff's other legal claim. Apart from its claim for breach of contract, plaintiff further alleges that Luckey committed what the law calls constructive fraud. For plaintiff to succeed on this claim, you must find that plaintiff and Luckey were in a "confidential relationship." A confidential relationship is a special legal relationship that exists only between parties who do not deal on equal terms because the person in whom trust and confidence is reposed and who accepts that trust knows he or she is in a superior position to exert influence over the other party who is vulnerable.

53. So, to find for plaintiff on its constructive fraud claim, you must first find that Seidl and Luckey were in a confidential relationship and find all of the following to be true:

(a) Seidl was vulnerable to Luckey;

(b) Seidl's vulnerability to Luckey resulted in the empowerment of Luckey;

(c) Luckey knowingly solicited or accepted that empowerment; and

(d) Luckey's empowerment prevented Seidl from protecting himself.

54. The type of "vulnerability" that the law requires for a confidential relationship usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity.

55. Just because two parties are in a business relationship does not mean they are in a confidential relationship. Nor is a contractual relationship, in itself, sufficient to constitute a confidential relationship.

56. The August 1 agreement included the following language:

> The parties agree to enter into a confidential relationship with respect to the disclosure of certain proprietary and confidential information.

In this agreement, Luckey agreed to keep information provided to him and some information generated by him confidential. I instruct you that the language in the August 1 contract quoted

15

above is not itself sufficient to establish the type of confidential relationship required under the law for TRT's constructive fraud claim. Nonetheless, while the contract between Luckey and TRT, including the confidential relationship clause, is not itself sufficient to create a confidential relationship, you may consider it as one factor when determining whether TRT has proven that it was in a confidential relationship with Luckey under the principles stated above.

57. If you find that Luckey was induced by fraud to enter into the contract in question, such that the contract would not be enforceable against him, then I further instruct you that, for the same reason, no relationship of trust and confidence was formed, given that a relationship induced by fraud could have imposed no duty on Luckey.

58. If you find that plaintiff has proven it had a confidential relationship with Luckey, in order to find for plaintiff on its constructive fraud claim, you must further find:

(a) That Luckey acted on plaintiff's behalf for purposes of designing a head-mounted display for use with plaintiff's application;

(b) That Luckey knew, or should have known that, by reason of his confidential relationship, he should tell plaintiff about the Rift and its status and success;

(c) That Luckey misled plaintiff by failing to disclose this information;

(d) That plaintiff was harmed; and

(e) That Luckey's conduct was a substantial factor in causing plaintiff's harm.

59. There are some limitations on this theory of recovery. When a party enters into a business or commercial contract to deliver a product or prototypes and performs his obligations thereunder in good faith, the law of constructive fraud may not be used to require delivery of more than was bargained for.

60. You will recall that I have instructed you that Luckey and Seidl agreed that Seidl would supply $798 for parts and Luckey would supply two prototypes. Seidl was free to accept one or the other or to reject both. If you find that Luckey complied in good faith with

1  his contractual obligations with respect to the prototype designs, then the law of constructive
2  fraud would not have required Luckey to deliver or to disclose yet another prototype design to
3  Seidl. If, however, you find that Luckey failed to comply with his contractual obligations, the
4  fact that he sent the Mk-1 and Mk-2 to Seidl would not, by itself, defeat a claim for
5  constructive fraud.

6  61.  In considering whether Luckey's conduct was a substantial factor in causing
7  plaintiff's harm, you may consider whether or not, had Luckey disclosed the information about
8  the Rift to Seidl, TRT would have still failed to pay the $10,000 in royalties by June 30, 2012,
9  which failure would have ended any exclusivity.

10  62.  The only claims for you to decide concern claims against Luckey. There is no
11  claim for you to decide concerning Facebook Technologies, LLC.

12  63.  This completes my instructions on the law that applies to this case.

13  64.  This phase of the trial addresses liability issues. If you find liability has been
14  proven, then we will proceed to Phase Two to determine the amount of damages. If you find
15  liability has not been established, then the trial will be over.

16  65.  Unless otherwise stated, the instructions apply to all parties. Under the law, a
17  corporation, or a limited liability company, is considered to be a person. It can only act
18  through its employees, agents, directors, or officers. Therefore, a corporation or limited
19  liability company is responsible for the acts of its employees, agents, directors, and officers
20  performed within the scope of authority. All parties are equal before the law and a corporation,
21  partnership, or limited liability company is entitled to the same fair and conscientious
22  consideration by you as any party.

23  66.  When you begin your deliberations, you should elect one member of the jury as
24  your foreperson. That person will preside over the deliberations and speak for you here in
25  court.

26  67.  You will then discuss the case with your fellow jurors to reach agreement if you
27  can do so. Your verdict as to each claim, must be unanimous. Each of you must decide the

17

1  case for yourself, but you should do so only after you have considered all of the evidence,

2  discussed it fully with the other jurors, and listened to the views of your fellow jurors.

3    68.   Do not be afraid to change your opinion if the discussion persuades you that you

4  should.  Do not come to a decision simply because other jurors think it is right.  It is important

5  that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after

6  having made your own conscientious decision.  Do not change an honest belief about the

7  weight and effect of the evidence simply to reach a verdict.

8    69.   Some of you have taken notes during the trial.  Whether or not you took notes,

9  you should rely on your own memory of what was said.  Notes are only to assist your memory.

10 You should not be overly influenced by the notes.  When you go into the jury room, the Clerk

11 will bring in to you the trial exhibits received into evidence to be available for your

12 deliberations.

13   70.   As I noted before the trial began, when you retire to the jury room

14 to deliberate, you will have with you the following things:

   (a)   All of the exhibits received into evidence except the Rift
         exhibit, which you can view by request;

   (b)   A work copy of these jury instructions for each of you;

   (c)   A work copy of the verdict form for each of you; and

   (e)   An official verdict form.

21   71.   You do not have to discuss the questions in the strict sequence indicated in the

22 special verdict form.

23   72.   When you recess at the end of a day, please place your work materials in the

24 brown envelope provided and cover up any easels containing your work notes so that if my

25 staff needs to go into the jury room, they will not even inadvertently see any of your work in

26 progress.

27   73.   A court security officer will be outside the jury-room door during your

28 deliberations.  If it becomes necessary during your deliberations to communicate with me, you

may send a note through the marshal, signed by your foreperson, or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone — including me — how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the Court.

74. You have been required to be here each day from 7:45 a.m. to 1:00 p.m. Now that you are going to begin your deliberations, however, you are free to modify this schedule within reason. For example, if you wish to continue deliberating in the afternoons after a reasonable lunch break, that is fine. The Court does, however, recommend that you continue to start your deliberations by 8:00 a.m. If you do not reach a verdict by the end of today, then you will resume your deliberations day to day until completed.

75. It is very important that you let us know in advance, via a note, what hours you will be deliberating so that the lawyers may be present in the courthouse at all times the jury is deliberating.

76. You may only deliberate when all of you are together. This means, for instance, that in the mornings before everyone has arrived, or when someone steps out of the jury room to go to the restroom, you may not discuss the case. As well, the admonition that you are not to speak to anyone outside the jury room about this case still applies during your deliberation.

77. After you have reached a unanimous agreement on a verdict, your foreperson will fill in, date, and sign the verdict form and advise the Court that you have reached a verdict. The foreperson should hold on to the filled-in verdict form and bring it into the courtroom

when the jury returns the verdict. Thank you for your careful attention. The case is now in your hands. You may now retire to the jury room and begin your deliberations.

Dated: October 13, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE