UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TOTAL RECALL TECHNOLOGIES,

        Plaintiff,

    v.

PALMER LUCKEY, et al.,

        Defendants.

No.  C 15–02281 WHA

**POST-TRIAL MEMORANDUM OPINION**

This memorandum opinion explains various rulings made during the course of trial.

**1.    IMPACT OF CREDIBILITY ON CONTRACT INTERPRETATION.**

In the spring, at the request of the judge, the parties submitted several rounds of supplemental briefing on the issue of contract interpretation including, specifically, the extent to which the credibility of Seidl or Luckey could affect the construction of the contract.  The parties also submitted, by way of exhibits, (1) all of the pre-execution communications between Seidl and Luckey, (2) their post-execution written communications, and (3) the parties' deposition transcripts.  The judge carefully considered the briefing and the exhibits, including the hundreds of emails and Skype chats between Luckey and Seidl.

In June, an order issued giving a tentative construction of the meaning of the agreement. The order rejected TRT's argument that the asserted pattern of lies and deceit by Luckey could, even if found true, affect the meaning of the contract.  In particular, TRT argued that Luckey's

concealment of his work on the Rift from Seidl could support a reasonable inference by the jury that Luckey did so because he believed his work on the Rift was in breach of the contract which, in turn, would be evidence that the contract did, in fact, have that meaning.  Therefore, TRT argued, interpretation of the contract should go to the jury which could draw inferences about the meaning based on Luckey's concealment and other conflicting extrinsic evidence.

The contract construction order rejected that argument for two reasons.  *First*, assuming TRT could persuade a jury to make the inference described above, such line of proof would only lead to a contract interpretation foreclosed by Section 16600 of California's Business and Professions Code.  TRT was not obligated to pay Luckey anything for his work and Seidl would have had no use for Luckey's HMD designs unsuitable for Seidl's stated purpose.  Interpreting the no-aid restraint to cover all designs in Luckey's workshop, including the Rift, regardless of whether they were reasonably suitable for Seidl's purpose, would have been an unreasonable restraint of trade and competition.  Thus, TRT's preferred inference from Luckey's alleged concealment of his work on the Rift would only lead to a contractual meaning foreclosed by Section 16600.

*Second*, a jury finding that Luckey concealed his work on the Rift because he believed it breached the agreement would only be one of several competing inferences that could be drawn from the extrinsic evidence, introducing further ambiguity into the meaning of the contract language.  In such case, the "tie breaker" of California Civil Code Section 1654, which resolves ambiguities against the drafter, would apply in spades here because Seidl was entirely responsible for the ambiguities.  Thus, "[g]iven that the alleged pattern of lies and deceit, even if proven, could not possibly matter on the issue of the meaning of the contract, there remains no credibility issue for jury determination," and, therefore, the meaning of the contract was a matter for judicial construction (Dkt. 418 at 18–19).

Despite the numerous rounds of briefing on the subject, the tentative contract construction order invited the parties to file briefs critiquing the Court's construction.  The Court then issued a final contract construction order adopting the construction given in the tentative order in all material respects, rejecting TRT's critiques (Dkt. 427).  The final construction order gave the

parties "an opportunity to adjust their expert reports to conform to the Court's construction" (*id.* at 23). In addition, the final construction order stated (*id.* at 23–24):

> The Court will consider all evidence received in the liability phase of the trial and then evaluate whether any adjustment to the final construction is warranted. The expert reports and trail plans should take this possibility into account. The Court will also consider the possibility, despite the foregoing, of asking the jury to return a special verdict or interrogatory answer with respect to the alleged lies and concealment of Luckey and the reason(s) therefor, and/or possibility with respect to some other supposed credibility issue pertaining to extrinsic evidence. At all events, the judge will instruct the jury on the meaning of the agreement(s) between the parties.
>
> . . . [E]ach side must further file a statement setting forth each specific credibility issue for the jury with respect to contract interpretation and extrinsic evidence, setting forth, for each issue, the witnesses whose credibility is implicated and what difference it would make in contract interpretation.

In response, TRT repeated its argument that (Dkt. 435 at 6) (emphasis in original):

> [T]he most telling evidence that supports TRT's view that the no-aid provision must apply to designs in progress is Luckey's eventual admission in September 2012—after being accused of breaching his agreement with Seidl by launching a Kickstarter for the Rift—that his commercial pursuit of the Rift **would have been precluded** by the Exclusivity Agreement had he pursued it before July 1, 2012.

At a conference outside the presence of the jury after the third day of trial, the Court requested TRT to file a brief showing how any trial testimony given thus far raised a credibility issue which could affect the Court's contract construction (Trial Tr. 804:20–805:9).

TRT responded with two points. *First*, TRT cited Luckey and Seidl's testimonies about their subjective understandings of the meaning of Section 9 of the contract. TRT cited the following testimony from Luckey (Trial Tr. 729:24–730:18):

> Q. And you considered the meaning of head mounted display used in that section prior to signing [the August 1 contract]; right?
>
> A. Yes.
>
> Q. And you understood the meaning of head mounted display, as used in Section 9, to mean the head displays that you were building for Tom, Mr. Seidl, to use in his project; right?

A.  Yes.

Q.  And you understood that the exclusivity in Section 9 applied to designs that you build using parts that TRT paid for; right?

A.  Using — it applied to designs that I was building for Seidl, whether or not I was using parts that they had paid for.  Because, remember, some of the prototypes I built for them used parts that I paid for.  So it wasn't about what parts they had paid for.  It was about things I was making for — for them.

Q.  Well, certainly you understood that with respect to parts that they paid for, you were going to use those parts exclusively for TRT?

A.  That's right.

This exchange tracks closely the actual instruction given to the jury.  TRT also pointed to Seidl's testimony that he did not intend a distinction between the different usages of the term "Head Mounted Display" in Section 9 of the contract (*see* Trial Tr. 469:19–470:20).

The fundamental problem with these snippets is that, once again, even if accepted as per TRT's spin, they would only lead to meanings foreclosed by Section 16600 and the rule construing ambiguities against the drafter.

TRT also pointed to Seidl's trial testimony in which Seidl read back the parties' written communications from September and December 2012 in which Seidl accused Luckey of breach and Luckey responded, in part, by lying to Seidl about the timing of his work on the Rift (*see* Trial Tr. 323:18–324:2, 327:15–24, 383:15–385:10).  As noted above, TRT relied on these statements in repeatedly arguing that interpretation of the contract should be left to the jury (Dkt. 435 at 6).  The Court considered these communications, along with the hundreds of pre-dispute communications made during the course of performance and before execution of the August 1 agreement, in construing the contract.  For the reasons stated in the construction order, those statements did not present credibility issues which could have possibly affected construction of the contract.

## 2.  CONSTRUCTIVE FRAUD.

The operative complaint alleged constructive fraud against all defendants (Second Amd. Compl. ¶¶ 42–50).  "Constructive fraud is a unique species of fraud applicable only to a

4

fiduciary or confidential relationship." *Assilzadeh v. California Fed. Bank*, 82 Cal.App.4th 399, 415 (2000) (citation omitted).

### A.   CONTRACTUAL LIMITS ON CONSTRUCTIVE FRAUD.

The jury instructions placed limits on TRT's constructive fraud theory (Jury Instr. ¶¶ 59, 60):

> When a party enters into a business or commercial contract to
> deliver a product or prototypes and performs his obligations
> thereunder in good faith, the law of constructive fraud may not be
> used to require delivery of more than was bargained for
>
> [. . .]
>
> If you find that Luckey complied in good faith with his contractual
> obligations with respect to the prototype designs, then the law of
> constructive fraud would not have required Luckey to deliver or to
> disclose yet another prototype design to Seidl.

These instructions captured the concept that a finding of Luckey's good faith compliance with the contract would foreclose recovery on the constructive fraud theory that amounted to an expansion of his contractual obligations.

This is an issue of first impression, as no authority definitively bars a constructive fraud theory between contracting parties. Other district courts, however, have acknowledged that no cases have allowed a constructive fraud theory to survive where the plaintiff failed to show a breach of an underlying agreement negotiated at arm's length. *See, e.g., Magic Leap, Inc. v. Chi Xu*, 2020 WL 3268659, at *8 (N.D. Cal. June 17, 2020) (Judge Lucy Koh) (unpublished); *Dena' Nena' Henash, Inc. v. Oracle Corp.*, 2007 WL 1455905, at *6 (N.D. Cal. May 16, 2007) (Judge Claudia Wilken) (unpublished); *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 868 F. Supp. 2d 376, 384 (D. Del. 2012) (constructive fraud claim dismissed where the defendant's counterclaim "did not allege that the [plaintiff] disclosed confidential information to [plaintiff's] competitor, which could have been read to violate the NDA, or that [defendant] alleged nondisclosure of its relationship with [plaintiff's] competitor breached any clause of the NDA or other duty thereunder . . . .") (citations omitted). In *Magic Leap*, Judge Koh noted:

> [T]the Court cannot locate[] any constructive fraud claim in which
> a court has imposed duties based on a contractual relationship that

5

> were not actually contained within the contract . . . . where a
> constructive fraud claim is based solely on a contractual
> relationship, a court must consider whether the alleged
> nondisclosure breached any duty contained in the contract.

*Magic Leap, Inc.,* 2020 WL 3268659 at *8.  Applying this logic, *Magic Leap* dismissed the
plaintiff's constructive fraud claim because the agreement "merely prohibited the improper use
or disclosure of confidential information but [did] not impose any affirmative duty to disclose his
post-employment plans." *Ibid*.

Our case provides a clear example of why such a theory would demolish the separation
between contractual requirements and tortious breach of a common law duty.  The parties
negotiated the August 1 agreement at arm's length to create the parameters of their contractual
relationship.  The contract disclaimed partnership, employment, and joint venturer relationships.
It included an integration clause.  Imposing extra-contractual duties on Luckey would be grossly
unfair and would fly in the face of long-held contract principles.  See, e.g., *Shawmut Bank, N.A.
v. Kress Assocs.*, 33 F.3d 1477, 1502 (9th Cir. 1994) ("When a limiting clause . . . is included in
[a contract], the trustee's obligations are confined to the scope of the contract, and do not extend
to common law fiduciary duties").

### B.     FIDUCIARY RELATIONSHIP.

A constructive fraud claim can be based on either a fiduciary relationship or a confidential
relationship.  TRT conceded that there was no fiduciary relationship in its opposition to summary
judgment (Opp. to Summ. Judg., Dkt. 320 at 29) (footnote omitted):

> Defendants' citation to City Solutions v, Clear Channel, 201 F.
> Supp. 2d 1048 (N.D. Cal. 2002) is inapt because this case concerns
> the standard for establishing a fiduciary duty not constructive
> fraud.
>
> Instead, the most instructive case is this Court's decision in
> Jobscience, 2014 WL 852477 at *2–3, where, as here, there was no
> fiduciary relationship, but the facts demonstrated a "confidential
> relationship," a predicate for constructive fraud.

Trial is too late to reverse course.  It would be unfair.  Thus, the jury charge excluded
instructions on a fiduciary relationship in the constructive fraud section.

*C.*     *V*ULNERABILITY.

The jury charge included the following instructions (Jury Instr. ¶¶ 52, 53, 54):

> A confidential relationship is a special legal relationship that exists only between parties who do not deal on equal terms because the person in whom trust and confidence is reposed and who accepts that trust knows he or she is in a superior position to exert influence over the other party who is vulnerable.

> So, to find for plaintiff on its constructive fraud claim, you must first find that Seidl and Luckey were in a confidential relationship and find all of the following to be true:

> > (a) Seidl was vulnerable to Luckey;

> > (b) Seidl's vulnerability to Luckey resulted in the empowerment of Luckey;

> > (c) Luckey knowingly solicited or accepted that empowerment;
> > and

> > (d) Luckey's empowerment prevented Seidl from protecting himself.

> The type of "vulnerability" that the law requires for a confidential relationship usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity.

TRT contended that vulnerability is only one path to showing a confidential relationship. To dispute the inclusion of the vulnerability requirement in the jury instructions, TRT relied on *Frye v. Wine Libr.*, Inc., 2007 WL 4357596 (N.D. Cal. Dec. 11, 2007) (Judge Samuel Conti), for the proposition that a confidential relationship does not require vulnerability. True, that decision's short treatment of the confidential relationship issue did not mention vulnerability, but neither did the briefing in that case (Case No. 06-cv-05399-SC, Dkts. 10, 12, 14, 28, 42, 49).

TRT also pointed to *Vai v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 56 Cal. 2d 329 (1961), which did not specifically require "vulnerability." *Vai* involved a constructive fraud claim by a wife against her husband who had sole control over their community property. The California Supreme Court found a confidential relationship supported the wife's constructive fraud claim. *Id*. at 337–38. *Vai* made clear that confidential relationships arise when one party has "gained the confidence of the other and purports to act or advise with the other's interest in mind," stating

7

that, for example, a "relation of confidence . . . arises between physician and patient or priest and penitent." *Ibid*. These are relationships in which one party is vulnerable to the other. Further, the California Civil Code Section 1573 states that constructive fraud "consists in any breach of duty which . . . gains an advantage to the person in fault."

True, cases relied upon for inclusion of the vulnerability instruction are not all constructive fraud cases. See *Richelle L. v. Roman Cath. Archbishop*, 106 Cal.App.4th 257, 273 (2003), *as modified* (Mar. 17, 2003) (breach of fiduciary duty case holding "[t]he vulnerability that is the necessary predicate of a confidential relation, and which the law treats as 'absolutely essential,' usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity."); *Persson v. Smart Inventions, Inc.*, 125 Cal.App.4th 1141, 1162 (2005). However, TRT pointed to no authority — nor can the Court find any — suggesting that a confidential relationship supporting a constructive fraud claim should be treated any differently than a confidential relationship supporting other similar claims (*e.g.*, breach of fiduciary duty). In fact, the California Court of Appeal adopted the holding from *Richelle* to analyze the existence of a confidential relationship asserted in support of a constructive fraud theory:

> The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party.

*Brown v. Wells Fargo Bank, N.A.*, 168 Cal.App.4th 938, 960 (2008) (citing *Richelle*, 106 Cal.App.4th at 271).

### 3.   AGENCY RELATIONSHIP.

The shifting sands in this case have been an ever-swirling problem. The only possible relevance of the "agency" issue in this case is in TRT's trying now to use it to establish a fiduciary duty as a predicate for its theory of constructive fraud. TRT already had available the possible predicate of a "confidential relationship." For the following reasons, the Court ruled out the agency theory.

8

*First*, the operative complaint nowhere alleged an agency relationship.  The complaint did not so much as mention the term "agent" or "agency" nor was an agency relationship an element or component of any of the claims pled.

*Second,* as already explained, TRT had conceded that there is no fiduciary relationship.  Further, TRT quoted *Engalla v. Permanente Med. Grp., Inc*., 15 Cal. 4th 951, 977 (1997) in a footnote in their opposition to summary judgment, reciting the holding that "[a]n agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal" (Opp. to Summ. Judg., Dkt. 320 at 13 n.11).  TRT cannot now use the agency argument as a work-around for the concededly-absent fiduciary relationship.

*Third*, TRT pointed to no facts showing that Luckey ever acted on TRT's behalf in relation to a third-party.  The closest the record comes to such circumstances was Luckey's offer to negotiate with parts suppliers on Seidl's behalf.  Luckey stated (very early on):

> I can put together a prototype, I can get a full list of the suppliers you would want to deal with most likely for displays and optics, and I would not even mind if you want me to negotiate with them on your behalf.

(LUCKEY0091879).  This never occurred.  All that did occur was that Luckey provided Seidl a general list of parts, Seidl approved it, Igra advanced Luckey $798, then Luckey ordered the agreed upon parts.  On the displays, Luckey asked the seller for a better price but he was acting for himself.  It did not change the $798.  This supposed "negotiation" did not elevate Luckey to the role of "agent."

Accordingly, the jury was not instructed on either the fiduciary or agency points.

### 4. UCL.

TRT's UCL claim, completely predicated on the constructive fraud theory, was rejected by the jury.

### 5. CORPORATE DEFENDANT.

The Court granted judgment as a matter of law to Facebook Technologies, LLC.  Rule 50(a) provides:

United States District Court
Northern District of California

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A)   resolve the issue against the party; and

(B)   grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

## A.   AIDING AND ABETTING, AND CONSPIRACY.

TRT asserted that Oculus could be held vicariously liable on the theory that while acting as an officer of Oculus, Brendan Iribe aided and abetted Luckey in committing constructive fraud against TRT.

There are no reported decisions from our court of appeals or the California courts specifically construing the tort of aiding and abetting constructive fraud under California law. Nonetheless, decisions construing the tort of aiding and abetting breach of fiduciary duty are apposite because breach of fiduciary duty, or, in our case, breach of a duty of confidence, is an element of a claim for constructive fraud.  *Salahutdin v. Valley of Cal., Inc.*, 24 Cal.App.4th 555, 562 (1994).

"A defendant is liable for aiding and abetting another in the commission of an intentional tort, including a breach of fiduciary duty, if the defendant knows the other's conduct constitutes a breach of duty and give substantial assistance or encouragement to the other to so act.  The elements of a claim for aiding and abetting a breach of fiduciary duty are:  (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's own conduct was a substantial factor in causing harm to plaintiff." *Nasrawi v. Buck Consultants LLC,* 231 Cal.App.4th 328, 343 (2014) (citations omitted).

To prevail on the second element, the TRT must show that the defendant "acted to aid the primary tortfeasor with knowledge of the object to be attained," and that the defendant had "actual knowledge of the primary violation."  *Casey v. U.S. Bank Nat. Assn.*, 127 Cal.App.4th 1138, 1148 (2005) (quoting *Lomita Land Water Co. v. Robinson*, 154 Cal. 36, 47 (1908), and *Neilson v. Union Bank of Cal., N.A.*, 290 F.Supp.2d 1101, 1118 (C.D. Cal. 2003)).

Here, TRT adduced insufficient evidence from which a reasonable jury could infer that Iribe had actual knowledge of Luckey's asserted confidential relationship with TRT or his asserted breach of his duties under that relationship.

TRT relied on two evidentiary points.  *First*, TRT relied on Luckey's testimony that Luckey "had told [Iribe] and others about [the August 1 contract] by the summer of 2012" (Trial Tr. 932:24–933:1) (emphasis added).  Some context is helpful.  On September 7, 2012, Seidl emailed Luckey, referring to the large fundraiser Oculus had completed on Kickstarter the month before and accused Palmer of being in breach of contract (Trial Tr. 931:16–24; Trial Exh. 139).  Luckey testified at trial about the September 7 email exchange with Seidl as follows (Trial Tr. 932:2–933:1) (emphasis added):

> Q:  This was an e-mail that Mr. Seidl sent you on September 7, 2012; yes?
>
> A:  That's right.
>
> Q:  And he wrote:  Wow, man.  Nice work.  Yes?
>
> A:  Yes.
>
> Q:  And he posted a link to your Kickstarter page; yes?
>
> A:  Yes.
>
> Q:  And he said that you were in breach; yes?
>
> A:  Yes.
>
> . . .
>
> Q:  This was your response to Mr. Seidl that same day at 3:49 p.m.; yes?
>
> A:  Yes.
>
> Q:  Now, did anyone at Oculus help you craft this response?
>
> A:  I don't think so.
>
> Q:  Mr. Iribe knew about your contract with Mr. Seidl by then?
>
> A:  I think so.
>
> Q:  Because you had told him and others about it by the summer of 2012; yes?

1    A:  Yes.

2       *Second*, TRT pointed to the sequence of events of Iribe's participation in the formation of

3    Oculus.  The following is a summation of the relevant undisputed points from Iribe's deposition

4    testimony.  E3, a trade event for the video game industry, was held in Los Angeles on June 5–7,

5    2012.  Iribe attended E3 in his capacity as chief product officer of Gaikai, presenting Gaikai's

6    products at the event (Iribe Dep. 40:10–17).  Iribe first learned about Luckey on the second day

7    of E3 when Laurent Scallie, a virtual reality hardware and software developer and friend of Iribe,

8    emailed Iribe and told Iribe to check out John Carmack's demonstration of the Rift with the

9    "Doom 3" videogame (Iribe Dep. 107:20–108:20; Iribe ZeniMax Dep. 45:19–23; Trial Ex. 213).

10   Iribe did not go to the Carmack Rift demonstration, however, because he was focused on doing

11   the work of his own employer at the tradeshow (Iribe Dep. 108:8–20).  Shortly after E3, Scallie

12   called Iribe and told Iribe that Luckey was an "interesting guy doing some really cool stuff in

13   VR" and that Iribe should meet Luckey (Iribe Dep. 41:16–44:4).

14      On June 15, Iribe met Luckey in person for the first time at dinner with several others,

15   including Michael Antonov and Nate Mitchell, who would go on to invest in and/or become

16   employees of, Oculus (Iribe Dep. 65:2–66:17).  At the dinner, Iribe and the others heard from

17   Luckey about his background, his Rift prototype, and his ideas for the future of VR (Iribe Dep.

18   69:15–74:12).  Iribe and the others offered to "help [and] advise" Luckey with his ideas but no

19   concrete business plans were made (Iribe Dep. 72:25–74:12).  Iribe wanted to see the same

20   demonstration of the Rift as Carmack had shown at E3, but Luckey could not give a

21   demonstration at the dinner because he did not have the prototype (Iribe Dep. 75:24–81:17).

22      On June 18, Iribe sent Luckey an email with his proposal for relative ownership stakes in

23   Oculus (Trial Ex. 220).  Within a week or two of the June 15 dinner, Iribe gave Luckey a check

24   to buy parts to build a prototype to give a demonstration to Iribe and the others (Iribe Dep.

25   98:19–100:21).  On July 4, for the first time, Luckey gave a demonstration of his Rift prototype

26   to Iribe using "a virtual reality demo experiment" (Iribe ZeniMax Dep. 21:11–22:11).  On July 6,

27   Iribe officially took an ownership interest in Oculus (Trial Ex. 237).

28

United States District Court
Northern District of California

Luckey's testimony that he "had told [Iribe] and others about [the contract] by the summer of 2012" covers a lot of the calendar. Summer begins on June 21 or 22 (the summer solstice) and ends on September 21 or 22 (the autumnal equinox). See *People v. Smith*, 171 Cal.App.3d 997, 1002 (1985). So, Luckey's testimony that he told Iribe about the contract in the summer is consistent with doing so after June 30 when exclusivity ended under the contract. Moreover, Iribe himself testified that, to the best of his recollection, he had never seen the TRT-Luckey contract before this lawsuit and could not "recall any discussions with anyone relating to [the contract] before the acquisition of Oculus by Facebook" (Iribe Dep. 313:20–314:9). Counsel never asked Iribe if he had any knowledge of TRT's relationship with Luckey prior to July.

Nonetheless, assuming a reasonable jury could infer from the above that Iribe had actual knowledge of the TRT-Luckey contract in June 2012, that alone could not have been enough for a reasonable jury to further infer that Iribe had actual knowledge of the alleged confidential nature of the TRT-Luckey relationship. The basis of the constructive fraud claim was that Luckey had a confidential relationship with TRT which in turn required a showing that TRT was vulnerable to Luckey. The above evidence was insufficient for a reasonable jury to infer that Iribe had actual knowledge of any confidential relationship with TRT. In fact, the jury found there was no such relationship in the first place.

## B. CONTRACT ASSIGNMENT.

TRT did not have an agreement with Oculus. Instead, TRT claimed that Luckey "assigned his contract with TRT to Oculus" (TRT's Mem. ISO Jury Instr. at 3). TRT pointed to an agreement between Luckey and Oculus whereby Luckey assigned all his "right, title, interest in and to the [Rift]" to Oculus (*ibid.*). Thus, TRT argued, "because the Rift was subject to a contract right in favor of Luckey and TRT, the agreement between Luckey and TRT was assigned to Oculus LLC" (*id.* at 4).

That is nonsense. *First*, the Luckey-Oculus agreement made no reference whatever to the Luckey-TRT agreement so the Luckey-Oculus agreement did not "assign" the Luckey-TRT agreement to Oculus.

*Second*, TRT confused the concepts of assignment of rights and delegation of duties. "[R]ights are said to be 'assigned'; duties are said to be 'delegated.'  The phrase 'assignment of the contract,' which may refer to either or both, is avoided because 'contract' is defined in § 1 in terms of the act or acts of promising. . . .  'Assignment' is the transfer of a right by the owner (the obligee or assignor) to another person (the assignee). . . .  A person subject to a duty (the obligor) does not ordinarily have such a power to substitute another in his place without the consent of the oblige; this is what is meant when it is said that duties cannot be assigned. 'Delegation' of performance may be effective to empower a substitute to perform on behalf of the obligor, but the obligor remains subject to the duty until it has been discharged by performance or otherwise."  Restatement of the Law of Contracts (Second) § 316, cmt. c *Assignment and Delegation* (1979).

TRT's breach of contract claim against Luckey was based on his alleged breach of his contractual duties of confidentiality and exclusivity and his contractually-implied duty of good faith and fair dealing.  Luckey never delegated any of those duties to Oculus nor FBT and neither Oculus or FBT ever assumed Luckey's duties nor agreed to perform them.  Neither Oculus nor FBT can be held liable for duties they never agreed to perform.

### 6.    FRAUDULENT INDUCEMENT.

TRT brought a renewed Rule 50(b) motion to foreclose defendant's affirmative defense of fraudulent inducement, stating that "the parties' agreement is binding and that [Luckey] has never contended otherwise" (Dkt. 528; Mot. at 2).  This was denied but the jury rejected the defense so the point is now moot.

### 7.    IMPLIED WARRANTY INSTRUCTIONS.

Near the end of trial, TRT requested instructions be given on breach of the implied warranties of merchantability and fitness for a particular purpose under Sections 2314 and 2315 of California's Uniform Commercial Code (Dkt. 504).  These warranties are implied only in contracts for the sale of goods.  Cal. Com. Code § 2106.  They do not apply to the contract in our case because it was not a contract for the sale of goods, it was a contract for Luckey's labor and

United States District Court
Northern District of California

1  rights to intellectual property he produced (Contract Constr. Order at 10 "The mutual, objective

2  intent was to give Seidl an option for an exclusive license on a prototype design").

3       TRT had also proposed an instruction on breach of the implied warranty of fitness for a

4  particular purpose under California's Song-Beverly Consumer Warranty Act.  California Civil

5  Code Section 1790 *et seq.*  In addition to the fact that the TRT-Luckey contract was not a

6  contract for the sale of goods, the Song-Beverly Consumer Warranty Act does not apply because

7  TRT was a partnership, not an individual.  Cal. Civ. Code Section 1791.

8      **8.**   *DAUBERT.*

9       With respect to TRT's damages expert (Alan Ratliff), the *Daubert* motion is moot in light

10  of the verdict and without prejudice to renewal if the case ever has to be retried.

12      **IT IS SO ORDERED.**

14  Dated:  October 15, 2021

17  WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE